Slip Op. 17 - 110

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| MEYER CORPORATION, U.S., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Before: R. Kenton Musgrave, Senior Judge |
| | : | Court No. 13-00154 |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## OPINION AND ORDER

[Cross-motions for partial summary judgment granted in part and denied in part.]

Dated: August 23, 2017

*John P. Donohue* and *Rachel B. Weil*, Reed Smith, LLP, of Philadelphia, PA, and *Joseph M. Donley* and *Christopher M. Brubaker*, Clark Hill, PLC, of Philadelphia, PA, for the plaintiff.

*Beverly A. Farrell*, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, of Washington, DC, for the defendant. With her on the brief were *Chad A. Readler*, Acting Assistant Attorney General, and *Amy M. Rubin*, Assistant Director; Of Counsel on the brief was *Paula S. Smith*, Attorney, Office of Assistant Chief Counsel. International Trade litigation, U.S. Customs and Border Protection, of Washington, DC.

Musgrave, Senior Judge: This test case[1] concerns protests to and denial thereof by

U.S. Customs and Border Protection ("Customs") with respect to the plaintiff's claims on certain

sets of cookware imported into the United States for preferential treatment under the Generalized

System of Preferences ("GSP"), 19 U.S.C. §2461, *et sequentes*. Exported from Thailand, a GSP-

designated "beneficiary developing country" ("BDC"), the imports were declared on entry to consist

---

[1] The plaintiff has suspended some 21 other actions hereunder, all purportedly involving similar issues.

of sets of pot(s) and/or pan(s) made in that country that had been packaged together with one or more

glass lids imported into Thailand from the non-BDC country of their manufacture, the People's

Republic of China ("PRC").   The goods were denied preferential treatment in part due to the

presence of the lids among the sets.

             Now before the court are the parties' cross-motions for partial summary judgment on

two of the three issues raised by the plaintiff's complaint, to wit: (1) whether the sets are disqualified

from GSP preferential treatment by reason of the presence of the non-BDC component and (2)

whether the sets are properly appraised on the basis of "first sale" transaction value.[2]  The defendant

also moves to dismiss Entry No. 304-0214721-6 from the case.   Jurisdiction here being properly

invoked *per* 28 U.S.C. §1581(a) and the material facts[3] not being in dispute, summary disposition

of the two issues presented via partial cross-motions for judgment, *see* USCIT R. 56, as well as the

defendant's further rule 12(b)(1) motion is appropriate. Further, the quality of the parties' able

briefing to this point obviates the need for oral argument; therefore, the plaintiff's motion therefor

can be, and hereby is, denied as moot.

             The following explains denial of the defendant's rule 12(b)(1) motion and rulings on

the issues of substance.

---

        [2]  The plaintiff holds the last of its causes of action in reserve.  That issue is whether certain raw materials undergo a double (or dual) substantial transformation in Thailand.  For exemplar analyses of that requirement, *see. e.g.*, *Azteca Milling Co. v. United States*, 12 CIT 1153, 703 F. Supp. 949 (1988), *aff'd*, 890 F.2d 1150 (Fed. Cir. 1989); *Torrington Co. v. United States*, 8 CIT 150, 596 F. Supp. 1083 (1984), *aff'd*, 764 F.2d 1563 (Fed. Cir. 1985).

        [3]  A minor wrinkle is that while some sets are specified as including other non-BDC implements imported into Thailand, the country of origin of certain sets' other cooking implements of has not been so specified, but such uncertainty is immaterial to disposition of the cross motions.

*Discussion*

I

The defendant argues Entry No. 304-0214721-6 should be dismissed because the plaintiff's amended complaint avers that this action covers only entries made at the Port of San Francisco, California, whereas Entry No. 304-0214721-6 was entered at the Port of Los Angeles, California, and is the subject of another action, CIT Court No. 13-00226. The plaintiff opposes, arguing that such a factual discrepancy is inconsequential, that the motion does not argue a jurisdictional challenge (*e.g.*, that the protest was not timely summoned before the court), and that to the extent the discrepancy requires resolution it requests that it be permitted to amend its complaint a second time (with a formal second amended filing, if form is to be exalted over substance)[4] -- to which the defendant responds that the plaintiff should be held to its explicit statement that this action "contests the denial of certain protests filed by the Plaintiff with the Port Director of Customs at San Francisco, California." Def's Mem. of Law in Reply to Pl's Opp. to Def's Cross-Motion for Partial Summ. J. ("Def's Reply") at 16, quoting Am. Compl. ¶1.

The arguments on the substance of the case do not concern the particular port(s) through which the plaintiff made its entries, but the defendant's more significant point is that the plaintiff has not justified bringing two actions concerning the same protest and entry. At any rate,

---

[4] The plaintiff further explains that this case encompasses a very large number of entries, probably in excess of 1,000, made at different ports, and that it sought to ease the burden on the Clerk's office by trying to limit one summons to entries made at a single port to that the Clerk's office would not need to write multiple letters to multiple Port Directors when the process could be more efficiently managed; that the first summons, *i.e.*, this case, was intended to cover entries made at the Port of San Francisco and that the inclusion of Entry No. 304-0214721-6 in this case was an inadvertent oversight and should not be the basis for a motion to dismiss.

jurisdiction over Entry No. 304-0214721-6 commenced with the filing of this case.  *E.g.*, *Heraeous-Amersil, Inc. v. United States*, 1 CIT 249, 515 F. Supp. 770 (1981).  On that basis, the instant motion to dismiss will be, and hereby is, denied, and the summons and amended complaint of the matter at bar will be, and they hereby are, construed without the need for formal amendment as encompassing Entry No. 304-0214721-6 of protest 2704-12-103427.  Whether jurisdiction over that same entry could attach subsequently via Court No. 13-00226 is a question for that case, in which issue has not been joined, and which is not technically *sub judice*.  *See* USCIT R. 84(a).  Any further comment here with respect thereto would amount to mere *dicta*.

## II

## A

The parties do not dispute the propriety of classifying the imported cookware under subheading 7323.93.0045 of the Harmonized Tariff Schedule of the United States ("HTSUS"), the tariff provision for "table, kitchen or household articles . . .  Of stainless steel."  *See*, *e.g.*, Pl's Rule 56.3 Statement of Undisputed Facts ("Pl's SUF") ¶24.  Also undisputed is that the cookware were classifiable as "sets."  Some were classified pursuant to Rule 1 of the General Rules of Interpretation ("GRI"), HTSUS, and the remainder apparently classified pursuant to GRI 3(b).[5]  But whether

---

[5]  GRI 1 provides, *inter alia*, that "classification shall be determined according to the terms of the headings and any relative section or chapter notes" while GRI 3(b) provides in relevant part that "goods put up in sets for retail sale . . . shall be classified as if they consisted of the material or component which gives them their essential character, insofar as this criterion is applicable."  Explanatory Note ("EN") (X) to the ENs for GRI 3(b) elaborates that "the term 'goods put up in sets for retail sale' shall be taken to mean goods which: (a) consist of at least two different *articles* which are, *prima facie*, classifiable in different headings . . . ; (b) consist of products or *articles* put up together to meet a particular need or carry out a specific activity; and (c) are put up in a manner suitable for sale directly to users without repacking (*e.g.*, in boxes or cases or on boards)."  EN (X) (continued...)

classified pursuant to GRI 1 or GRI 3(b), if an import is properly considered to be a "set," then the

set obtains a single customs classification for the entirety rather than separate classifications for the

set's constituent parts, which is indeed how the parties approached the issue of classification.

Considering the imports to be sets as such, Customs proceeded accordingly.  Relying

on Treasury Decision ("T.D.") 91-7, 25 Cust. B. & Dec. 7 (Jan 8, 1991), Customs denied the

plaintiff's protests on the sets' preferential tariff treatment, due, in part as indicated, to the presence

of the non-BDC component glass lid(s) at the time of entry.  *Cf.* 19 C.F.R. §102.11 (country of

origin).  T.D. 91-7 came into being after the "product of" requirement was added to the GSP statute

in the wake of *Madison Galleries, Ltd. v. United States*, 12 CIT 485, 688 F. Supp. 1544 (1988),

*aff'd*, 870 F.2d 627 (Fed. Cir. 1989).[6]  T.D. 91-7 sets forth: (1) that, based on General Note 3(a)(iii),

---

[5] (...continued)
to GRI 3(b) (italics added).  "Six fondue forks", for example, do not form a "set" pursuant to
requirement (a).  *Id.  Cf. What Every Member of the Trade Community Should Know About:
Classification of Sets* at 9 (U.S. Dep't of Homeland Security, Informed Compliance Pub., March
2004).

[6] *See* 19 U.S.C. §2463(a)(2).  *Madison Galleries* addressed certain imported plates that had
first been produced as "blanks" in a non-BDC country and then advanced in value in amounts
exceeding 35 percent of their appraised value by application of finishing artwork in a BDC country.
Customs took the position that the finished plates were not eligible for GSP treatment because the
plate was not a "product of" the BDC country; however, both courts affirmed that the only statutory
conditions for the grant of duty-free treatment at the time were that the subject merchandise be
"directly shipped" from the BDC country, that 35 percent or more of the appraised value of the
subject article originate in the BDC country, and that the "substantial transformation" requirement
in the relevant Customs' regulation was therefore inapplicable regardless of that regulation's
consistency with the GSP statute; therefore, because the imported plates satisfied the statutory
conditions, the merchandise attained GSP treatment.  The relevant regulation, 19 C.F.R. §10.177(a),
provided, then as now, as follows:
> "*Produced in the beneficiary developing country*" *defined*.  For purposes of §§
> 10.171 through 10.178, the words "produced in the beneficiary developing country"
> refer to the constituent materials of which the eligible article is composed which are
> (continued...)

HTSUS, the first step to determining whether GSP may be applicable to an imported article is to

identify the proper classification under the HTSUS for it and determine if a special rate is available

for that subheading; (2) that if such a rate is available, then the next step is to confirm that the article

satisfies all of the requirements for eligibility; (3) that for sets that are classifiable through the use

of GRI 3(b) rather than GRI 1, classification of the set as a whole is determined by the item that

imparts the essential character of the set[7]; (4) that, in order to be considered the growth, product, or

manufacture of a BDC, goods imported into the BDC from a non-BDC country must undergo a

"substantial transformation" in the BDC[8]; and (5) that under the GSP, an article must satisfy the 35

percent value/content requirement[9].

            The papers argue over T.D. 91-7, over how to interpret the GSP statute for purposes

of sets classification, and also over the applicability of *Uniden Corp. v. United States*, 24 CIT 1191,

120 F. Supp. 2d 1091 (2000), a case that considered a GSP claim on a cordless phone imported as

---

        [6] (...continued)
either:
                (1) Wholly the growth, product, or manufacture of the [BDC]; or
                (2) Substantially transformed in the [BDC] into a new and different
                article of commerce.
19 C.F.R. §10.177(a).

        [7] Or, in other words, if the essential character of the set satisfies a subheading that includes
a provision for GSP treatment, then the entire set could be eligible for GSP treatment.

        [8] Or, in other words, the "product of" requirement would render an entire set ineligible for
GSP treatment when it contains an item or component that cannot be regarded as a "product of" the
BDC, which was now in contrast to such sets' treatment of GSP eligibility prior to amendment of
the GSP statute.

        [9] Or, in other words, the cost or value of the materials produced in the BDC and the direct
costs of processing operation in the BDC must be equal to or greater than that fraction of the
appraised value of the article.

a set with a detachable component (an A/C adapter) of PRC origin.  That decision concluded, albeit

in a footnote, that the "35 percent" test is used to determine what proportion of "an article" qualifies

as the product of a BDC, which means the substantial transformation test is applied to "fractions"

of the article rather than to the article as a whole, in order to determine "which components" may

be considered for GSP purposes as originating in the BDC, whereas the "product of" test considers

the article as a whole to determine if it is "wholly" the product of the BDC or has been substantially

transformed therein.  "[T]he mere fact that one detachable component is not a BDC product does not

automatically disqualify the entire article from GSP eligibility."  *Uniden*, 24 CIT at 1196 n.5, 120

F. Supp. 2d at 1096 n.5.

   The defendant argues *Uniden* was decided incorrectly and that a significant degree

of deference should be afforded to T.D. 91-7, *per* the following: (1) in 19 U.S.C. §2463(a), Congress

sought to induce trade from "least-developed beneficiary developing countries" directly to the United

States, and Customs, understandably, did not want those countries abused as mere "pass-through"

facilities; (2) Congress, for whatever reason, "left a gap" for the agency to "fill" and T.D. 91-7 filled

that gap as an interpretative rule of general applicability,[10] and unlike a ruling limited to a particular

---

[10] Elaborating further: Customs is authorized by statute not only "to issue rules and regulations governing the admission of articles under the provisions of the tariff schedule" pertaining to a claim for classification that would provide total or partial relief from duty or other import restrictions "on the basis of facts not determinable from an examination of the article itself in its condition as imported", General Note 8, HTSUS (1991), it is also charged with prescribing rules and regulations, consistent with law, to be used in carrying out the provisions of the law relating to raising revenue from imports or to duties on imports. 19 U.S.C. §66. Among the regulations so prescribed therefrom is 19 C.F.R. §177.8(b), which provides that the agency may issue, in addition to rulings addressing a specific importer's transactions, "other rulings with respect to issues or transactions described or suggested by requests for rulings submitted under the provisions of this part, or with respect to issues or transactions otherwise brought to its attention." The regulation

(continued...)

import transaction it was published in the Customs Bulletin and was issued with a degree of

formality greater than the ruling at issue in *Mead*[11] and more proximate to the level of formality

expected for *Chevron*[12] deference despite not having been subject to notice-and-comment; (4) the

statutory and regulatory scheme surrounding the administration of tariff preference programs, tariff

classification and other like issues is highly detailed and complex, and Customs brings the benefit

of specialized experience to bear on the subtle questions addressed in T.D. 91-7; (5) T.D. 91-7

creates consistency in treatment of GRI 3(b) goods for GSP, Caribbean Basin Initiative, the

Automotive Products Trade Act, the Agreement on Trade in Civil Aircraft, and other similar trade

preference programs as well as treating GRI 3(b) goods in the same manner as GRI 1 goods; (6) T.D.

91-7 as a whole establishes consistent treatment of sets and composite goods on three key issues that

can intersect, *i.e.*, marking, preferential tariff programs, and American Goods returned; and (7) T.D.

91-7 has been consistently applied by the agency since its issuance, for example in HQ 556451(Jan.

28, 1992), HQ 561454 (Dec. 14, 1999), HQ 556798 (Sep. 23, 1993), HQ 956347 (Aug. 30, 1994),

HQ 963453 (Feb. 26, 2001) and HQ 555999 (Nov. 20, 1991).

        To which the plaintiff responds that *Chevron* is inapplicable, because the statute's

meaning is "plain". Pl's Opp. to Def's X- Mot at 8. The plaintiff criticizes T.D. 91-7 as adding a

---

[10]   (...continued)
further explains that "[t]hese rulings, which are statements of the official position of the Customs
Service [that] are likely to be of widespread interest and application, are published in the Customs
Bulletin, as described in §177.10." 19 C.F.R. §177.8(b). The defendant contends Customs issued
T.D. 91-7 consistent with such authority.

[11]   *United States v. Mead Corp.*, 533 U.S. 218 (2000).

[12]   *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984).

fourth requirement (that every single one of the components of a set claiming GSP preferential treatment must be the "product of" a BDC including substantial transformation thereof therein) that does not exist in the statute, and the plaintiff stresses that *Uniden* did address the same legal question that is relevant here (*i.e.*, whether a single detached component could be the basis, without more, of a disqualification for GSP treatment) and held that it could not, after reasoning that the GSP statute mandates that the "product of" rule and the 35 percent rule of substantial transformation must be read as applying to "the article" as a whole.

The defendant, curiously, "agree[s] with the *Uniden* court that the 'product of' requirement must be applied not to each detachable component, but to the imported article as a whole", but it then contends "the article as a whole includes all of its detachable components, and in Meyer's case all of those components are not the 'growth, product, or manufacture' of the BDC." Def's Resp. at 27.  In any event, the defendant's expressed concern over "finding that only the component which imparts the essential character to the finished article must be substantially transformed would open the door for all kinds of significant non-originating goods to be included with originating goods to receive GSP treatment", *id.*, is not unreasonable.  On the other hand, this court does not agree with the defendant's statement which follows: "[a]n approach more keeping with the purpose of GSP (and the statutory amendment adding a 'product of' requirement to GSP) is to interpret the statute to require that all integral (*i.e.*, non *de minimis*) component pieces of the finished article must be substantially transformed", *see id*.  Indeed, after considering the parties' papers and the law, such as it is, this court is unpersuaded by either party's argument on how the GSP statute applies to this "sets" case.

B

In considering the GSP statute, the court concludes that neither *Uniden* nor T.D. 91-7

is adequate to the context here, and that a fresh approach is necessary. *Cf. Kamen v. Kemper Fin.*

*Servs., Inc.*, 500 U.S. 90, 99 (1991) ("[w]hen an issue or claim is properly before the court, the court

is not limited to the particular legal theories advanced by the parties, but rather retains the

independent power to identify and apply the proper construction of governing law") (citing *Arcadia*

*v. Ohio Power Co.*, 498 U.S. 73, 77 (1990)). That approach stems from the parties' disagreement,

which actually indicates agreement: that despite amendment, the GSP statute does not specifically

address how the additional "product of" requirement and the existing "35 percent of appraised value"

requirement are to be applied to the context of sets containing both BDC and non-BDC components

that are discreet and detachable for purposes of the GSP trade preference program.

The problem confronting the prospect of GSP eligibility for the Thai-made pots and

pans of these cookware sets at entry was the fact that, generally speaking, by classifying the entirety

of a set under a single tariff provision pursuant to GRI 3(b), thereby the HTSUS may seem to force

the assumption of a single country of origin for the purpose of its components' dutiability as well.[13]

*See, e.g.* T.D. 91-7, 25 Cust. B. & Dec. at 14-16. The parties also appear to have proceeded on the

assumption that "article" in the GSP statute can be construed to cover a single rate of duty (including

---

[13] Further speaking generally, international trade flows are currently computed by attributing
the full commercial value of a product to the origin of the last country where it underwent substantial
transformation. *Cf.* 19 U.S.C. §1304 (marking of articles) *and* 19 U.S.C. §1485 (entry declaration)
*with* 19 C.F.R. §141.86(a) ("[e]ach invoice of imported merchandise, must set forth . . . [t]he country
of origin of the merchandise") *and* 19 C.F.R. §134.1(b)("[c]ountry of origin means the country of
manufacture, production, or growth of any article of foreign origin entering the United States" and
"[f]urther work or material added to an article in another country must effect a substantial
transformation in order to render such other country the country of origin") (internal quotes omitted).

duty-free) for a "set" containing both BDC components and non-BDC components, and thus the

Thai-made pots and pans were presented on entry as one or more of the component parts of the kinds

of sets that obtain a singular tariff classification pursuant GRI 3(b).  And it is axiomatic, of course,

that merchandise is evaluated in its condition as imported on entry.  *E.g.*, *Worthington v. Robbins*,

139 U.S. 337 (1891).

Obviously, the set as a whole was manifested in a single country when the pots/pans

were packaged in combination with the lids, cooking implements, *et cetera*.  But, 19 U.S.C.

§2463(a)(2)(B) denies that "an article" becomes the growth, product or manufacture of a BDC

merely by having undergone, *inter alia*, "simple combining or packaging operations".  That does not

mean, of course, that the presence of the non-BDC component rendered the entered merchandise

"not sets" as such, only that, contrary to the plaintiff's assertions in this regard, the defendant is

correct in arguing that merely being put up for sale as part of a pot/pan set combination changes

nothing about the character, "essential" or otherwise, of the lids.  *See also* 19 C.F.R. §10.176(a)(2).

On the other hand, this is not, apparently, a case of a BDC being used as a "pass

through" operation for the purpose of combining a non-BDC component with BDC components,

which is to say this is not a case of non-BDC lids being exported "in search of" BDC components

with which they could combine and thereby avoid customs duties.  The tariff provision under which

the imports were classified, subheading 7323.93.00, HTSUS, is not in dispute, implying that the "of

iron or steel" characteristic of these stainless steel, Thai-made, table, kitchen and other household

articles obviously imparted their sets' essential character, and that the glass and/or the lids of non-

BDC origin did not.[14]  In short, it is the pots and pans, regardless of their country of origin, that

informed the classification of these sets under a single tariff provision.[15]  But that does not answer

the question of the proper dutiability of the sets: that question is informed by the sets' constitution.

In T.D. 91-7's discussion of subheading 9801.00.10, HTSUS, which provides for

duty-free (re)entry of merchandise of U.S. origin that has not been advanced in value or improved

in condition while abroad (*i.e.*, not having undergone substantial transformation abroad, which is

analogous to the glass lids at issue after importation into Thailand), Customs considered the

circumstance of a battery-charger set consisting of both U.S.-origin and foreign-origin component

articles.  Subscribing to the views expressed in *Superscope, Inc. v. United States*, 13 CIT 997, 727

F. Supp. 629 (1989), Customs first rejected the argument "that if two items in a four-item set are

granted subheading 9801.00.10, HTSUS, treatment, the remaining two foreign-origin items may no

longer qualify, by themselves, as a set and, therefore, each item should be separately classified."  25

Cust. B. & Dec. at 10:

> In our opinion, a set or mixed or composite goods can exist, within the meaning of
> GRI 3(b), even though a portion of the collection consists of American goods
> returned. . . . [T]he presence of American goods returned in a set (also containing

---

[14]  Obviously, and to the extent further discussion of essential character is even necessary
here: the essence of pots and pans is to contain and cook, and they can serve those functions  with
or without lids; and while lids may complete or enhance that purpose, they are merely incidental
thereto and serve no purpose otherwise without the pots/pans to which they are intended to be fitted
or combined.

[15]  Which is consistent with the fact that classification under the HTSUS is driven first and
foremost by what the article *is*, not where it comes from.  *Cf.*, *e.g.*, 25 Cust. B. & Dec. at 14 ("the
first step in determining whether sets or mixed or composite goods are entitled to special duty
treatment under one or more of the tariff preference programs is to ascertain the proper classification
of the article pursuant to the GRI's").  Only after a determination on what the article is do the other
facets of customs duty concerns come into play: *exampli gratia*, country of origin, *et cetera*.

foreign-origin items) should not destroy the identity of the set and frustrate the purpose of GRI 3(b), which is to facilitate the classification of sets, mixtures and composite goods by permitting the components or items to be classified under a single HTSUS heading.

*Id*. Customs then explained that as a practical matter it would classify sets consistent with GRI 3(b) under the tariff provision that covers the item in the set that imparts the set's essential character, and would then determine whether any of the items in the set qualify for duty free treatment under subheading 9801.0010, HTSUS -- in other words, the items would be classified as a set in Chapters 1-97, HTSUS, but Customs would apply a "classification allowance" under Chapter 98 for qualifying items within the set. *Id*. at 11-12.

That is indeed practical. And reasonable. However, in T.D. 91-7's discussion of the eligibility of sets for special tariff treatment programs, Customs did not apply similar reasoning but assumed that the addition of the "product of" requirement to the GSP statute meant each component of a set claiming a preferential rate must be the "product of" the BDC, or the set as a whole would not be granted preferential treatment. *See id*. at 14-15.GRI 3(b). This assumption is incorrect.

The plain language of the GSP statute extends trade preference to "articles". It does not extend to countries *per se*, but confers authority on the President to designate any or all of the "articles" of a BDC as "eligible articles." 19 U.S.C. §2463(a)(1). Of "sets," there is no indication. And it is notable that in 19 U.S.C. §2463 the plural form of the term is used in subsection (a)(1) while the singular form is used in subsections (a)(2)'s and (a)(3)'s description of the three requirements for preferential treatment: (1) the "article" must be "wholly"[16] the growth, product or

---

[16]   *Cf*. 19 U.S.C. §2463(a)(2) ("growth, product, or manufacture of a" BDC) *with id*. §2463(a)(3)(A) ("*wholly* the growth, product, or manufacture of a" BDC) (italics added).

manufacture of the BDC (*i.e.*, the "product of" requirement),  (2) the "article" must be imported

directly from the BDC to the United States, and (3) the sum of the cost or value of the materials

produced in the BDC and the direct costs of processing operations performed in the BDC must be

at least 35 percent of the appraised value of the "article" (*i.e.*, the "35% requirement").  *See* 19

U.S.C. §2463(a)(2).

      Congressional use of the plural and the singular ("article") cannot be read as

unintentional.  Similarly, the references to the plural forms in the statutory provision that is GRI 3(b),

HTSUS, which appear therein, are likewise construed intentional, *e.g.*, in the phrase (italics added)

"*goods* put up in sets for retail sale . . . shall be classified as if *they* consisted of the material or

component which gives them *their* essential character" *et cetera*.  EN (X), as already noted, clarifies

that "the term 'goods put up in sets for retail sale' [*i.e.*, "sets"] shall be taken to mean goods which:

(a) consist of at least two different *articles* which are, *prima facie*, classifiable in different headings

. . . ; (b) consist of products or *articles* put up together to meet a particular need or carry out a

specific activity; and (c) are put up in a manner suitable for sale directly to users without repacking

(*e.g.*, in boxes or cases or on boards)."  EN (X) to GRI 3(b) (italics added).[17]

      "Article" and "set" are not interchangeable terms.  In common parlance, "an article"

might be used to refer to a "set", but the reverse is not true.  For classification purposes, "set" is

shorthand for an aggregate, comprised of at least two different articles intended to a common or

complementary purpose, but it is a distinct term with a distinct meaning.  *See id*.  Further obvious

---

[17]  "The EN provide persuasive guidance and 'are generally indicative of the proper interpretation,' though they do not constitute binding authority."  *Schlumberger Technology Corp. v. United States*, 845 F.3d 1158, 1164 (Fed. Cir. 2017), quoting *Kahrs International, Inc. v. United States*, 713 F.3d 640, 645 (Fed. Cir. 2013).

is the fact that there is nothing inherent about a "set" that requires for classification purposes that it be comprised of articles from a single country of origin, as is the logic that simply because two or more articles have different countries of origin does not mean that those articles cannot constitute a set.  *See* 25 Cust. B. & Dec. at 10, *supra*.  Indeed, T.D. 91-7 itself recognized the reality of that "difficulty" by requiring components of sets to be marked with their respective countries of origin. *See id.* at 17.  It is also noteworthy that the distinction between "article" and "set" in U.S. customs law has for long predated the GSP, which was established by the 1974 Trade Act, and the HTSUS, which was established by the 1988 Omnibus Trade and Competitiveness Act,[18] and enactment of the HTSUS or GSP did not alter the understanding of these terms in customs law.

In view of the foregoing, the court concludes that by assuming that the GSP statute and its requirements can be construed *as a description of* (and are therefore intended to be directly applicable to the question of preferential treatment for) the singular "set" *taken as a whole* (*i.e.*, as "an article"), the parties' assumption unreasonably conflates customs classification pursuant to GRI 3(b) with the special preferential treatment of the singular "an article" (*i.e.*, whether or not "an article" is imported as part of a set) that Congress intended the GSP statute to benefit.  The defendant urges deference to TD 91-7, but to the extent T.D. 91-7 has the effect of denying preferential treatment to "an article" that is otherwise eligible for the benefit of GSP simply because it has been "put up in sets for retail sale" together with one or more non-BDC component articles that are not *de minimis*, the purpose of the GSP statute is thereby undermined.  In turn, the plaintiff argues that

---

[18]  *See, e.g.*, *United States v. Citroen*, 223 U.S. 407, 413 (1912), (construing certain act of 1897, *inter alia*, on "[a]rticles commonly known as jewelry. . . including precious stones set, pearls set or strung").

its sets when analyzed as a whole satisfy the GSP requirements for eligibility, but allowing a non-*de minimis* non-BDC component article the benefit of preferential tariff treatment simply by virtue of its being a component part of the set would also undermine the purpose of the GSP statute.   Either instance contorts the GSP statute into covering a condition that is beyond that which the language adopted by Congress apparently contemplates.

Simply put: classification pursuant to GRI 3(b) of "an article" (*e.g.* a set) is a distinct consideration apart from preferential duty-free treatment of "an article", and the two articles are not at the same level of consideration.   Customs classification, *i.e.*, the process of official import recognition, is based on the *contours* of the set, as a whole, while GSP analysis, which is concerned with dutiability, considers whether and to what extent preferential treatment extends to the *content* of the set.   The defendant argues Customs' rulings recognize a *de minimis* exception to the general proposition that the "product of" criterion requires that all non-originating components of a set be substantially transformed into the finished product, but allowing the inclusion of "some" non-BDC content in a set as a "carve out" winds up collapsing that rule: if the GSP statute's use of "article" is to be interpreted as encompassing a set, then Congress has already spoken to that very issue in the 35 percent cost/value content requirement for "an article", and the parties both agree that it is the "article" (set) taken as a whole (*i.e.,* the component "articles" thereof) that is the appropriate consideration.   *See Uniden*, 24 CIT at 1196 n.5, 120 F. Supp. 2d at 1096 n.5.

In the final analysis, at any rate, the court holds that Customs denied preferential tariff treatment to the Thai-made components of the set on the basis of an assumption that is invalid as a matter of law.   Whether the Thai-made components of the set are entitled to duty-free treatment

under the GSP as a matter of fact remains to be determined, but it is at least clear to the court that the non-BDC components of the set are not entitled to such treatment upon reliquidation.

That leads to the question of what that reliquidation should entail.[19] Do the non-BDC items of the sets obtain the rate of duty applicable to the set as a whole, as classified under subheading 7323.93.0045, HTSUS? Or, applying the inverse here of Customs' rationale with respect to the item of the battery-charger set that obtained the "classification allowance" of a *different* provision of the HTSUS from which the "set as a whole" was classified, is the rate of duty applicable to the non-BDC component(s) that which is applicable to the individual article itself, in this instance the sets' glass lids, which would appear, *prima facie*, to be dutiable pursuant to a provision of heading 7013, HTSUS? Further briefing of this issue before a decision thereon can be reached is desirable, *but see* "*Conclusion*", *infra*.

---

[19] In its letter of August 6, 2010 to Customs Headquarters seeking advice, the plaintiff asked whether (and thereby it would appear to agree that), "under the authority of 19 C.F.R. §141.52, [it could] simply make two entries, or create two tariff lines on a single entry, one for the lids, dutiable, and one for the rest of the set, duty-free under GSP". Customs' response, after acknowledging the requirements of 19 C.F.R. §141.52 (*inter alia*, if a port director is satisfied that there will be no prejudice to "the revenue" then "separate entries may be made for different portions of all merchandise arriving on one vessel or vehicle and consigned to one consignee under" any of the circumstances listed therein with Customs' prior approval), concluded that "[i]n the circumstances of this case, there would be prejudice to the revenue and therefore, we find that 19 CFR 141.52 is inapplicable." Headquarters Ruling ("HQ") H088815 (Sep 28, 2011) at 13. The response is facially conclusory and circular, apparently assuming the validity of 91-7 on the issue, while the papers here do not reasonably support concluding that "the revenue" is entitled to duties from Thai-made pots and pans that would appear, *prima facie*, to be entitled to GSP eligibility, whether imported alone or as part of a set. But for Customs' statement in that regard, the sets might have been entered bearing invoices with individual line items for the sets' BDC and non-BDC components, rather than, as entered, simply bearing declarations of each set as a whole. At any rate, it appears that in order to reliquidate these sets it will be no mean feat for the parties to determine the applicable column, either the "Special" preferential treatment column or the "General" treatment column of column 1 and/or the column 2 rate, HTSUS, for the sets' component articles under whatever subheading(s) is/are appropriate, but that is the only just result here.

III

The foregoing appears to moot the plaintiff's arguments on the impact the appraised value of the merchandise had on the denominator of the formula Customs used for the 35 percent content required for GSP benefits, but there remains the question of the appropriate dutiable value of the imported sets in their own right.  Thus the next phase of this opinion addresses the parties' arguments on whether the plaintiff's cookware is viably valued at the price established between the Thai producer and a middleman, both of whom are related to the plaintiff, or, as Customs held, on the basis of the price established between the plaintiff's related-party middleman and the plaintiff itself.

A

The issue here concerns the appraisal of the sets at entry.  The preferred method is on the basis of transaction value.  *Luigi Bormioli Corp. v. United States*, 304 F.3d 1362, 1366 (Fed. Cir. 2002).  *See generally* 19 U.S.C. § 1401a.  When the manufacturer and the middleman are related entities, the first sale price is to be used if it is a viable transaction value, and it is viable if the price paid can be determined to have been reached "at arm's length, in the absence of any non-market influences that affect the legitimacy of the sales price."  *Nissho Iwai America Corp. v. United States*, 982 F.2d 505, 509 (Fed. Cir. 1992).  *See* in particular 19 U.S.C. §1401a(b)(2)(B).

One method Customs uses to evaluate the circumstances of sale is to determine whether the price paid is adequate to ensure recovery of all costs plus a profit that is equivalent to the firm's overall profit realized over a representative period of time in sales of merchandise of the same class or kind.  19 C.F.R. §152.103(*l*)(1)(iii).  *See*, *e.g.*, Def's Resp. at 4.  Relying on this "costs

plus profit" test, the plaintiff, through its consultant, presented to Customs port officials an analysis of the Thai producer's profit on the sets' sales to the middleman using a "full cost markup method" and also as compared to a benchmarking study of the rate of profit earned by "12 comparable, independent Thai manufacturers of cookware."  *See generally* Plaintiff's Rule 56.3 Statement of Undisputed Facts ("Pl's SUF") ¶¶ 44-57.  Although Customs initially approved of the plaintiff's proposed first sale valuation, it subsequently rejected such valuation during a 2009 audit,[20] and HQ 088815, dated September 28, 2011, upheld that finding.

Here, apart from an apparently material factual dispute over the actual amount (*i.e.*, percent) of profit in question, *cf.* Pl's SUF ¶¶ 48-49 *with* ¶69, the plaintiff claims the legal dispute is over the definition of "firm" in regulation 152.103(*l*)(1)(iii).  It argues with respect thereto that the relevant profits are those of the entity that actually manufactures the goods at issue, not those of the parent company which neither produces nor sells any goods, and that Customs' interpretation of "firm" only deserves *Skidmore* deference[21] at best.

The defendant contends that Customs did not make a determination that the plaintiff's parent was the "firm" of section 152.103(*l*)(1)(iii), but that Customs generally interprets the term "firm" in the "costs plus profits" test to mean the parent company anyway, and that the issue here is actually whether Customs erred in denying the protests when the burden was on it, the plaintiff,

---

[20]  Customs Audit Report 811-07-OFO-AU-21434 (Aug. 31, 2009) ("Audit Report").

[21]  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("[t]he weight [judicially accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control"); *see also United States v. Mead Corp.*, 533 U.S. 218, 235 (2001) (citing *Skidmore*).

to demonstrate the acceptability of related-party first-sale valuation treatment for its imports, and when it simply failed to meet that burden.  The defendant argues the plaintiff's parent's profits are indeed relevant to that consideration, and specifically to the question of whether the relationship of the parties influenced the price actually paid, and that therefore Customs was justified in seeking financial information pertaining to the plaintiff's parent during the internal audit leading up to the issuance of HQ H088815.  *See* Def. Ex. R at 4, 20.  The plaintiff did not provide Customs with any financial documents for its parent, *id*., and it has not provided such documents during this litigation.

B

On a threshold point, the plaintiff responds that the defendant waived the issue of its failure to provide financial documents from its parent company by not moving to compel production.  However, given the plaintiff's objection that its parent is a separate legal entity over whose documents the plaintiff has no possession, custody or control, the defendant correctly responds that it could not move to compel the plaintiff to produce these documents unless the defendant were able to establish an alter ego relationship between the parent and subsidiary(s) or there are facts to suggest that the plaintiff is able to obtain documents from its parent in the ordinary course of business.  The defendant is therefore correct in arguing that it did not waive the issue by not filing a motion for which it did not have grounds.

C

The court's decision here is guided by *Nissho Iwai*, which was clear in articulating that the "first sale"

> rule only applies where there is a legitimate choice between two statutorily viable
> transaction values. The manufacturer's price constitutes a viable transaction value

when the goods are clearly destined for export to the United States and when the manufacturer and the middleman deal with each other at arm's length, in the absence of any non-market influences that affect the legitimacy of the sales price.

*Nissho Iwai*, 982 F.2d at 509 (italics added).

The plaintiff complains that Customs did not seek financial information about its parent in order to assess the "second" sale, *i.e.*, the price paid by the plaintiff as importer to the middleman, Pl's Resp. at 18, but that issue is not before the court, only the claim of "first sale" treatment for which the burden is on the importer to establish that the manufacturer and middleman dealt with one another at "arm's length." All of the entities relevant to that issue are related, and therefore the financial information pertaining to the parent is also relevant to examining whether any non-market influences affect the legitimacy of the sales price. *See id*. Those influences can include, for example, parental support or guidance that has a market-distortive effect on the cost of inputs or of financing, which in turn can translate a "booked" profit on a particular sale into one that, in reality, is unrepresentative of sales of merchandise of the same class or kind that have been made without the distortion of non-market influences. The glass lids in the sets at bar were procured from the PRC, and the court takes judicial notice of the fact that the United States has yet to recognize that the PRC has attained "market economy" status under Article 15(a)(ii) and (d) of the PRC's agreement to the World Trade Organization,[22] and thus it presumptively remains a non-market economy in this and other proceedings. Given that reality, in order to overcome that presumption what is missing from the statements of undisputed facts at bar is any indication of whether the plaintiff-related Thai producer procured the glass lids from an unrelated entity and/or at "arm's

---

[22] Protocol on the Accession of the People's Republic of China, WT/L432 (Nov. 23, 2001).

length," which goes to the question of "the absence of any non-market influences that affect the legitimacy of the sales price." This matters, because the determination of whether a particular valuation test may be appropriate is based on the record as developed before the court, *see* 28 U.S.C. §2640, and the burden is on the plaintiff to make that showing. In the absence thereof, on the facts as alleged, no reasonable market-based conclusions can be drawn at this point from the profit comparisons the plaintiffs aver with respect to the plaintiff-related Thai producer's profits.

Finally, the plaintiff argues that Customs is trying to "walk a tightrope" because it could choose to have the appraisement of its goods using computed value, one element of which is "an amount for profit and general expenses equal to that usually reflected in sales of merchandise of the same class or kind as the imported merchandise that are made by the producers in the country of exportation for export to the United States." Pl's Resp. at 19. But, as the defendant points out, the argument appears to conflate one of the elements of computed value with the "all costs plus a profit" test of 10 C.F.R. §152.103(*l*)(1)(iii). The elements used to calculate computed value are not relevant to the issue of whether Customs was justified in seeking relevant financial information in order to examine the relationship of related parties pursuant to a requested to accept first-sale transaction valuation.

The court has considered the other arguments raised in the briefs and concludes that, while most are not without merit, the foregoing disposes of the concerns expressed therein and that explicit discussion of them would not advance the opinion(s) already expressed here.

*Conclusion*

In view of the foregoing, plaintiff's motion for partial summary judgment can be granted in part as to the GSP eligibility of the BDC-component(s) of its imported cookware sets and also denied in part as to the GSP eligibility of the non-BDC-component(s) of its sets and denied with respect to the issue of whether Customs erred as a matter of law in denying the sets first sale transaction valuation treatment.  Defendant's cross-motion for  partial summary judgment must therefore be denied in part as to the GSP eligibility of the BDC-component(s) of plaintiffs' imported cookware sets and granted in part as to the GSP eligibility of the non-BDC-component(s) of plaintiffs' sets and also granted with respect to the issue of whether Customs erred as a matter of law in denying the sets first sale transaction valuation treatment on the evidence presented at the administrative level.

Briefing of that issue also reveals disputed material facts.  The parties are therefore to confer and propose how to proceed to final disposition of this test case and the matters suspended thereunder by September 22, 2017.

So Ordered.


                                                         /s/  R. Kenton Musgrave
                                                         R. Kenton Musgrave, Senior Judge


Dated:  August 23, 2017
            New York, New York