Slip Op. 21 - 26

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - -x Senior Judge Aquilino

MEYER CORPORATION, U.S.,                    :

                    Plaintiff,              :

                v.                          : Court No. 13-00154

UNITED STATES,                              :

                    Defendant.             :

- - - - - - - - - - - - - - - - - - - -x

## Opinion & Order

[Upon trial as to transaction value of imported cookware,
 judgment for the defendant.]

Decided: March 1, 2021

Joseph M. Donley and Lisa Carney Eldridge, Clark Hill PLC, and
John P. Donohue, Ciardi Ciardi & Astin, of Philadelphia, PA, for
the plaintiff.

Beverly A. Farrell, Trial Attorney, U.S. Department of
Justice, Civil Division, Commercial Litigation Branch, of
Washington, DC, for the defendant along with Joseph H. Hunt,
Assistant Attorney General, Jeanne E. Davidson, Director, Justin R.
Miller, Attorney-in-Charge, and Paula S. Smith, Attorney, Office of
Assistant Chief Counsel, International Trade litigation, U.S.
Customs and Border Protection, of counsel.


AQUILINO, Senior Judge:   This test case considers

valuation under 19 U.S.C. §1401a of 125 different sets of cookware

(pots and pans) imported from the People's Republic of China and

the Kingdom of Thailand, a beneficiary developing country ("BDC").

Its focus is (1) the "first sale" rule articulated by Nissho Iwai

America Corp. v. United States, 982 F.2d 505 (Fed.Cir. 1992); (2)
preferential treatment of entries from Thailand under the
Generalized System of Preferences ("GSP"), 19 U.S.C. §2461 et seq.;
and (3) whether circular metal "blanks" imported into Thailand from
the People's Republic of China ("PRC") underwent a "double
substantial transformation" as required by Customs and Border
Protection ("CBP") interpretation of the GSP[1] for purposes of both
of those valuation issues.

I

A

Previously, the court granted in part and denied in part
each party's cross-motion for partial summary judgment on the first
two of the three issues presented.  Meyer Corp., U.S. v. United
States, 41 CIT ___, 255 F.Supp.3d 1348 (2017).

The Nissho Iwai "first sale" rule requires (1) bona fide
sales that are (2) clearly destined for the United States (3)
transacted at arm's length and (4) absent any distortive nonmarket

---

[1]   It requires a "double substantial transformation", i.e.,
there first must be substantial transformation of the non-BDC
material into a new and different article of commerce, which then
becomes "materials produced" that then must be substantially
transformed into a new and different article of commerce in order
to be GSP-eligible.  See, e.g., The Torrington Company v. United
States, 8 CIT 150 (1984), aff'd, 764 F.2d 1563 (Fed.Cir. 1985).

influences.   Whether  due  to  first  sale  tests  being  generally

applied  to  transactions  from  market  economy  countries,  the  last

consideration  has  generally  been  neglected,  but  it  is  not

irrelevant in the context of this case.

CBP's interpretation of <u>Nissho</u> <u>Iwai</u>'s first sale rule led

it  to  the  following  considerations:    In  order  to  establish

"entitlement" to first sale valuation, an importer needs to provide

(1)  a  detailed  description  of  the  roles  of  each  of  the  parties

involved  in  a  multi-tiered  transaction  and  (2)  a  complete  paper

trail relating to the imported merchandise that shows the structure

of such transaction. Def. Ex. 12, <u>Determining Transaction Value in</u>

<u>Multi-Tiered Transactions</u>, T.D. 96-87, 30 Cust.Bull. 52 (Jan. 2,

1997).[2]  Thus,  the  same  documentation  required  to  establish  a  <u>bona</u>

---

[2]    Here,  it  is  worth  noting  that  CBP's  subsequent  attempt  to
revoke  T.D.  96-87,  in  order  to  conform  the  anomaly  of  the
interpretation  U.S.  import  valuation  law  over  the  meaning  of  "when
sold  for  exportation"  *vis-à-vis*  how  every  other  World  Trade
Organization  signatory  interprets  that  phrase  with  respect  to
imports  into  their  own  countries,  met  with  vocal  opposition  and
resulted in withdrawal of <u>Proposed Interpretation of the Expression</u>
<u>"Sold  for  Exportation  to  the  United  States"  for  Purposes  of</u>
<u>Applying  the  Transaction  Value  Method  of  Valuation  in  a  Series  of</u>
<u>Sales</u>,  73  Fed.Reg.  4,254  (CBP  Jan.  24,  2008).   <u>See</u>  <u>Withdrawal  of</u>
<u>Notice  of  Proposed  Interpretation  of  the  Expression  "Sold  For</u>
<u>Exportation  to  the  United  States"  as  Used  in  the  Transaction  Value</u>
<u>Method  of  Valuation  in  a  Series  of  Sales  Importation  Scenario</u>,  75
Fed.Reg. 60,134 (CBP Sept. 29, 2010) ("Congress also stated in the
[Food,  Conservation  and  Energy  Act  of  2008,  Pub.  L.  110-246,  122
Stat.  1651  (June  18,  2008)]  that,  prior  to  January  1,  2011,  CBP
should  not  implement  any  change  to  its  existing  interpretation  of
(continued...)

<u>fide</u> sale and an export destined for the United States are applicable for a multi-tiered transaction, even when the parties to that transaction are related.

The valuation statute applies special rules when the buyer and seller are related parties under 19 U.S.C. §1401a(g). <u>See</u> 19 C.F.R. §152.103(j),(l); Def. Ex. 12; Def. Ex. 15, <u>Determining the Acceptability of Transaction Value for Related Party Transactions</u>, p. 6 (April 2007). These rules state that when parties are related, a sale is at "arm's length" only if (i) an examination of the "circumstances of the sale" of the imported merchandise indicates that the relationship between the buyer and seller did not influence the price actually paid or payable, or (ii) the transaction value closely approximates a test value. 19 U.S.C. §1401a(b)(2); Def. Ex. 15, p. 7.

These foregoing CBP publications are entitled to a degree of deference. "[T]he well-reasoned views of the agencies implementing a statute constitute a body of experience and informed

---

² (...continued)
**the expression 'sold for exportation to the United States' for purposes of applying the transaction value method of valuation . . . and, then, only in accordance with the prescribed terms set forth in th[at] Act....").** See also **trial transcript ("T.T.") Vol. V, 881:1-883:20.**

judgment to which courts and litigants may properly resort for guidance . . . and [w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." United States v. Mead Corp., 533 U.S. 218, 227-28 (2001) (internal quotations and citations omitted).

Under Nissho Iwai, 982 F.2d at 509, Meyer must further establish the absence of any market-distortive influences on the price of the cookware, both for that manufactured in the PRC and for the Thai cookware with components from China. The court previously took judicial notice of the fact that the PRC is a non-market economy. 41 CIT at ___, 255 F.Supp.3d at 1361. One method that could be used to establish the absence of PRC non-market influence are the factors used by entities located there to obtain a duty rate other than the country-wide rate established by the U.S. Department of Commerce in antidumping-duty proceedings involving non-market economy participants. See, e.g., Advanced Tech. & Materials Co. v. United States, 36 CIT ___, 885 F.Supp.2d 1343 (2012).

To obtain a separate rate in that context, an entity must satisfy three de jure factors and four de facto factors. "The de jure factors are (1) an absence of restrictive stipulations

associated with an individual exporter's business and export licenses, (2) any legislative enactments decentralizing control of companies, and (3) other formal measures by the government decentralizing control of companies." Id., 36 CIT at ___, 885 F.Supp.2d at 1347. Typically-considered de facto factors include "(1) the ability to set export prices independently of the government and without the approval of a government authority, (2) the authority to negotiate and sign contracts and other agreements, (3) the possession of autonomy from the government regarding the "selection" of management, and (4) the ability to retain the proceeds from sales and make independent decisions regarding the disposition of profits or financing of losses." Id.[3]

    Further, for viable transaction value, there must be sufficient information available with respect to the amounts of the statutory additions, if any, set forth in 19 U.S.C. §1401a(b)(1):

> The transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold for exportation to the United States, plus amounts equal to—

---

[3] To the extent such matters could be considered relevant here, do they not relate to the government's obligations in discovery? That is, is it not the plaintiff's burden to prove a negative but the government's to defend by way of an affirmative? It does not appear in this case that the government pursued such lines of inquiry, with one exception: the financial statements of the parent company, Meyer Holdings.

       **(A)  the packing costs incurred by the buyer with respect to the imported merchandise;**

       **(B)  any selling commission incurred by the buyer with respect to the imported merchandise;**

       **(C)  the value, apportioned as appropriate, of any assist;**

       **(D)  any royalty or license fee related to the imported merchandise that the buyer is required to pay, directly or indirectly, as a condition of the sale of the imported merchandise for exportation to the United States; and**

       **(E)  the proceeds of any subsequent resale, disposal, or use of the imported merchandise that accrue, directly or indirectly, to the seller.**

**See Def. Ex. 12.  "If sufficient information is not available, for any reason, with respect to any amount referred to in the preceding sentence, the transaction value of the imported merchandise concerned shall be treated, for purposes of this section, as one that cannot be determined."  Id.**

**With respect to Meyer's GSP claims, in order to be eligible, an imported article must satisfy the following conditions:**

      **(1)  the article must be the 'growth, product or manufacture' of a beneficiary developing country (BDC);**

    (2)   the article must be imported directly from a BDC
          into the customs territory of the United States; and

    (3)   the sum of (a) the cost or value of the material
          produced in the BDC plus (b) the direct costs of
          processing operations performed in the BDC must not
          be less than 35% of the appraised value of such
          article at the time of its entry into the customs
          territory of the United States.

See 19 U.S.C. §2463(a)(2)(A).  See also Dal-Tile Corp. v. United States, 28 CIT 358, 393 (2004).

        In addition, in order to count towards GSP a non-BDC material input as an article that is "produced" in a BDC, the raw material must undergo a double (or dual) substantial transformation. Torrington Co. v. United States, 764 F.2d 1563, 1567 (Fed.Cir. 1985).  In that case, the appellate court affirmed the trial court's determination that a dual substantial transformation occurred when wire was first transformed into swages, a separate article of commerce with a "distinctive name, character, or use," and the second substantial transformation occurred when the swages were transformed into needles, another distinctively named article of commerce.  Id.

B

        Plaintiff's papers herein explain that in 2006, having arranged "middleman" procurement by that point to its apparent satisfaction, it sought approval from CBP to appraise the imported

sets on the basis of the "first sale" rule between related parties articulated by Nissho Iwai.   See 19 U.S.C. §1401a.   Meyer also sought GSP treatment for sets procured through the Thai supply chain because Thailand is a BDC under the GSP.

Meyer made two presentations for first sale valuation, with the assistance of accountants PwC, to one of CBP's import specialists at the Port of San Francisco.  The first, in September 2006, concerned the Thai supply chain.   The import specialist approved the proposed valuation on the basis of the first sale the next month.   Accordingly, Meyer began making entry based upon such valuations.

The second presentation, also by PwC on behalf of Meyer, occurred approximately a year later, again to the same import specialist.  This concerned the Chinese supply chain. It, too, was approved.

Shortly after approval, the import specialist referred the matter to CBP's Office of Field Operations at the Port of San Francisco for an audit of those first sale valuations. It concluded with respect to both of the Thai and Chinese supply chains that the first sale transactions met the first two of the Nissho Iwai tests (i.e., bona fide sales and clearly destined for the United States)

but also that they had not been at arm's length.  The audit report additionally concluded that there had not been a double substantial transformation of the circular metal "blanks" imported into Thailand from China, fabricated into the pots and pans, and exported in sets to the United States.

In early 2010, Meyer requested reconsideration, at which point CBP headquarters became involved.  Months later, Meyer asked the port for clarification on an additional "point of inconsistency" that it had raised, namely whether the presence of glass lids would disqualify an entire set from GSP eligibility. That request was duly forwarded to headquarters.

In September 2011, headquarters transmitted an "internal advice response" ("IAR") to the port.  It agreed with the audit findings that Meyer had failed to show its relationship with its suppliers and middlemen had not influenced the prices paid or payable and had been at arm's length.  The IAR further found that the presence of the glass lids disqualified such sets from GSP eligibility and that the clad metal discs imported from China that were worked into the finished pots and pans could not be counted as "Thai originating" material for purposes of the 35% requirement under the GSP.

Upon receipt of that IAR, PwC spoke with its author, defendant's witness at trial, and PwC also (in a written submission to her) articulated Meyer's concerns about the conclusions reached in the IAR.  No response was forthcoming.

Timely-filed suit following denial of Meyer's protest(s) invoked jurisdiction herein pursuant to 28 U.S.C. §1581(a), which denial is considered by the court de novo.  See, e.g., Park B. Smith, Ltd. v. United States, 347 F.3d 922, 924 (Fed.Cir. 2003).

The court's decision is on the basis of the record as developed, 28 U.S.C. §2640(a)(1), and that development, in turn, is pursuant to the Federal Rules of Evidence, which "shall apply to all civil actions in the Court of International Trade". 28 U.S.C. §2641.

C

As indicated, the parties sought to narrow the issues earlier in this matter by moving for summary judgment on whether the imported cookware sets are to be appraised on the basis of the first sale rule, and whether the sets from Thailand obtain the benefit of GSP preferential treatment.  The plaintiff held the issue of double substantial transformation in reserve.  The

defendant cross-moved to dismiss on the basis that the presence of
the glass lids imported into Thailand from China disqualified the
sets from GSP preference <u>per</u> Treasury Decision 91-7, 25 Cust. B. &
Dec. 7 (Jan 8, 1991), and on the basis that Meyer had not satisfied
its burden of production or proof that it was entitled to first
sale treatment.

     On the GSP issue, the court concluded that the sets did
not appear to be disqualified from GSP preferential treatment as a
matter of law simply by reason of the presence of non-BDC
components among the sets. 41 CIT at ___, 255 F.Supp.3d at 1358.
On the first sale issue, the court first noted that the preferred
or primary method of appraisal for imported merchandise is
"transaction value", <u>see</u> 19 U.S.C. §1401a(b)(1), which is "the
price actually paid or payable for the merchandise when sold for
exportation to the United States." 41 CIT at ___, 255 F.Supp.3d at
1359, citing <u>Luigi Bormioli Corp. v. United States</u>, 304 F.3d 1362,
1366 (Fed.Cir. 2002).

     Also noting that transactions between a related buyer and
seller will "normally" be considered acceptable if examination of
the circumstances of the sale indicates that the buyer-seller
relationship did not influence settling the price actually paid or

payable, or, if that price approximates other test values[4] [see 19
U.S.C. §1401a(b)(2)(B); 19 C.F.R. 152.103(*l*)], the court previously
held that CBP had not erred in declining to appraise the sets
pursuant to the first sale rule on the basis of the arguments
presented.  41 CIT at ___, 255 F.Supp.3d at 1362.

        Observing    that    _Nissho    Iwai_    had    interpreted
§1401a(b)(2)(B) to mean "if the price paid can be determined to
have been reached 'at arm's length, in the absence of any
non-market influences that affect the legitimacy of the sales
price'", _id._, 41 CIT at ___, 255 F.Supp.3d at 1358 (quoting _Nissho_
_Iwai_, 982 F.2d at 509), the court concluded that material facts
remained in dispute as to both issues, and also (obviously) with
respect to the third (unaddressed) issue of whether circular steel
"blanks" undergo a double substantial transformation in the

---

        [4]  Here, it must also be noted that transaction value
includes, if not included in the price actually paid or payable,
amounts equal to packing costs and selling commissions "incurred"
by the buyer, the proportionate value of any "assist," royalty or
license fees, and the proceeds of any subsequent resale, disposal,
or use of the imported merchandise that accrue to the seller
directly or indirectly. "If sufficient information is not
available, for any reason, with respect to any amount referred to
in the preceding sentence, the transaction value of the imported
merchandise concerned shall be treated, for purposes of this
section, as one that cannot be determined."   19 U.S.C.
§1401a(b)(1).  In that event, resort to another valuation method
would become necessary.  See _generally_ 19 U.S.C. §1401a.

manufacture of pots and pans in Thailand, which affects both of the first two issues.  The court thus denied both parties' motions for summary judgment.

     With respect to trial of all three issues, to which this opinion applies, the burden remained on the plaintiff to prove its case with respect to each element through a preponderance of the evidence.  See, e.g., Fabil Mfg. Co. v. United States, 237 F.3d 1335, 1340 (Fed.Cir. 2001), quoting St. Paul Fire & Marine Ins. Co. v. United States, 6 F.3d 763, 769 (Fed.Cir. 1993) ("[t]he preponderance of the evidence formulation is the general burden assigned in civil cases for factual matters").  Attention was also drawn at the pretrial conference to the law of the case, which generally bars retrial of issues that were previously resolved.  See, e.g., Intergraph Corp. v. Intel Corp., 253 F.3d 695, 697 (Fed.Cir. 2001).  The applicability of that doctrine is a matter of discretion, see, e.g., Hudson v. Principi, 260 F.3d 1357, 1363 (Fed.Cir. 2001), but it encompasses issues decided by necessary implication.  E.g., United States v. White, 846 F.2d 678, 684 (11th Cir. 1988).  See also Ford Motor Co. v. United States, 38 CIT ___, ___, 992 F.Supp.2d 1346, 1355 (2014).

The defendant argues that, in the aftermath of the court's initial opinion, the only GSP issue to be tried, in addition to the first sale issue, is whether the cookware components (pots/pans) of the sets exported from Thailand are entitled to duty-free treatment. Plaintiff's response to that point is ambiguous.   But worth noting, perhaps, in light of the relatedness of companies involved in plaintiff's claim of first sale valuation, is that one of the disputes between the parties concerned defendant's attempt at discovery of financial information from Meyer Holdings, the ultimate parent of the Meyer Group.

In accordance with <u>Nissho Iwai</u>, the court's initial opinion was that "financial information pertaining to the parent is also relevant to examining whether any non-market influences affect the legitimacy of the sales price."   41 CIT at ___, 255 F.Supp.3d at 1358.   The parent's financial documents could reveal whether "parental support or guidance has a market-distortive effect on the cost of inputs or of financing", thereby resulting in a "'booked' profit" "unrepresentative of sales or merchandise of the same class or kind that have been made without the distortion of non-market influences."   <u>Id</u>.   The court further took "judicial notice of the fact that the United States has yet to recognize that the PRC has attained 'market economy' status under Articles 15(a)(ii) and (d)

of the PRC's agreement to the World Trade Organization, and thus it presumptively remains a non-market economy in this and other proceedings." Id. Accordingly, Meyer has the burden of demonstrating that inputs from the PRC, as well as with respect to the transactions from its producer/seller to its middleman/buyer, were procured at undistorted prices. See id.

D

The following are pertinent facts upon which the parties have agreed, as summarized by the defendant:

1.   Meyer Corporation, U.S. (Meyer) is a Delaware corporation with its principal place of business in Vallejo, California and is the importer of record of the merchandise subject to protest and the plaintiff in this case.  Docket No. 148, Schedule C, ¶ 1.

2.  Meyer purchases a wide variety of cookware, both in sets and in individual pieces, from overseas affiliates and resells them in the United States for use in the home. It is the exclusive distributor in the United States for all Meyer cookware products. Docket No. 148, Schedule C, ¶ 1.

3.  Meyer Industries, Ltd. (Thai Producer [or MIL]) is located in Laem Chabang, Thailand and is the producer of the Thai origin goods that are the subject of this proceeding. Docket No. 148, Schedule C, ¶ 2.

4.  Meyer Zhaoqing Metal Products Co., Ltd. (China Producer [or MZQ]) is located in Zhaoqing, China and is the producer of the Chinese origin goods that are the subject of this proceeding. Docket No. 148, Schedule C, ¶ 3.

5.  Meyer Marketing (Macau Commercial Offshore) Co. Ltd. (Meyer Macau or Thai Middleman [or MMC]) is a corporation located in the Chinese Special Administrative Region of Macau and the middleman purchaser of the goods produced by the Thai Producer.  Docket No. 148, Schedule C, ¶ 4.

6.  Meyer Manufacturing Company Ltd. (Meyer Hong Kong or China Middleman) is a corporation located in the Chinese Special Administrative Region of Hong Kong and the middleman purchaser of certain goods produced by the China Producer. Docket No. 148, Schedule C, ¶ 5.

7.  Each of the entities identified in paragraphs 3-6 is a related party to Meyer within the meaning of 19 U.S.C. § 1401a(g)1)(F).  Docket No. 148, Schedule C, ¶ 6.

8.  Meyer International Holdings Ltd. (Meyer Holdings [or MIH]) is a corporation organized under the laws of the British Virgin Islands[5] and is the parent company of Meyer. Docket No. 148, Schedule C, ¶ 7.

9.  At all times relevant to this proceeding, the Kingdom of Thailand was designated by the President of the United States as a Beneficiary Developing Country (BDC) within the meaning of 19 U.S.C. § 2462(a)(1), also known as a GSP country, *i.e.*, a country designated for preference under the GSP legislation.  Docket No. 148, Schedule C, ¶ 8.

---

[5]  The court notes that they would seem to be a notable choice of tax haven for Chinese "investors".  See, e.g., "China Leaks: How the BVI Became China's Foreign Tax Haven of Choice," available at https://www.taxjustice.net/2014/01/22/china-leaks-bvi-became-chinas-tax-haven-choice/ or at web.archive.org; "Found: Offshore Wealth Stashed by Families of China's Leaders," available at https://time.com/1374/offshore-wealth-of-chinas-leaders or at web.archive.org ("Pricewaterhouse-Coopers, UBS and other Western banks and accounting firms play a key role as middlemen in helping Chinese clients set up trusts and companies in the British Virgin Islands, Samoa and other offshore centers usually associated with hidden wealth, the records show").

10. At all times relevant to this proceeding, certain of the Thai merchandise under review was an "eligible article," i.e., the merchandise was classified under a provision of the Harmonized Tariff Schedule of the United States (HTSUS), which qualified the article for GSP treatment if it otherwise met the requirements of the GSP statute. Docket No. 148, Schedule C, ¶ 9.

11.  The merchandise was classifiable at entry under subheading 7323.93.0045 of the HTSUS, the provision for "table, kitchen or household articles . . . of stainless steel." Docket No. 148, Schedule C, ¶ 10.

12.  Each of the cookware items subject to the set issue was imported as a set of cookware, and the common denominator of each of the sets is that the set includes one or more glass lids made in China, a non-BDC country. Docket No. 148, Schedule C, ¶ 11.

13.  All of the pots and pans constituting the cookware sets that are the subject of the [GSP] set issue were manufactured by the Thai Producer.  Docket No. 148, Schedule C, ¶ 12.

14.  The glass lids in the sets referenced in preceding paragraphs 12 and 13 were produced in China and sold to the Thai Producer, but the glass lids themselves were not substantially transformed in Thailand.  Docket No. 148, Schedule C, ¶ 13.

15.  The cookware at issue in this case was produced by either the Thai Producer or the China Producer.  Docket No. 148, Schedule C, ¶ 14.

16.  The PRC is not recognized by the United States as a "market economy" and is, therefore, considered a non-market economy in this proceeding. Docket No. 148, Schedule C, ¶ 16.

17.  Meyer Holdings is the only shareholder of Meyer. Docket No. 148, Schedule C, ¶ 17.

18.  Meyer, the Thai Producer, the China Producer, Meyer Macau and Meyer Hong Kong are subsidiaries of Meyer Holdings.  Docket No. 148, Schedule C, ¶ 18.

19.  Other subsidiaries of Meyer Holdings are in the business of cookware, such as Meyer Cookware Australia Pty Ltd. (distributor), Meyer New Zealand (distributor of kitchenware, which includes cookware, i.e, pots and pans), Meyer UK Limited (distributor), Meyer Europe SRL (manufacturer), Meyer Japan, Meyer Canada Housewares, Inc. (distributor), Meyer Taiwan Limited (distributor), and Meyer Housewares Singapore (distributor). Docket No. 148, Schedule C, ¶ 19.

20.  The subsidiaries listed in paragraph 19 consolidate their financial statements with Meyer Holdings.  Docket No. 148, Schedule C, ¶ 20.

21.  The Thai Producer, the China Producer, Meyer Macau, and Meyer Hong Kong consolidate their financials with Meyer Holdings.  Docket No. 148, Schedule C, ¶ 21.

22.  Meyer Macau and Meyer Hong Kong occasionally work together. Docket No. 148, Schedule C, ¶ 22.

23.  Meyer Macau sells to Meyer UK Limited, Meyer Cookware Australia Pty Ltd., Meyer New Zealand, Meyer Canada Housewares, Inc., QVC, Costco, Walmart, Meyer Japan, Amway, and WMF (a non-Meyer affiliate and competitor cookware company). Docket No. 148, Schedule C, ¶ 23.

24.  Meyer Hong Kong also sells to Meyer UK Limited, Meyer Cookware Australia Pty Ltd., Meyer New Zealand, Meyer Canada Housewares, Inc., QVC, Costco, Walmart, and Meyer Japan.  Docket No. 148, Schedule C, ¶ 24.

25.  The Thai Producer and the China Producer both sell to their domestic markets directly.  Docket No. 148, Schedule C, ¶ 25.

26.  Meyer Hong Kong owns the Anolon and Circulon brand names. Docket No. 148, Schedule C, ¶ 26.

27.  Meyer Macau owns the exclusive right to the brand name Rachel Ray for cookware, bakeware, tabletops (aka dinnerware, serverware and glassware), gadgets and cutlery for the western hemisphere and some Meyer affiliates have the right to sell with the licensor's consent in UK, South Africa, Ireland and Australia. Docket No. 148, Schedule C, ¶ 27.

28.  Meyer Macau owns the exclusive license for the brand name Paula Deen for cookware, bakeware, tabletops (aka dinnerware, serverware and glassware), gadgets and cutlery for the western hemisphere.  Docket No. 148, Schedule C, ¶ 28.

29.  The Rachel Ray and Paula Deen licenses were granted to Meyer Macau plus affiliates, including those like Meyer, that are under the common ownership of Meyer Holdings. Docket No. 148, Schedule C, ¶ 29.

30.  Meyer Macau can sell to U.S. Retailers other than Meyer but only in exchange for a commission it pays to Meyer.  Docket No. 148, Schedule C, ¶ 30.

31.  The commissions paid by the middlemen for sales to U.S. retailers other than Meyer vary based on lines and customers.  Docket No. 148, Schedule C, ¶ 31.

32.  The Thai Producer and the China Producer purchase some components of their cookware from Meyer affiliates that are direct or indirect subsidiaries of Meyer Holdings. Docket No. 148, Schedule C, ¶ 32.

33.  The Thai Producer also sold cookware to a customer in Vietnam. Docket No. 148, Schedule C, ¶ 33.


Def. Proposed Findings of Fact and Conclusions of Law ("Def. PFF&CL"), pp. 4-7.

                                  II

          During trial, the plaintiff did not present witnesses
from either Meyer Hong Kong or Meyer Holdings.  <u>See</u> P. Ex. 152.
Its direct testimony was presented by S. Darrin Johnson, a former
managing director of Meyer from 2006 to 2019; Siukai Kwok, a
financial manager at the Thai producer; Sharon Lau, a sales
director at Meyer Macau; Kan Ming Kam, a production manager of the
stainless steel department at the China producer; and Craig
Pinkerton, a director of customs international trade practice at
PricewaterhouseCoopers ("PwC"), who was proffered as an expert
witness.

          The defendant countered with Monika Brenner, the head of
the valuation and special programs branch of CBP.


                                   A

          Mr. Johnson had full responsibility and control of all of
Meyer's departments.   T.T. Vol. I, 69:23-112:11 (direct),
113:152:13 (cross).   He averred that, despite being related
companies within the Meyer Group, they are structured with
different "silos" of business that operate independently of and
competitively with each other, and that the plaintiff was
accountable for its own profitability, independent of any other
Meyer group entity.   <u>Id</u>. at 110:16-111:6.

Describing the process of plaintiff's procurement of cookware, Mr. Johnson stated that three or four times a year it would conduct a market analysis to keep abreast of the competition, product offerings, retail pricing, and identify potential opportunities to fill a consumer need. Id. at 76:20-79:16, 115:2-116:9. Meyer Macau would procure product for the plaintiff from the Thai Producer or the China Producer, depending on the product order and tooling capability. See id. at 122:18-123:23; Vol. T.T. III, 352:18-21. Trial did not explore negotiations between the plaintiff and Meyer Hong Kong except in passing, for in almost all matters the plaintiff negotiated with Ms. Lau, Meyer Macau's sales director. See, e.g., T.T. Vol. I, 83:12-20, 86:9-17, 109:15-24, 122:9-17.

Regarding the Thai producer, Mr. Kwok testified on how the cookware is manufactured, the producer's pricing and profit, and how the GSP calculations are performed. Id., 156:16 to Vol. II, 224:4 (direct), 224:22-331:7 (cross). The Thai producer has four divisions of cookware: aluminum, hard anodized, advanced automated production, and stainless steel, employing 2,000 to 3,000 workers. T.T. Vol. I, 159:7-13. Ninety-six percent of its cookware is sold to Meyer Macau. Id. at 160:23-24. The Thai

producer coordinates with the marketing managers of Meyer Macau in negotiating prices for the cookware, which are never sold at a loss.  Id. at 161:8-12 & 175:6-177:18.

        Mr. Kwok identified plaintiff's exhibits 294 and 296 as cookware produced by the Thai producer, and he expressed familiarity with the documentation of a sample entry packet, P 190. Mr. Kwok was responsible for preparing GSP calculations for the Thai producer cookware if customers requested them, id. at 183:8-11, and he related specifics from P 154 and 155 on cost, local content, overhead, et cetera, with respect to how he makes the GSP calculations thereof, which he tied to the product that is P 296. Id. at 183:12-190:7.  He acknowledged that he performed similar analyses in the GSP calculations of P 379 that relate to a product represented pictorially as P 375, id. at 191:13-194:10, and also with respect to the GSP calculations of P 380 that relate to a ten-piece cookware set, P 376, id. at 194:20-197:3, Vol. II, 204:7-23.

        Lastly, Mr. Kwok narrated answered questions regarding a video depicting the manufacture of a piece of cookware intended for the ten-piece set P 133.  Some 14 manufacturing steps are involved in the transformation of a flat steel disc to the finished pot/pan, and Mr. Kwok confirmed that all of the Thai producer's cookware

undergoes a substantially similar manufacturing process.  Vol. II,
205:5-224:2.

        Mr. Kam testified regarding production at the China
producer.  T.T. Vol. III, 412:3-425:11 (direct), 425:18-458:10
(cross).  It makes aluminum and stainless steel cookware, and Mr.
Kam is responsible for production planning, quality control, and
costing issues.  He testified that there is trade in work-in-
process "shells" of the cookware pots/pans, e.g. P 131F, between
the China producer, the Thai producer, and Meyer group's factory in
Italy.  Id. 414:14-415:9.  His responsibilities included providing
cost and production process information to the China producer's
"custom department," such knowledge being conveyed to him via a
product's SKU number, from which he can discern the country for
which the product is destined.  See id., 416:4-417:9; 433:5-15.
His understanding is that the China producer does not negotiate
directly with the plaintiff, nor does it discuss pricing with its
parent company.  Id. at 417:10-418:3.  Lastly, Mr. Kam denied, to
his knowledge, that the China producer has ever received any
subsidy, grant, assistance, instruction, contribution, concession,
input, tax exemption, loan guarantee -- in short, anything
whatsoever from any PRC governmental organ or the Chinese Communist
Party in order to support or "direct" its operations.  Id. at

421:18-425:6.  He stated that the Chinese producer "purchased" and "owns" the land for its factory, <u>id</u>. at 424:12-13, but later clarified that meant the Chinese producer "would have the right to use the land for a period of time" and that he was unsure who actually "owns" it, <u>id</u>. at 456:6-17.  He also clarified that his knowledge extended over the steel department, not to "everything" concerning the aluminum department as well.  <u>Id</u>. at 430:2-13.

Mr. Kam also clarified that the steel used in the production of cookware comes from a PRC company, also "sometimes" from Japan and Taiwan.  <u>Id</u>. at 439:2-7.  The aluminum bottom of the pots/pans comes from a PRC company; the glass lids come from a PRC company; the knobs and handles come from the PRC and also from a non-Meyer company in Thailand.  <u>Id</u>. at 439:24-442:23.  Further testimony from Mr. Kam examined other incidentals necessary for the production and completion of the pots/pans and completion of the sets from the PRC, including the packaging for the products for shipment, origin of the solder used in welding, rivets, variability in the Chinese manufacturer's profitability (including Mr. Kam's knowledge or lack thereof with respect to the company general manager's authority to attend to matters involving PRC governmental

functionaries), how the Chinese producer is managed <u>et</u> <u>cetera</u>.[6] <u>Id</u>. at 440:3-462:23.

Ms. Lau testified regarding her work experience with Meyer Macau and her dealings with all of the above. T.T. Vol. III, 319:9-355:8 (direct), 356:6:409:6 (cross). Her negotiations with Meyer would lead her to place orders with either the Thai producer or the China producer, depending on the product order, and, if orders were to be undertaken by the China producer, Meyer Macau would "assign" orders to Meyer Hong Kong to act as middleman, either individually or in addition to the plaintiff. <u>See</u>, <u>e</u>.<u>g</u>., <u>id</u>. at 320:6-24. She testified that Meyer Macau's top ten purchasers included both Meyer group and non-Meyer group companies. In dealing with "private label" orders from one such example of a non-Meyer-group company, Meyer Macau would deal with that entity directly, or, if such orders concerned Meyer brands, then Meyer Macau would pay a commission to the plaintiff. Overall, between 80 and 90 percent of the cookware sets Meyer imported into the United States were manufactured by the Thai producer. <u>Id</u>. at 353:4-17.

---

[6] Defendant's counsel at one point directly asked Mr. Kam if he would have had knowledge of any "assistance" from the PRC government, to which his response, in effect, was that in his position he was on a "need to know" basis with respect to the general manager. T.T. Vol. III, 462:14-23.

The remainder were manufactured by the China producer in the PRC, depending on whether the Thai producer was at full capacity or if the product was labor-intensive. Id., 386:7-16.

Mr. Pinkerton, a licensed customs broker, testified as to his belief regarding errors in CBP's administrative rulings on the plaintiff's entries.  T.T. Vol. IV, 501:5-648:7 (direct), 651:16-696:17 & Vol. V, 703:18-822:7 (cross).  He had no knowledge of the application of the specific entries involved in this case, T.T. Vol. IV, 483:7-484:22, but testified as to his general knowledge of plaintiff's process of manufacture of the pots/pans at issue, including the process of what the plaintiff claims is the double substantial transformation of them during manufacture.[7]  See id. at 485:9-496:20.  He described the due diligence PwC undertook with regard to the operations of the Thai producer, the China producer, Meyer Macau, and Meyer Hong Kong, to determine whether plaintiff's transactions satisfied the Nissho Iwai factors and CBP's regulations governing its interpretation thereof, as well as PwC's presentation of its analyses to CBP, other of his experiences with

---

[7]    During voir dire, in response to the question of whether the plaintiff's "cost sheets" clarified the issue of double substantial transformation ("DST"), the witness responded that CBP "sometimes" considers labor in deciding whether there has been a DST.  T.T. Vol. V, 493:14:494:7.

such presentations to it, and his interpretation of CBP's ultimate decision(s) on first sale treatment for plaintiff's imported merchandise.  Id. at 502:10-648:7.

Ms. Brenner testified for the defendant.  T.T. Vol. V, 859:3-885:9 (direct), 885:21-915:18 (cross).  She described her experiences in supervising CBP valuation rulings, which process solicits both importers' and ports' perspectives, and with respect to first sale rulings in particular.  T.T. Vol. V, 858:3-885:8. She  also answered questions with respect to CBP's ruling on plaintiff's first sale treatment as it related to a proposal CBP published in the Federal Register in response to a certain World Customs Organization case study regarding such treatment, which proposal was later withdrawn in light of comments in opposition to that proposal.  See id. at 879:18-883:20.  Lastly, she testified that, in her experience, most requests for first sale treatment are ultimately granted.  Id. at 884:5-885:8.  Ms. Brenner was then cross-examined as to the process of denying the plaintiff first-sale treatment.  Id. at 885:13-915:18.

At the conclusion of trial, the court requested the parties to submit proposed findings of fact and conclusions of law. They are restated as follows:

B

Thai Supply Chain First Sale

1

Addressing   the   first   of   the   Nissho   Iwai   factors,

plaintiff's witnesses uniformly related the "independent business

silos" theme of all the relevant Meyer group entities involved in

this matter, each having its own objectives.   The plaintiff thus

relates  the  testimonial  "proof"  that  the  negotiations  among  the

relevant "silos" involved bona fide price establishment as follows:

> 56.  PwC determined that goods sold from MIL to MMC were
> made  pursuant  to  a  bona  fide  sale.  PwC  made  this
> determination  by  examining  the  following  documentation:
> (i)  purchase  orders  between  MUS  and  MMC;  (ii)  purchase
> orders  between  MMC  and  MIL;  (iii)  MIL's  invoices  to  MMC;
> (vi)  MMC's  invoices  to  MUS;  and  (v)  proof  of  payments,
> usually  through  wire  payments.  (Pinkerton  T.T.  Vol.  IV,
> 502:21-504:3).
>
> 57.  In seeking to determine whether the sale from MIL to
> MMC  was  a  bona  fide  sale,  PwC  also  examined  whether  MMC
> was   a   legal   entity,   had   employees,   had   managerial
> controls,  and  had  financial  statements.  PwC  also  looked
> at  the  intent  of  the  parties  during  the  transaction,
> which of the parties bore the risk of loss, and how title
> of  the  goods  was  transferred.  (Pinkerton  T.T.  Vol.  IV,
> 502:21-504:3).
>
> 58.  The methodology that PwC used to determine whether
> transactions  between  MIL  to  MMC  met  the  bona  fide  sale
> test  had  been  accepted  by  Customs  in  other  first  sale
> presentations  and/or  submissions  handled  by  Pinkerton.
> (Pinkerton  T.T.  Vol.  IV,  504:4-10;  529:19-530:13).

> 59.   The FOB terms are also included on the invoices from
> MIL to MMC. For example, on Entry Packet at Plaintiff's
> Exhibit 190, the FOB terms indicate that MIL is
> responsible for the transportation costs for the goods to
> the Port in Thailand, Laem Chabang. Title transfers
> according to the date of the Bill of Lading. (Kwok T.T.
> Vol.  I,  171:6-172:4;  P.  Ex.  190,  Entry  Packet,
> MUS001402).

Pl's Proposed Findings of Fact and Conclusions of Law ("Pl's
PFF&CL"), pp. 13-14.

The defendant responds that the plaintiff did not present
proofs of purchase orders or payments between the various entities
in the Meyer supply chains.  _See_ _infra_.  The court indeed considers
such proof probative and relevant, but for the purpose of this
question, it is of some moment that at the port level CBP initially
agreed that there was a _bona_ _fide_ sale of merchandise imported by
Meyer through its Thai supply chain, and that its regulatory audit
also reached the same conclusion. P. Ex. 20, Office of Field
Operations Referral Audit Report, p. 3.

The evidence at bar facially supports finding _bona_ _fide_
sales between the Thai producer and Meyer Macau.

2

Regarding the second of the _Nissho_ _Iwai_ factors, the
plaintiff claims that all of Meyer's purchases sourced from the

Thai producer and relevant to this case resulted in shipment of
goods "clearly destined" for the United States.   Plaintiff's
recital is as follows:

> 61.  At the time the goods are produced at MIL for MMC,
> they are destined for the United States. (Kwok T.T. Vol.
> I, 161:20-23).
>
> 62.  The Entry Packets before the Court contain a Bill of
> Lading which identifies that the merchandise entered is
> being shipped directly to the United States. (Kwok T.T.
> Vol. I, 170:8-22; P. Ex. 190, MUS001430).
>
> 63.  In its earlier work on demonstrating Meyer's first
> sale qualification to Customs, PwC had determined that
> the goods sold by MIL were clearly destined for the
> United States. PwC made this determination by analyzing
> relevant case law and agency guidance documents. Further,
> PwC examined bills of lading for the products at issue
> and determined that the products were shipped directly
> from Laem Chabang, Thailand to either New York or San
> Francisco. (Pinkerton T.T. Vol. IV. 504:11-505:15).
>
> 64.  The methodology that PwC used to determine that the
> goods produced by MIL in Thailand were clearly destined
> for the United States had been accepted by Customs in
> other matters handled by Pinkerton. (Pinkerton T.T. Vol.
> IV, 505:16-21; 529:19-530:13).
>
> 65.  The products before the court that were purchased by
> MUS through MMC and manufactured by MIL were shipped
> directly from Thailand to the United States as set forth
> in the bill of lading and detailing either New York or
> San Francisco as the port of unloading (FOB Laem
> Chabang). (Johnston T.T. Vol. I, 111:22-112:3; P. Ex.
> 190, MUS001392).

                            * * *

15. By way of example, Plaintiff's Exhibit 190 (Entry#
30402149170), was submitted to the San Francisco Port on

October 29, 2011 and identifies various products imported
by MUS that are eligible for first sale and GSP
treatment. (P. Ex. 190, Entry Packet, MUS001384).

16.   The invoices related to the three-tiered transaction
of these imports are attached and made part of this Entry
Packet. This includes the invoice from MIL to MMC that
shows the sale of 16 different products manufactured by
MIL and the first sale unit price of each. (Kwok T.T.
Vol. I, 168:5-169:3; P. Ex. 190, Entry Packet,
MUS001404).

17.   One of these products, the Paula Deen steamer set
(P. Ex. 296) is itemized on this invoice with a first
sale unit price of $14.56. (Kwok T.T. Vol. I,
169:11-170:7; P. Ex. 190, Entry Packet, MUS001423).

18.   This Entry Packet also contains a Bill of Lading
which declares that the merchandise is being shipped
directly from Thailand to the United States. (Kwok T.T.
Vol. I, 170:8-22; P. Ex. 190, Entry Packet, MUS001430).

19.   The terms of sale and delivery ("FOB") are also
included on the invoice from MIL to MMC. For this Entry
Packet, the FOB terms indicate that MIL is responsible
for the transportation costs of the goods from the
factory to the Laem Chabang Port in Thailand. Conversely,
the MUS/MMC Master Distribution Agreement ("Distribution
Agreement") terms indicate that MUS only takes title
after the goods have been paid for[8], which means that

---

[8]   The defendant points out that Section 6.2 of the Master
Manufacturing Agreement provides that title in the products passes
to Meyer upon delivery irrespective of whether the price for such
products had been wholly or partially paid or remains completely
unpaid at that time, Def. Br. at 27, referencing T.T., Vol. II at
279-80 and Pl. Ex. 123, but it does not elaborate on the
significance of that point. Risk of loss transfers according to
the date of the bill of lading and testimony at trial indicated
that Meyer took title when the Thai producer delivered the goods
for shipment from the port in Thailand. Where title actually
"stood" when the goods were delivered FOB Laem Chabang Port does
                                                      (continued...)

> MMC assumes title and risk of loss from the port of
> export in Thailand until payment by MUS. Risk of loss
> transfers according to the date of the Bill of Lading.
> (Kwok T.T. Vol. I, 171:6-172:4; P. Ex. 190, Entry Packet,
> MUS001402; P. Ex. 124, Master Distribution Agreement,
> Section 9.1).

Pl's PFF&CL, pp. 14, 4-5.

Defendant's response again points out that the plaintiff did not present proofs of purchase orders or payments between the various entities in the Meyer supply chains. It further points out that such testimony described Mr. Pinkerton's work for plaintiff's 2008 and 2010-12 products, not for the products at bar. <u>See</u> P. Exs. 117, 125.

The court concurs with the defendant that proofs of purchase orders and payments are normally and critically necessary to establishing entitlement to first sale dispensation when a claim therefor is challenged by CBP. When requested by CBP to provide reasonable proof, it is not unreasonable to expect importers to provide such proof so CBP can reasonably expect to satisfy a claim. Plaintiff's case before the court is somewhat cavalier in this regard, focusing on minutiae and essentially asking the court at

---

[8]   (...continued)
not undermine the goods' clear destination, which was the United States, according to the bill of lading.

various points to take plaintiff's "word" that certain facts were true, without corroborating evidence in support, but at least on this particular point, it is once again of some credence that CBP at the port level, and at its regulatory audit, was satisfied the merchandise imported by Meyer through its Thai supply chain was clearly destined for the United States.

3

For the third <u>Nissho</u> <u>Iwai</u> factor, <u>i</u>.<u>e</u>., "arm's length" sales, CBP considers the "circumstances of sale" issue to be met when either of three tests are satisfied under the regulations. Under that issue, to determine whether a relationship influenced the price, relevant aspects of the transaction are analyzed, such as (i) how the buyer and the seller organize their commercial relations; and (ii) how the price was arrived at. Def. Ex. 15 at 7. <u>See</u> <u>also</u> 19 C.F.R. §152.103(l)(1)(i).  In accordance with the referenced regulation, circumstances such as the following can demonstrate that the relationship did not influence the price:

> -- The price was settled in a manner consistent with the normal pricing practices of the industry in question;
>
> -- The price was settled in a manner consistent with the way the seller settles prices for sales to buyers who are not related to it; or

    -- The price is adequate to ensure recovery of all costs
    plus a profit that is equivalent to the firm's overall
    profit realized over a representative period of time in
    sales of merchandise of the same class or kind.

<u>See</u>, <u>e</u>.<u>g</u>., Def. Ex. 15 at 7.   Only the first and third

circumstances listed above are at issue here, and it is plaintiff's

burden to establish that one of them is applicable.

    In particular, to establish that the price was settled in

a manner consistent with the "normal pricing practices" of the

industry in question, an importer must have objective evidence of

the normal pricing practices of the industry in question and

present evidence that the transfer price was settled in accordance

with these industry pricing practices.   <u>See</u> <u>id</u>. at 7-8.   The

"industry in question" normally includes the industry that produces

goods of the same class or kind as the imported merchandise.

<u>See</u> <u>id</u>. at 8.

    To establish that a price is adequate to ensure "recovery

of all costs plus a profit" that is equivalent to the firm's

overall profit realized over a representative period of time in

sales of merchandise of the same class or kind, an importer should

be prepared to provide records and documents of comprehensive

product related costs and profit, such as financial statements,

accounting records, including general ledger account activity,

bills of materials, inventory records, labor and overhead records, relevant selling, general and administrative expense records, and other supporting business records. See id. at 9.

CBP's administrative considerations of such tests are not irrelevant, but they are not dispositive, as this is trial of those matters, de novo.  See Park B. Smith, supra.

a

At trial, the plaintiff sought qualification of Mr. Pinkerton, both as a fact witness and as an expert.  It offered his opinion(s) on these topics: (i) Meyer's entitlement to first sale treatment on the entries before the court; (ii) error by CBP's audit in determining that Meyer was not eligible for first sale or GSP treatment; (iii) error by headquarters during the course of the request for internal advice and flaws in the IAR (Internal Advice Response); and (iv) double substantial transformation for purposes of GSP calculations of the clad products manufactured in Thailand that originated with clad metal discs imported from China. Pinkerton T.T. Vol. IV, 481:5-7; See Joint Pre Trial Order Doc. 148 at Schedule G-1.

After voir dire, the court qualified Mr. Pinkerton to provide "his opinion in this matter" as an "expert" at trial.  The

court did not, however, expand its qualification as to what matters it considered him to be "expert" upon, as opposed to lay opinions on other aspects of the case, in which the court was also interested. <u>See</u> Pinkerton T.T. Vol. IV, 500:14-24. Also, as urged by the defendant, that qualification did not fundamentally negate any appearance of potential bias from Mr. Pinkerton's business relationship with the plaintiff, from which the court might draw conclusions as to what weight his testimony is due, if any.

Further in that regard, the defendant moved, <u>in</u> <u>limine</u>, to exclude certain summary documents. <u>See</u> Docket No. 145. It renewed its objection to their admission into evidence during trial. <u>See</u>, <u>e</u>.<u>g</u>., Vol. IV at 584:10-585:20. The defendant also moved to exclude Mr. Pinkerton's testimony based on those documents not provided in discovery. <u>See</u>, <u>e</u>.<u>g</u>., Def. PFF&CL, pp. 7-15.

Rule 1006 of the Federal Rules of Evidence provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

This rule requires that the documents whose information is to be summarized be so voluminous as to make comprehension difficult and

examination inconvenient. E.g., <u>United States v. Bray</u>, 139 F.3d 1104, 1109 (6th Cir. 1998). When such is the case, the rule requires that the proponent make the documents underlying the summary available for examination or copying. "The purpose of the availability requirement is to give the opposing party an opportunity to verify the reliability and accuracy of the summary prior to trial." <u>Amarel v. Connell</u>, 102 F.3d 1494, 1516 (9th Cir. 1996) (internal quotation and citation omitted). To satisfy this requirement, a party must identify the exhibit as a summary, provide a list or description of the underlying documents, and state when the documents could be reviewed. <u>Air Safety, Inc. v. Roman Catholic Archbishop of Boston</u>, 94 F.3d 1, 8 (1st Cir. 1996). "Where a party fails to make available materials underlying a summary exhibit, that summary exhibit is inadmissible." <u>Amarel</u>, 102 F.3d at 1516.

Defendant's position here is that "because FRE 1006 'operates independently of discovery rules,' it is immaterial whether an opponent sought discovery of the documents underlying a summary document: a party has an 'absolute right to subsequent production of material under Rule 1006, should that material become incorporated in a chart, summary or calculation.'" Def. PFF&CL, p. 8, quoting <u>Air Safety</u>, 94 F.3d at 8. The defendant thus contests

plaintiff's exhibits 119, 125, 154, 155, 156, 379 and 380 reference information and data that were not provided during discovery.  Its position is that the very purpose for FRE 1006 is to provide an opportunity to an adversary to verify the accuracy and reliability of a summary, and that purpose was thwarted here, i.e., that admission of these summary documents is prejudicial because neither the court nor the defendant are able to test the accuracy and reliability of these exhibits.

The court conditionally accepted those exhibits into evidence but took defendant's objection under advisement. See, e.g., Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996) ("[t]he Federal Rules of Evidence are meant to instruct [trial] courts in the sound exercise of their discretion in making admissibility determinations and should not be interpreted as exclusionary rules").  The concern over those documents and testimony is with respect to their credibility rather than their admissibility.

Hence, defendant's objection to inclusion of the referenced documents, as well as Mr. Pinkerton's testimony, is hereby denied, and they will be accorded whatever weight they deserve in the final analysis herein.

b

As for the "arm's length" factor, plaintiff's proposed findings are first with respect to CBP's "normal pricing practices" test, followed by its proposed findings on the "all costs plus profit" test:

68. Pinkerton testified that PwC determined that the sale of goods between MIL and MMC were made at arm's length. PwC made this determination by applying the "normal pricing practices" test set forth in interpretative note two and the "all costs plus profit" test set forth in interpretative note three of 19 C.F.R § 152.103(l)(1)(ii-iii). (Pinkerton T.T. Vol. IV, 505:22-508:22).

* * *

69. For purposes of the "normal pricing practices" test, set out in 19 C.F.R § 152.103(l)(1)(ii), PwC compared MIL's overall profits to other manufacturers of cookware in Thailand to examine whether MIL's pricing practices are consistent with the normal pricing practices in the industry. (Pinkerton T.T. Vol. IV, 517:3-518:6; P. Ex. 117, 2008 MIL Assessment).

70. PwC calculated the rate of profit for MIL and "tested companies" (competing companies PwC used to compare to MIL) by using a profit level indicator. The profit level indicator used by PwC is the full-cost markup and the operating-cost markup, which are consistent with the guidance issued by Customs. (Pinkerton T.T. Vol. IV, 518:17-519:4; P. Ex. 119, 2010-2012 Benchmarking Study).

71. MIL compared favorably, and was within the interquartile range, with the tested companies. (Pinkerton T.T. Vol. IV, 519:5-8; P. Ex. 119, 2010-2012 Benchmarking Study).

72.  The interquartile range for the three-year average (2010-2012) for full cost markup for all of the companies tested by PwC was between -2.0% and 3.8%. MIL's full cost markup for this time period was 2.77%. (P. Ex. 119, 2010-2012 Benchmarking Study).

73.  The interquartile range for the three-year average (2010-2012) for the operating profit margin for all of the companies tested by PwC was between -2.0% and 4.4%. MIL's operating profit margin for this period was 2.72%. (P. Ex. 119, 2010-2012 Benchmarking Study).

74.  The methodology used by PwC to determine whether Meyer satisfied the "normal pricing practices" test was accepted by Customs in other matters. This test is also considered standard within the accounting profession. (Pinkerton  T.T.  Vol.  IV,  517:3-24;  519:9-  21; 529:19-530:13).

75.  PwC's findings regarding "normal pricing practices" is bolstered by evidence presented by MUS at trial in which MMC's business practices and price negotiations were described in detail by Sharon Lau ("Lau") (See Lau Testimony, Findings of Fact at ¶¶ 76- 104), Siukai Kwok ("Kwok") testimony, Findings of Fact at ¶¶ 105-131; and Darrin Johnston testimony, Findings of Fact at ¶¶ 133-170).

* * *

76. Lau is the sales director at MMC and has been employed with the company for almost twenty years. Through her employment, Lau has gained experience and knowledge about the manufacturing capacities of MIL and MZQ. (Lau T.T. Vol. III, 319:10-14; 322:7-323:2).

77.  MMC primarily acts as a middleman between MUS and MIL (Thai supply chain). Lau accepts pricing requests from MUS for certain products. Based on Lau's experience and knowledge of the products and manufacturing sites, including tooling capacity, she decides whether the order should be placed through the Thai supply chain or the China supply chain. (Lau T.T. Vol. III, 320:6-321:19; 322:22-323:6; 361:17-362:24).

78.  MMC operates as an individual entity in its pricing negotiations. (Lau T.T. Vol. III, 324:21-325:6).

79.  MMC did not have the ability to dictate to MIL what pricing terms it should accept, nor did MMC ever require that a price be accepted. Similarly, MUS cannot require MMC to accept its pricing terms. (Lau T.T. Vol. III, 325:7-24; 326:14-16).

80.  No other Meyer Group entity has attempted to influence MMC to accept a certain price. In particular, MMC's parent, MIH, does not influence, persuade or direct MMC to accept a price with MIL or MUS. (Lau. T.T. Vol. III, 328:4-8;328:12-15).

81.  MMC was free to negotiate at arm's length with MIL and MUS and did so. (Lau T.T. Vol. III, 328:16-19).

82.  A typical transaction consists of MUS forwarding a target price to MMC. If MMC could not meet the target price that would still render MMC a profit, Lau would engage in pricing negotiations. In doing so, Lau would negotiate using an alternative product that may be less expensive. For example, Lau would propose a different product with a lighter gauge such as stainless steel or aluminum, or a product alteration such as changing the handle. (Lau T.T. Vol. III, 326:19-328:3).

83.  Once a final price is negotiated between MMC and MUS, MUS will issue a final purchase order to MMC. (Lau T.T. Vol. III, 367:17-21).

84.  The process that MMC engages in -- accepting an order, filling the order, billing the client, and collecting the money -- did not change in any significant way between 2008 and 2015. At present, the process remains the same although there are often less hard copy papers because of advancing Electronic Data Interchange systems. (Lau T.T. Vol. III, 342:9-19).

85.  Once MUS submits its price request to MMC, Lau begins price negotiations with MIL. (Lau. T.T. Vol. III, 323:16-18).

86. By way of an example, on October 29, 2011, MIL issued an invoice to MMC for products that MMC negotiated to purchase from MIL. (Lau T.T. Vol. III, 334:20- 335:2; P. Ex. 190, Entry Packet, MUS001401).

87. Payment is accepted as an electronic wire or graphic transfer. (Lau T.T. Vol. III, 407:12-17).

88. The payment terms as to MIL and MMC are an open account for 60 days. (P. Ex. 190, Entry Packet, MUS001404).

89. The payment terms as to MMC and MUS indicate an open account for 20 days. (Lau T.T. Vol. III, 406:13-24; P. Ex. 190, Entry Packet MUS001392).

90. MUS paid for the goods covered by the invoice. (Lau T.T. Vol. III, 339:17-21; P. Ex. 190, Entry Packet).

91. Every payment is reflected in MMC's accounting system. (Lau T.T. Vol. III, 407:18-21).

92. Both MMC and MUS have separate accounting departments that monitor and confirm the invoices and purchase orders to ensure there are no discrepancies or clerical errors. If there are any issues, these would be reported directly to Lau. (Lau T.T. Vol. III, 365:17-367:16).

93. Approximately 80-90% of MUS's production is ordered through the Thai supply chain. (Lau T.T. Vol. III, 353:4-17). Lau may direct orders to MHK/MZQ (the China Supply Chain) if MIL is at full capacity or if the product is labor-intensive. (Lau T.T. Vol. III, 386:7-16).

94. Lau requests a price quote from either the Thai Producer or the Chinese Producer based on the assignment and the price negotiations are similar no matter the Producer with which she deals. (Lau T.T. Vol. III, 320:11-18; 342:4-8).

95. MMC retains accounting records reflecting its profitability to MUS. It also retains accounting records

reflecting its profitability when it sells directly to non-Meyer entities such as Costco. (Lau T.T. Vol. III, 403:12-24).

96. MMC maintains a profit in its business with MIL and MZQ and retains documentation reflecting such. (Lau T.T. Vol. III, 404:21-405:9).

* * *

97. MMC's business is not exclusive to Meyer-related entities. MMC also sells to various companies for product delivery in the United States, e.g., HyCite, Costco, . . . Amway, Element, Canadian, QVC U.S.A., Sears, Wal-Mart, MYREX International and Target. (Lau T.T. Vol. III, 340:14-341:5; 370:12-371:11).

98. MMC collects information independently and also from MUS with respect to the business and competitor landscape in the United States. MMC's major competitors for business in the United States include: Calphalon, T-Fal, Tramotina, Cuisinart, Pioneer Woman at Wal-Mart and Chrissy Teigen at Target. (Lau T.T. Vol. III, 342:20-343:4; 343:9-25).

99. Consumer insight regarding major competitors helps MMC engage in negotiations at the right price for the right product. MMC has to consider the competition in the market for risk of business going to another competitor. (Lau T.T. Vol. III, 344:3-17; 345:3-18).

100. To ensure that MMC stays competitive, Lau often attends trade shows with MUS. There, she is able to evaluate competitor products and new product launches. This type of market survey is vital for MMC in its ability to stay competitive with price, design, service and development of new products. (Lau T.T. Vol. III, 345:19-346:21).

101. MMC negotiates pricing from non-Meyer related entities, such as Costco, using the same arm's length strategy and approach as its negotiations with MIL or MZQ when an order is placed by MUS. For example, Lau considers the same factors in assigning the order from

Costco to either MIL or MZQ as she does when the order is placed by MUS. (Lau T.T. Vol. III, 341:12-352:17).

102. Rollback pricing is one of the ways that Meyer entities stay competitive in the United States market. For example, if Wal-Mart issues a rollback price on a product distributed by MUS, MUS will in turn talk with MMC to try and negotiate a better price and essentially rollback MMC pricing indirectly. (Lau T.T. Vol. III, 346:22-347:13).

103. MMC will gauge MUS's projected volume and then determine whether it is a sound financial decision to match the rollback. (Lau T.T. Vol. III, 347:14-23). In making this decision, MMC considers the pricing from MIL and determines whether there is any leeway in the financials. If there is an impasse or financial restrictions, Lau will either decline to participate in the rollback or she will directly negotiate pricing with MUS and forgo a rollback price with MIL. (Lau T.T. Vol. III, 348:3-349:20).

104. MMC's approach to negotiating prices with its manufacturers when a non-Meyer company issues a rollback, such as Wal-Mart or Costco, is the same approach that MMC takes with MUS. (Lau T.T. Vol. III, 350:14-22).

* * *

105. Similarly, MIL (Thai Producer) negotiates its pricing with MMC in an arm's length manner consistent with normal pricing practices in the industry. (See Findings of Fact at ¶¶ 105-131 below).

106. MIL primarily manufactures pots and pans. In addition, MIL also manufactures boxes, glass lids, handles, knobs and kitchen tools. (Kwok T.T. Vol. I, 166:21- 167:4).

107. Siukai Kwok ("Kwok") has been employed with MIL for twenty-seven years, first as the costing manager and now as the finance manager. (Kwok T.T. Vol. I, 157:7-9)

108. Kwok was MIL's finance manager in the fourth quarter of 2011 at the time the products at issue in this case were imported. (Kwok T.T. Vol. I, 157:23-158:3).

109. In his position as the finance manager, Kwok prepares price quotes and coordinates with the banks. He also compiles the monthly financial statements and records all of the manufacturing costs and manages inventory control. (Kwok T.T. Vol. I, 158:4-11).

110. MIL sells primarily to MMC, MHK and Myrex Thailand Limited ("MTL"), a Meyer Group distributor of cookware located in Thailand. (Kwok T.T. Vol. I, 159:23-160:16).

111. MIL sells about 96% of its goods to MMC and about 2% of its goods to MHK (China Middleman) and MTL (Thailand Distributor). (Kwok T.T. Vol. I, 160:20-25).

112. Both MMC and MUS conduct site visits at MIL where they may bring their respective clients to visit the MIL factory. (Kwok T.T. Vol. I, 162:17-163:5).

113. MMC and MIL negotiate prices for pots and pans. In general, MMC requires a specific number of items from MIL. If MIL's price does not meet MMC's requirement MIL will review the price again in order to try to make the sale. However, if adjusting the price will result in a loss of profit for MIL, then MIL will reject MMC's offer. MIL does not have to accept MMC's price. (Kwok T.T. Vol. II, 238:18-25).

114. As between MIL and MMC, there is a Master Manufacturing Agreement ("Manufacturing Agreement") between the parties entered into on February 14, 2003 that formalized the payment terms for the production of products and remains in force to date. (Kwok T.T. Vol. I, 177:19-178:11; Lau T.T. Vol. III, 328:23-329:7; P. Ex. 123, Master Manufacturing Agreement, MUS010359).

115. Under the terms of the Manufacturing Agreement, MMC ("the Company"), is required to place a minimum order to MIL ("the Supplier"). Specifically, MMC provides MIL with $100,000,000 dollars in business, per year, but there are

no minimum quantity requirements. (Lau T.T. Vol. III, 332:24-333:22; P. Ex. 123, Section 3.5).

116. This contractual minimum was negotiated to create a stable business between the companies. (Lau T.T. Vol. III, 394:11-17).

117. The Manufacturing Agreement provides for negotiation between the parties. Section 5.3 of the payment terms indicate that MMC, the Company, "shall pay the total price in relation to any invoice prepared in respect of a Purchase Order at such times and such manner as the Company and the Supplier may from time to time agree and in the absence of such agreement at such times and in such manner as the Supplier shall reasonably demand...." (Lau T.T. Vol. III, 337:11-20; P. Ex. 123, Section 5.3).

118. MIL and MMC operate under the Manufacturing Agreement with a FOB Thailand term. (Lau T.T. Vol. III. 337:24-338:25; P. Ex. 123, Section 6; P. Ex. 190, Entry Packet MUS001392).

119. Kwok negotiates product sales price with four to five different marketing managers at MMC. (Kwok T.T. Vol. I, 161:2-15).

120. MIL ships products direct to MUS but there are no direct discussions with MUS regarding pricing or sale. (Kwok T.T. Vol. I, 162:4-12).

121. Kwok is responsible for setting pricing of the pots and pans that MIL sells to MMC. (Kwok T.T. Vol. I, 175:23-176:2).

122. Pricing negotiations between MIL and MMC are typically conducted through email, with MIL setting the initial price for the products it sells based on its costs incurred making those products. (Kwok T.T. Vol. I, 178:13-25).

123. Once an order was agreed to through MMC, MIL would direct its invoice to MMC stating the merchandise and price for purchase, which MMC would pay. (Lau T.T. Vol. III, 332:23-334:6; 335:8-9).

124. Kwok manages and tracks the MIL production costs. This includes both material and production costs. (Kwok T.T. Vol. I, 175:6-13).

125. MIL production costs include: labor, water, electricity, gas, and overhead costs of the factory, which includes depreciation costs. (Kwok T.T. Vol. I. 175:14-22).

126. In setting the price, MIL considers the cost of production plus the profit margin, with a goal of maintaining an average profit margin of three percent. Profit can range below and above three percent. (Kwok T.T. Vol. I, 176:3-18).

127. MIL engages in internal discussions based on competitor pricing to differentiate itself and stay competitive in the market. These competitors include other companies in the market of cookware and kitchenware including pots and pans. (Kwok T.T. Vol. I, 176:19-177:3).

128. MIL's profit as compared to its competitors is more than average. (Kwok T.T. Vol. I, 177:4-8).

129. The MIL price to MMC is not accepted automatically. At times MMC has rejected MIL prices. Moreover, MIL does not sell its goods to MMC at a loss. (Kwok T.T. Vol. I, 177:16-18; 179:2-4).

130. In the event pricing is rejected, the parties will work together in negotiations. MIL would be able to concede a lower price while still insuring marginal profit at MIL. (Kwok T.T. Vol. I, 179:9-18).

131. Meyer Group has a company-wide philosophy that each individual company within the Meyer Group should maximize its own profit. (Kwok T.T. Vol. I, 180:8-12).

132. MIL's parent, MIH, does not participate in any day-to-day business of MIL, nor does it direct any of the production schedules at the factory. Nor does MIH direct any of MIL's pricing or provide any assists in the form of loans or subsidies. (Kwok T.T. Vol. I 163:19-164:10).

* * *

133. In a typical transaction involving MUS's purchase of products through its Thai supply chain, an entry packet accompanies a shipment of goods from MIL in Thailand to MUS. (Johnston T.T. Vol. I, 104:2-6; P. Ex. 190, Entry Packet).

134. The entry packet contains an invoice from MIL to MMC, commonly referred to as the "first sale price." (Johnston T.T. Vol. I, 105:12-23; 106:13-19).

135. The entry packet also contains an invoice from MMC to MUS reflecting the price that MUS would pay to MMC, commonly referred to as the "second sale price." (Johnston T.T. Vol. I, 104:11-23).

136. The MMC invoice includes the credit terms which were negotiated between MMC and MUS. (Johnston T.T. Vol. I, 107:23-108:9).

137. Johnston was not aware of any instance where MUS received an invoice from MMC and the purchase order price did not match the invoice price. (Johnston T.T. Vol. I, 137:15-21).

138. Johnston was not aware of any instance where MUS received an invoice from MHK and the purchase order price did not match the invoice price. (Johnston T.T. Vol. I, 137:15-21).

139. Each purchase order is considered the contract for each delivery of cookware and is guided by an overarching Master Distribution Agreement. (Johnston T.T. Vol. I, 138:8-14).

140. The Master Distribution Agreement ("Distribution Agreement") between MUS and MMC formalized the process for purchasing products from MMC by MUS. (P. Ex. 124, Master Distribution Agreement).

141. The Distribution Agreement was effective as of May 16, 2003 and was in effect at the time of the entries at

issue in this case. (Johnston T.T. Vol. I, 85:7-19; P. Ex. 124, Master Distribution Agreement).

142. Under the terms of the Distribution Agreement, MUS was required to pay MMC for products in cash within twenty-one days of invoice. (Johnston T.T. Vol. I, 127:5-12; 130:16-22).

143. An order placed by MUS under the Distribution Agreement was done by way of a purchase order and contained details such as how many products were going to be purchased, the SKU number, pricing time, date and delivery for each product. (Johnston, T.T. Vol. I, 117:24-118:24).

144. There is underlying accounting documentation as part of MUS's normal accounting practice that confirms the final payment figures for all of MUS's purchases of product. (Johnston T.T. Vol. I, 131:20-132:14).

145. MUS was not beholden to any approval or accommodations from MIH in the negotiation of the Distribution Agreement between MUS and MMC, nor did MIH have any influence over negotiations despite the parties having the same parent company. (Johnston, T.T., Vol. I, 87:8-11; 96:5-98:3).

146. Johnston's point of contact on behalf of both MMC and MHK was Lau, who was in charge of all pricing on products purchased by MUS and coordinated the target supply chain best suited to fulfill the purchase and overflow for product development. (Johnston T.T. Vol. I, 86:9-17; Lau T.T. Vol. III, 320:6-321:19; 322:22-323:6; 361:17-362:24).

147. MUS and MMC commonly engaged in pricing negotiations and in a typical transaction, pricing for products was not fixed nor guaranteed. As part of a common practice, MUS would submit a pricing request for a product, and MMC would submit a counteroffer. (Johnston T.T. Vol. I, 87:12-24).

148. MUS would submit a document to MMC that gives specifications from the business development team

requesting product pricing accompanied by an estimated required retail target price. (Johnston T.T. Vol. I, 83:24-84:14).

149. When negotiating price with Lau on behalf of MMC or MHK, MUS would consider factors such as its targeted retail price and margin structure in the U.S. (Johnston T.T. Vol. I, 88:4-17).

150. Often times MUS would use competitive market information to negotiate pricing with MMC to provide a clearer understanding of the price requests based on the market for similar products. (Johnston T.T. Vol. I, 88:18-89:9; 92:17-22; 120:15-20).

151. MUS gauges market competition by conducting a competitive market analysis three to four times a year, which allows it to stay abreast of competitors' operations and understand how competitors are operating in the marketplace. (Johnston T.T. Vol. I, 76:14-78:5; 115:2-15).

152. For example, MUS would assess competitors' new product launches and price adjustments. (Johnston T.T. Vol. I, 115:16-22).

153. If MUS assessed a major adjustment of price by a competitor that could be a disadvantage to its business, MUS would use the price adjustment to retroactively try and negotiate a better price on its business with MMC. (Johnston T.T. Vol. I, 116:10-19).

154. MUS's primary competitors in the U.S. market are Newell Corporation[ and Group[e] SEB[,] who sell products available in department stores like Costco, and additional competitors include Tramontina and The Cookware Company. (Johnston T.T. Vol.1, 90:19- 92:3).

155. These companies hold the most significant amount of additional market share in the United States, specifically in the cookware business. (Johnston T.T. Vol.1, 92:10- 16).

156. During negotiations, MUS did not know ultimately which supply chain would manufacture the products, because Lau would independently assess whether the order should be through the Thai supply chain or China supply chain. (Johnston T.T. Vol. I, 122:9- 123:10).

157. Accordingly, Johnston's negotiation strategy with Lau was the same for both the Thai supply chain and the China supply chain. (Johnston T.T. Vol. I, 122:9-123:4).

158. Communications regarding price negotiations were sent from the MUS business development team, who handled all communications for MUS with MMC. Price negotiations, however, were not a simple sign and send. Johnston would typically submit a request based on a new product being developed. Lau would then come back to Johnston with a work up of price that could be offered. (Johnston T.T. Vol. I, 119:10-22; 120:3-9).

159. MUS requests to MMC on pricing w[ere] not automatically accepted as a matter of course; at times Lau would negotiate with Johnston on pricing that was different from the initial MUS pricing request. (Johnston, T.T. Vol. I, 120:21-121:2).

160. In determining price, MUS operated with MMC at arm's length by operating as two completely independent and separate entities. (Johnston T.T. Vol. I, 89:19- 90:10).

161. MUS's business negotiations with MMC were at arm's length and were consistent with Mr. Johnston's experience negotiating on behalf of other entities outside of the Meyer Organization. (Johnston T.T. Vol. I, 90:6-14).

162. MUS understood that an order placed with MMC, if accepted, was produced by MIL or MZQ, but MUS did not negotiate the price directly with either factory and never tried to influence either factory's pricing negotiations with MMC. (Johnston T.T. Vol. I, 93:7-14; 94:8-12).

163. During the time of Mr. Johnston's employment at MUS as managing director, he was not aware of any instance

where MUS assisted MIL in the production of any goods ordered by MUS. (Johnston T.T. Vol. I, 98:8-22).

164. On behalf of MUS, Johnston also dealt with global Meyer distributors in the United Kingdom, Canada, Australia and Japan that sometimes contract with MUS for cookware. (Johnston T.T. Vol. I, 142:7-15).

165. In preparing pricing to other Meyer distributors, Johnston considered overhead and costs such as warehousing operational costs and profit. MUS sought to make the same rate of profitability on these sales to Meyer distributors as it would when selling to a United States retailer. (Johnston T.T. Vol. I, 143:10-144:5).

166. These pricing negotiations that MUS engaged with MMC and related distributors were the same tactics MUS used with unrelated parties. (Johnston, T.T. Vol. I, 89:14-18).

167. If, for example, a Meyer Group entity had a shortage or market need, MUS would sell and distribute its products to those entities on the condition that MUS had inventory in the warehouse. (Johnston T.T. Vol. I, 99:13-25). However, MUS would always mark up the cost of those products to cover its own overhead and profit. (Johnston T.T. Vol. I, 100:12-21).

168. MIH's ownership of MMC and MUS did not influence pricing negotiations between the companies. (Johnston T.T. Vol. I, 90:15-18).

169. MUS sold to retail clients directly and, on occasion[,] it facilitated an independent sale from MMC to one of its clients, such as Costco, in which case MUS would receive a commission from MMC. (Johnston T.T. Vol. I, 101:17-102:16; 146:11-22).

170. Although Johnston was not operating as managing director of MUS at the time of the products before the court being imported, he believes that the pricing negotiations were done in the same or similar way. (Johnston T.T. Vol. I, 123:18-23; 125:12-21).

Pl's PFF&CL, pp. 15-30, in support of finding CBP's "normal pricing practices" test satisfied for the Thai supply chain.

Proposing that the Thai distribution channel also satisfies CBP's "all costs plus profit" test, the plaintiff argues trial showed as follows:

171. In Customs' view, the "all costs plus profit" test requires that the related-party price cover the seller's costs in a profit that is equal to the firm's overall profit of sales of the same class or kind over a representative period of time. (Brenner T.T. Vol. V, 873:12-19).

172. However, aside from Treasury Decision 96-87, there are no statutes or regulations that require an importer to provide specific and exact documentation to Customs in order to be eligible for first sale treatment. (Brenner T.T. Vol. V, 896:18-897:6).

173. Although Customs usually interprets the word "firm" to mean the parent company of the importer, Brenner admitted that "firm" is not defined as the parent company in any statute or regulation. (Brenner T.T. Vol. V, 875:15-876:3; 905:22-906:3; D. Ex. 15, ICP, Determining the Transaction Value of Imported Merchandise for Related Party Transactions).

174. Customs does not have a position with respect to what entity would be the firm in the event that the parent did not meet the definitional test for "parent" for purposes of the "all costs plus profit" test. (Brenner T.T., Vol. V, 906:9-907:11).

175. In fact, in the event there is no parent or the parent company is not a producer of the same class or kind of goods as the manufacturer, Customs takes a flexible approach and considers both tests as a whole and

whether there is a qualified related party against which
to measure profit:

> Q: So does [sic] customs tied to only the firm
> being a parent?
>
> A: I mean, that's usually what we think is the
> best, but we have issued decisions that —
> where the firm was not the parent.
>
> Q: And how were you able to issue a decision
> when the firm was not the parent and use that
> cost-plus prong under the circumstances of
> sale?
>
> A: Well, in those situations, we kind of —
> they have given us sort of information on the
> other tests as well. So I mean, I think they
> have satisfied some aspects . . . of the other
> tests to show that price was set without
> influence.
>
> Q: So they can still use cost-plus-profit; is
> that fair?
>
> * * *
>
> A: . . . They have some other good comparison,
> so it might not be the parent, but maybe
> there's another subsidiary that is a good
> comparison . . . they might show, oh and we
> also do this in the industry. And then so
> taking that together, we would say that they
> operate in an arms-length fashion.

(Brenner T.T. Vol. V, 877:2-878:12).

176. PwC determined that Meyer's products were sold at
arm's length under the "all costs plus profit test" by
examining the following: (i) the cost sheets of products
at issue; (ii) the cost of materials and allocation of
labor, overhead, expenses, and materials; and (iii) the
sales price or FOB price. PwC would then calculate a

profit to determine whether MIL was selling at cost plus
a profit. (Pinkerton T.T. Vol. IV, 508:22-509:23).

177. For purposes of the "all costs plus profit" test,
PwC considered the "firm" to be the overall producer,
MIL. PwC did not consider MIL's parent, MIH, to be the
appropriate "firm" because MIH is purely a holding
company for many different entities. MIH's profits are
derived from capital gains and investments in real
estate, not the sale of cookware. Therefore, PwC found
it inappropriate and inconsistent with the regulation to
compare MIL's profit with MIH's profit. (Pinkerton T.T.
Vol. IV, 511:4-513:11).

178. Instead, PwC compared the rate of profit of MIL's
products exported to the United States compared against
the overall profit of MIL. PwC determined that MIL was
the appropriate tested party here because the profit at
the manufacturing level meets the statutory criteria,
which is to ascertain whether the price of the product is
adequate to ensure "recover of all costs plus a profit"
as compared with the "firm's" overall profit. The reason
that the profit of individual items shipped from MIL to
MUS should be compared to MIL's overall profit (i.e.,
Operating Profit Margin) is to demonstrate that the
profitability of items shipped to the US is not being
manipulated (e.g., disproportionately lowered) solely to
take advantage of first sale. There is the expectation
that the profit levels should be in line with rest of
world. PwC determined that the rate of profit for MIL's
goods exported to the United States and goods MIL sold
worldwide were equivalent or within a normal range.
(Pinkerton T.T. Vol. IV, 510:22-514:10; 516:21- 517:2).

179. There are no Customs regulations that require that
the "firm" mentioned in 19 C.F.R §152.103(1)(1)(iii) must
be the parent of the importing party. (Pinkerton T.T.
Vol. IV, 511:15-512:2).

Pl's PFF&CL, pp. 30-32.

C

China Supply Chain First Sale

The plaintiff argues that the transactions involving the PRC supply chain satisfy the first sale rule of <u>Nissho Iwai</u> in addition to the Thai supply chain.[9]

1

Regarding the first <u>Nissho Iwai</u> factor, when preparing the China Producer's Assessment for 2010-2012, PwC confirmed that the transactions to Meyer Macau and/or Meyer Hong Kong were <u>bona fide</u> sales. Pinkerton T.T. IV, 599:11-601:21; P. Ex. 125, 2016 China Producer Assessment covering 2010-2012.  As it had with repect to the Thai supply chain, at the port level CBP agreed that there was a <u>bona fide</u> sale of merchandise imported by Meyer through its PRC supply chain, and regulatory audit did not challenge this conclusion.  <u>See</u> P. Ex. 5, First Sale Letter of Understanding for

---

[9] For merchandise procured from the Chinese producer, plaintiff's witness described the China producer's place in the transaction flow relevant to this case as receiving orders for merchandise "from Meyer Hong Kong," purchasing raw materials for production of merchandise, manufacturing cookware imported by Meyer, selling merchandise "to Meyer Hong Kong," acting as exporter to foreign markets including the United States, and receiving payment from Meyer Hong Kong for merchandise.  The China producer exports its products not only to Meyer through Meyer Hong Kong but also to other Meyer affiliates worldwide.

China Supply Chain; P. Ex. 20, Office of Field Operations Referral Audit Report.

Regarding the second factor, Mr. Kam testified that the SKU numbers of the products manufactured by the China producer sold to Meyer Hong Kong or Meyer Macau indicate that those products are ultimately destined for the United States. Kam T.T. Vol. III, 416:25-417:9. Further, when preparing the China Producer Assessment for 2010-2012, PwC confirmed that the transactions were clearly destined for the United States for that period of time. Pinkerton T.T. Vol. IV, 599:11-601:2; P. Ex. 125, 2016 China Producer Assessment covering 2010-2012. To confirm that the goods purchased by Meyer Hong Kong from the China producer were clearly destined for the United States at the time they were sold to Meyer Hong Kong by the China producer, PwC examined purchase orders from Meyer to Meyer Hong Kong and Meyer Hong Kong to the China producer, commercial invoices, and bills of lading. P. Ex. 125, 2016 China Producer Assessment covering 2010-2012.

2

Here, the court defers to its rationale on the first two Nissho Iwai factors with respect to the Thai supply chain, as well

as CBP's earlier consideration thereof, in finding those satisfied on this point.

3

Regarding the third <u>Nissho Iwai</u> "arm's length" factor applied to sales from the China producer, plaintiff's restatement is muddled, but it calls attention to the following in support of the "normal pricing practices" test:

> 185. MZQ is the manufacturer in the China Supply Chain. (P. Ex. 152a, Relevant Meyer Entities Demonstrative).

> 186. MZQ primarily manufactures aluminum and stainless steel cookware and is organized by two main assembly lines. (Kam T.T. Vol. III, 413:25-414:5; 429:14-19).

> 187. The two departments are universally kept separate with respect to pricing, employment and management. In some instances the departments may share employees if there is a need. The costing department will account for associated labor costs from one department to the other. (Kam T.T. Vol. III, 430:2-431:7).

> 188. The MZQ stainless steel department uses material imported from China (Tisco), Japan (Hanwa) and Taiwan. The majority of steel is imported from Japan. (Kam T.T. Vol. III, 439:2-23).

> 189. MZQ generally sells its cookware products to MHK, MMC, Meyer Europe SRL (Ltd.) ("MES") and Meyer China Limited ("MCN"). MCN is the Meyer sales department in China. (Kam T.T. Vol. III, 415:10-16).

> 190. Kan Ming Kam ("Kam") has been the production manager for the stainless steel department at MZQ since 1999. He holds one of the top five to seven management positions

at MZQ and reports to the general manager. (Kam T.T. Vol.
III, 412:12-19; 413:17-21; 458:18-459:2).

191. As production manager at MZQ, Kam is responsible for
the planning and production process. This includes
tracking the purchase orders, solving any difficulties or
issues with production such as technical, quality or
costing issues. Kam also controls production costs for
new products and provides preliminary costing estimates
and quotes. (Kam T.T. Vol. III, 412:24-413:11).

192. MZQ does not directly negotiate pricing with MUS.
(Kam T.T. Vol. III, 417:10-13).

193. MZQ does not consult with MIH before it can present
a new product price to its customers. (Kam T.T. Vol. III,
417:20-23).

194. MZQ does not receive any assistance from MIH in the
pricing of new products. (Kam T.T. Vol. III,
417:24-418:3).

195. MZQ often hosts site visits with either MHK clients
or MHK business personnel who want to better understand
the production process. (Kam T.T. Vol. III, 418:7-12).

196. MZQ also provides site tours for MMC clients and
business associates. This also includes MMC project teams
regarding issues as to production of materials. (Kam T.T.
Vol. III, 418:18-419:12).

197. Kam oversees the production in the stainless steel
department which also includes clad metal. (Kam T.T. Vol.
III, 429:10-13).

198. MZQ retains purchase orders evidencing the
merchandise purchase, including the lids, knobs, handles.
(Kam T.T. Vol. III, 442:17-23).

199. MZQ creates WIP shells as part of the manufacturing
process of its pots and pans and, at times, sells the WIP
shells to either MIL, MMC, MZQ or MES, a Meyer Group
producer in Italy. (Kam T.T. Vol. III, 414:14-415:13; P.
Ex. 131f).

200. MZQ costing department sets the price for the sale of the WIP shells. (Kam T.T. Vol. III, 426:8-24).

201. MZQ maintains the purchase orders when the WIP shells are sold to distributors such as MIL, MES, MHK, and MCN. (Kam T.T. Vol. III, 426:25-427:14).

202. In the event MMC determines that an order is better filled through the China supply chain, it directs MUS to issue the order to MHK instead of MMC. However, MHK does not engage MUS with any pricing negotiations or agreements. All of the pricing and finalizing of the order is through MMC. (Lau T.T.Vol. III, 390:9-22).

203. MHK is not obligated to accept an assigned order through MMC. At times an order will be rejected if MHK does not have manufacturing capacity. (Lau T.T. Vol. III, 395:3-12).

204. When determining new product pricing, MZQ considers various factors such as level of difficulty in production, whether the design of the production process is reasonable, the amount of scrap incurred for the material and whether it is feasible to make the product based on the material chosen. (Kam T.T. Vol. III, 419:13-23).

205. As part of the pricing of new products for MZQ, Kam provides information to the custom department such as dimensions of the materials, type of materials, number of steps involved in the production process, and estimate for budget on the scrap materials. Scrap materials include materials that were not manufactured properly so they could not be recycled or reused. (Kam T.T. Vol. III, 415:25-416:13; 434:10-14).

206. For example, a pot with clad metal could have an external layer of stainless steel that may crack from production, which could not be salvaged. (Kam T.T. Vol. III, 435:2-12).

207. Certain steps in the process may range in difficulty, and this may affect the cost and sale of the product. The cost of production will increase based on

the difficulty in the manufacturing steps. (Kam T.T. Vol. III, 416:14-24).

208. In addition, MZQ also considers the cost of labor and of overhead (including depreciation of the machinery, cost for water and electricity). These costs are tracked by the MZQ costing department. (Kam T.T. Vol. III, 419:24-420:11; 437:18-24).

209. Every week the MZQ IT department automatically compiles this information with respect to performance and manpower. Essentially the manpower is tracked each week by the amount of products produced each week. (Kam T.T. Vol. III, 436:17-438:2).

210. As to water and electric expenses, MZQ keeps a copy of the bills and proof of payment. (Kam T.T. Vol. III, 438:6-21).

211. MZQ also considers profit in determining new product pricing. It retains a general profit margin goal and its corporate policy requires that the MZQ products be sold at around a three to five percent profit. The most important factors in keeping the profit range is the amount of scrap and whether the manufacturing stages are easy or difficult. (Kam T.T. Vol. III, 420:12-421:5).

212. The costing department and accounting department maintain documents evidencing MZQ's profit. (Kam T.T. Vol. III, 447:23-10).

213. The corporate policy of maintaining a profit from three to five percent was initiated by the MZQ general manager and communicated to all managers. (Kam T.T. Vol. III, 448:17-24).

214. For products ultimately purchased by MUS from MZQ, MUS coordinated and negotiated pricing with Lau. (Johnston T.T. Vol. I, 109:15-24).

215. In 2016, PwC conducted an additional Benchmarking Study for the China supply chain for the periods of 2010, 2011, and 2012, which takes into account the merchandise

before this Honorable Court. (Pinkerton T.T. Vol. IV, 583:5-15; P. Ex. 119, 2010-2012 Benchmarking Study).

216. The 2016 Benchmarking Study was prepared in the same manner and using the same methodology as the Benchmarking Study used for the 2008 audit. (Pinkerton T.T. Vol. IV, 583:16-584:9; 598:14-599:2).

217. The interquartile range of profit between 2010 and 2012 for comparable Chinese companies was between -.8% and 4.6%. MZQ's average operating profit margin during this time was 2.09%, which is within the interquartile range. (Pinkerton T.T. Vol. IV, 597:16- 598:6; P. Ex. 119, 2010-2012 Benchmarking Study).

218. The interquartile range of profit between 2010 and 2012 for comparable Chinese companies was between 1.8% and 5.6%. MZQ's average full cost markup during this time was 2.05%, which is within the interquartile range. (Pinkerton T.T. Vol. IV, 597:16-598:6; P. Ex. 119, 2010-2012 Benchmarking Study).

* * *

220. PwC's findings regarding "normal pricing practices" was bolstered by evidence presented by MUS at trial in which business practices and price negotiations in the China supply chain were described in detail by Kam (See Findings of Fact ¶¶ 184-212 above).

221. PwC conducted a study dated May 13, 2016 which was designed to assess the transaction value for purposes of first sale treatment for MZQ. PwC did an analysis under the three-part test set forth in Nissho Iwai. (Pinkerton T.T. Vol. IV, 603:14-604:24; P. Ex. 125, 2016 MZQ Assessment covering 2010-2012).

222. PwC analyzed inter-company transactions on a product-by-product basis to verify recovery of all costs plus an appropriate profit equivalent to the firm's

overall profit during the 2010-2012 calendar years as
required by 19 C.F.R. § 152.103(1)(1)(iii). (P. Ex. 125,
2016 MZQ Assessment covering 2010-2012). PwC provided the
following analysis of two sample transactions per year to
confirm that the product price between MZQ and MHK was
sufficient to cover all productions costs plus a profit
for 2010-2012:

| Year | Part Number | Average First Sale Price | Average Total Cost | Profit Margin |
|------|-------------|--------------------------|--------------------|---------------|
| 2010 | 71246-C | $28.51 | $20.90 | 26.7% |
| 2010 | 71892-C | $ 5.91 | $ 4.18 | 29.3% |
| 2011 | 71892-C | $ 6.44 | $ 4.57 | 29.0% |
| 2011 | 82365-C | $12.52 | $ 9.01 | 28.0% |
| 2012 | 71892-C | $ 6.51 | $ 4.83 | 25.8% |
| 2012 | 82796-C | $15.56 | $ 9.71 | 37.6% |

(P. Ex. 125, 2016 China Producer Assessment covering
2010-2012).

223. As MIH is an investment holding company that does
not have operations, is not a party to any of the
transactions between MHK and MZQ and does not engage in
the sale of merchandise of the same class or kind as MZQ,
MZQ is the appropriate "firm" to analyze under the "all
costs plus profit test." (P. Ex. 125, 2016 MZQ Assessment
covering 2010-2012).

Pl's PFF&CL, pp. 34-39.


4

    With regard to the last requirement of Nissho Iwai that

prices not bear any nonmarket distortions, the plaintiff contends

that no variables of China's nonmarket economy affected the

transaction value of the items before the court.  Its position is

as follows.

219. In PwC's analysis of MUS's China supply chain it did not find any evidence of government assistance or subsidies. (Pinkerton T.T. Vol. IV, 601:6-16; P. Ex. 117, 2008 MIL Assessment; P. Ex. 125, 2016 MZQ Assessment covering 2010-2012).

* * *

225. As part of MZQ's management team, Kam participates in group meetings with the general manager and the other department managers about various issues. During these meetings, Kam was never informed of any assists by the Chinese government. (Kam T.T. Vol. III, 462:21-23).

226. Additionally, MZQ has never received a reduction or exemption from taxes, either direct or indirect from China, nor has the Chinese government ever provided services or goods to MZQ at no cost. (Kam T.T. Vol. III, 422:17-423:2).

227. MZQ has not received a deduction or redemption from the Chinese local provincial or national government and has not been paid any money to increase its export plan capacity. (Kam T.T. Vol. III, 423:3-11).

228. MZQ owns its own land, and its power and water companies are privately operated. (Kam T.T. Vol. III, 424:14-21).

229. MZQ has not been given any concession to export goods that MZQ would not have received had the goods been sold locally. (Kam T.T. Vol. III, 423:12-16).

230. MZQ has not been directed to hire a particular employee, or put particular persons in management positions at MZQ, by the Chinese government or Communist Party. (Kam T.T. Vol. III, 423:17-424:6).

231. MZQ has not been required to meet any quota on its production by the local or national Chinese government and is not mandated to use a specific company as its raw material suppliers. (Kam T.T. Vol. III, 424:7-425:2).

232. MZQ does not receive any contributions from either the Communist Party or the local or national government of China to defray labor costs. (Kam T.T. Vol. III, 425:3-6).

233. If the United States Government made a finding that either aluminum cookware or stainless steel cookware was either being dumped into the United States or was being subsidized in violation of United States' countervailing duty laws there would be a designation of a case number on the entry documents, specifically the Customs Form 7501. There was no evidence in any of the entry packets before the court that aluminum cookware or stainless steel from Thailand or China was subject to an anti-dumping or countervailing duties order. (Pinkerton T.T. Vol. V, 817:16-822:5; P. Exs. 157-196; 377-378, Entry Packets).

234. If there were, in fact, an anti-dumping or countervailing duty order in place, but it was overlooked in the preparation of an entry, the entry would still be flagged or rejected by the Customs Automated Broker Interface (ABI) system. The broker uses a software system known as the ABI system that automatically generates a reading to the broker that the broker must declare the anti-dumping or countervailing duty with Customs. (Pinkerton T.T. Vol. V, 819:4-22).

Pl's PFF&CL, ¶¶ 219, 225-234.


                                 III

        The plaintiff contends that the evidence shows clad products manufactured by the Thai producer in Thailand from discs imported from China undergo a double substantial transformation in Thailand and are properly considered Thai-originating content for purposes of GSP calculation, and that CBP incorrectly denied its GSP claims.

A

Plaintiff's witnesses testified as follows:

241. A typical GSP calculation prepared by a corporation would consist of sections for raw materials, expenses, labor, and overhead, and also includes the selling price to calculate whether the product met the 35% foreign-content threshold requirement for GSP treatment. Meyer's GSP Calculations of the products before the Court were prepared in a manner consistent with calculations Pinkerton has seen in other companies and accepted by Customs. (Pinkerton T.T. Vol. IV, 632:5-12; 632:25-633:8).

. . .

243. PwC performed due diligence to ensure that MUS's costing sheets were accurate. It requested and reviewed manufacturer affidavits, invoices for materials, and proofs of payment to ensure accuracy. (Pinkerton T.T. Vol. IV, 495:7-496:20).

244. MIL is the largest producer of pots and pans in Thailand in terms of production volume. (Kwok T.T. Vol. I, 181:4-11).

245. Kwok was responsible for preparing the GSP calculations to determine whether products would be eligible for GSP treatment. Kwok prepares the GSP calculations at the request of a customer. (Kwok T.T. Vol. I, 181:15-183:25; P. Exs. 154-156, GSP Calculations).

246. GSP calculations are performed at the time the goods are being manufactured. (Kwok T.T. Vol. II, 304:24-305:2; P. Exs. 154-156, GSP Calculations).

247. The costs associated with manufacturing a product would not be any different if the product was ultimately shipped to the United States as opposed to being shipped to another country. (Kwok T.T. Vol. II, 311:23-312:9).

248. The GSP calculations contain eleven sections. The first section states the name of the manufacturer and the second section describes the product by SKU number. (P. Exs. 154-156, GSP Calculations).

249. The third section of the GSP calculations lists the raw materials not originating in Thailand. This includes information about the types of non-Thai originating materials used, the quantity of the non-Thai material used, and the price of non-Thai material. For SKU 71935-T, the non-Thai originating materials cost was $4.279 which was 29.4% of the first sale price. (Kwok T.T. Vol. I, 184:24-185:14; P. Ex. 155, GSP Calculations).

250. Lids manufactured in China are included in the non-Thai originating materials section of a GSP calculation. (Kwok T.T. Vol. I, 185:15-25; P. Ex. 155, GSP Calculations).

251. The fourth section of the GSP calculations lists the raw materials originating in Thailand. This information is calculated based on bills of materials and suppliers invoices. For SKU 71935-T, the Thai originating material cost $5.406 which was 37.1% of the first sale price. (Kwok T.T. Vol. I, 186:7-19; P. Ex. 155, GSP Calculations).

252. The fifth section of the GSP calculations is for direct expenses. This information is calculated by taking the factory's expenses for electricity, gas, and water and dividing it by the total number of items produced to get the average price per pan. For SKU 71935-T the price was $0.6261, which was 4.3% of the first sale price. (Kwok T.T. Vol. I, 186:20-187:12; P. Ex. 155, GSP Calculations).

253. The sixth section of the GSP calculations is for labor costs. This information is calculated by taking the total cost of labor for an entire year divided by the number of items produced for that year to get the average cost of labor per item. For SKU 71935-T, the price was $0.7717, which was 5.3% of the first sale price. (Kwok T.T. Vol. I, 187:13-20; P. Ex. 155, GSP Calculations).

254. The seventh section of the GSP calculation is manufacturing overhead. The costs associated with manufacturing overhead include the salaries of indirect production staff, depreciation, repair costs, loading tubes costs, local transportation costs. The manufacturing overhead price for SKU 71935-T was $1.6307 which was 11.2% of the first sale price. (Kwok T.T. Vol. I, 187:21-188:13; P. Ex. 155, GSP Calculations).

255. The eighth section of the GSP calculation is the sale price. The sale price is the first sale price which is the price MMC pays to MIL for a product. The sale price for SKU 71935-T is $14.56. (Kwok T.T. Vol. I, 188:14-189:7; P. Exs. 155, GSP Calculations and . . . Ex. 190, Entry Packet).

256. The ninth section of the GSP calculation is the qualified local content. This is calculated by adding the local materials cost, the direct expenses, direct labor costs, and manufacturing overhead. The qualified local content for SKU 71935-T was $8.434 which was 57.9% of the first sale price. (Kwok T.T. Vol. I, 189:8-190:4; P. Ex. 155, GSP Calculations).

257. The qualified local content for SKU 71935-T was above the 35% threshold required to be GSP eligible. (Kwok T.T. Vol. I, 190:5-7; P. Ex. 155, GSP Calculations).

258. The qualified local content for SKU 30575-T was 37.7% of the first sale price. Therefore, the qualified local content was above the 35% threshold required to be GSP eligible. (Kwok T.T. Vol. I, 191:13-193:14; P. Ex. 375, Product Catalogue SKU No. 30375-T and P. Ex. 379, Calculations SKU No. 30375-T).

Pl's PFF&CL, pp. 43-46.

B

Regarding the issue of double substantial transformation, the plaitniff contends it proved the following:

235. MIL has one factory, which is located in Laem Chabang, Thailand. There are four division departments within the factory: (i) aluminum; (ii) hard anodized; (iii) advanced automated production; and (iv) stainless steel. (Kwok T.T. Vol. I, 158:18-159:10).

236. The MIL factory employs 2,000 to 3,000 people. (Kwok T.T. Vol. I, 159:11-13).

237. In 2018, MIL produced about 75,000 pots per day. At times, MIL has produced more than 100,000 pots a day for a given year. (Kwok T.T. Vol. II, 240:12-16; 240:23-241:8).

238. MIL engages in a complex multi-step manufacturing process in order to manufacture its goods. MIL utilizes complex machinery that requires specialized skill and training. (See infra Findings of Fact at ¶ 272). For example, SKU 30382-T requires fourteen steps and thirty-four employees in order to manufacture just one pan. . . .

* * *

239. MIL manufactures certain clad products in Thailand that were disqualified from GSP treatment because the materials from which the products are developed originated as metal discs from China. Customs determined during the audit of MUS and the IAR that there was no "double substantial transformation" of those discs sufficient to make the metal become "Thai-originating" material for purposes of GSP calculations. (P. Ex. 20, Office of Field Operations Referral Audit Report; P. Ex. 81, Letter re: Statement of Fact contained in Internal Advice Response with attachments).

240. If clad metal input materials are not subject to a double substantial transformation, they are treated as non-qualifying materials for purposes of a GSP calculation. However, if the manufacturing processes constitute a double substantial transformation, then the cost of clad metal materials would be moved from the non-Thai originating bucket into the Thai originating bucket. Therefore, these products would meet or exceed

the 35% requirement threshold and would be entitled to GSP treatment. This would apply to the following products currently before the court: SKU Nos. 30503-T, 30504-T, 30510-T, 30511-T, 30522-T, 30382-T. (Pinkerton T.T. Vol. IV, 493:11-21; P. Exs. 370-374; 376).

* * *

259. When a product is substantially transformed at least twice ("double substantial transformation") raw materials that did not originate from Thailand may be treated as local materials for the purposes of a GSP calculation. For example, the clad metal product used to manufacture SKU 30382-T is currently listed as non-Thai originating material in the GSP calculations. However, if it is determined the clad metal is doubly substantially transformed then the costs associated with the clad metal would be treated as Thai-originating material. (Kwok T.T. Vol. I, 193:25-194:10; 194:20-197:2; P. Ex. 376, Product Catalogue SKU No. 30382-T and P. Ex. 380, Calculations SKU No. 30382-T).

260. In its analysis, PwC determined that there was a double substantial transformation for the clad material that came in discs. PwC made this determination by analyzing the flowchart describing each stage of the production, reviewing and analyzing case law and customs rulings relating to double substantial transformation. (Pinkerton T.T. Vol. IV, 620:17-621:23).

261. SKU 30382-T is a Food Network, ten-piece clad cookware set. (Kwok T.T. Vol. II, 204:7-10; P. Ex. 376, Product Catalogue SKU No. 30382-T).

262. The GSP calculations prepared by Kwok for SKU 30382-T identified the clad metal in the non-Thai originating material. (Kwok T.T. Vol. II, 204:11-19; P. Ex. 380, GSP Calculations SKU No. 30382-T).

263. SKU 30382-T was manufactured by MIL in Thailand. (P. Ex. 133, Production video of manufacturing process SKU 30382-T).

264. There are fourteen steps required for manufacturing the clad frying pan that is part of the SKU 30382-T Food Network ten-piece set. (P. Ex. 369, SKU 30382-T Details of Process Flow & No. of Workers; P. Ex. 133(a)-(n), frying pan demonstrative of manufacturing steps).

265. The first step in manufacturing the frying pan is known as lubricating. During this step grease is put on the clad disc to prevent the disc from forming cracks, scratches or dents during the manufacturing process. One worker is used for this step. (Kwok T.T. Vol. II, 205:11-23; P. Ex. 133a; P. Ex. 369).

266. The disc used for manufacturing the frying pan is imported from China. (Kwok T.T. Vol. II, 206:16-18; P. Ex. 380, GSP Calculation SKU No. 30382-T).

267. The second step in manufacturing the frying pan is known as deep drawing. During this step the circular disc is transformed into a WIP shell. One worker is used for this step. (Kwok T.T. Vol. II, 206:21-207:11; P. Ex. 133b; P. Ex. 369).

268. The Government concedes that after the deep drawing stage a substantial transformation has occurred. (Kwok T.T. Vol. II, 207:16-24; Government Opening Statement/Judicial Admission Vol. I, 66:22-67:5).

269. The third step in manufacturing the frying pan is known as edge cutting. The purpose of this step is to make the height of the pot even so that a lid can be placed on the pan. One worker is used for this step. (Kwok T.T. Vol. II, 208:7-21; P. Ex. 133c; P. Ex. 369).

270. The fourth step in manufacturing the frying pan is known as degreasing. The purpose of this step is to remove the grease and clean the WIP shell. One worker is used for this step. (Kwok T.T. Vol. II, 209:9-18; P. Ex. 133d; P. Ex. 369).

271. The fifth step in manufacturing the frying pan is known as bottom flattening. The purpose of this step is to flatten the bottom to facilitate the production of the pan in the subsequent steps. One worker is used for this

step. (Kwok T.T. Vol. II, 210:13-211:5; P. Ex. 133e; P. Ex. 369).

272. The sixth step in manufacturing the frying pan is known as rim sunray. The purpose of this step is to remove burr (sharp edges) from the WIP shell. One worker, who requires special training, is used for this step. (Kwok T.T. Vol. II, 211:8-212:15; P. Ex. 133f; P. Ex. 369).

273. After the sixth step, known as the rim sunray, the WIP shell is able to be commercially sold by MIL to other producers of cookware as a WIP shell — an item of commerce different than the finished pot or pan. In fact, other companies that manufacture pots and pans have bought the WIP shells following step six. (Kwok T.T. Vol. II, 212:19-213:9; 231:4-6; Pinkerton T.T. Vol. IV, 621:24-622:25; P. Ex. 133, Production video of manufacturing process for SKU 30382-T; P. Ex. 369; P. Ex. 376).

274. MIL can sell its product for a higher price when the product is completed than after it goes through the deep drawing stage. In other words, each product increases in value as it goes through each manufacturing stage. (Kwok T.T. Vol. II, 312:10-19; P. Exs. 133, 133b, and 133n).

275. The seventh step in manufacturing the frying pan is known as exterior bottom sunray. The purpose of this step is to remove the scratches and dents on the bottom of the WIP shell. One worker is used for this step. (Kwok T.T. Vol. II, 213:18-214:7; P. Ex. 133g; P. Ex. 369).

276. The eighth step in manufacturing the frying pan is known as interior embery "u". The purpose of this step is to make the pan shiny, but also to help improve food release while cooking. Seven workers are used for this step. (Kwok T.T. Vol. II, 214:8-215:3; P. Ex. 133h; P. Ex. 369).

277. The ninth step in manufacturing the frying pan is known as exterior mirror polishing. The purpose of this step is to polish the pan for aesthetic purposes to entice more consumers to purchase the pan. Six workers

are used for this step. (Kwok T.T. Vol. II, 215:6-25; P. Ex. 133i; P. Ex. 369).

278. The tenth step for manufacturing the frying pan is known as cleaning. The purpose of this step is t[o] cleanse the stains from the wax. Six workers are used for this step. (Kwok T.T. Vol. II, 216:2-9; P. Ex. 133j; P. Ex. 369).

279. The eleventh step for manufacturing the frying pan is known as re- flattening. The purpose of flattening the pan for a second time is help make the cooking oil distribute evenly and to prevent the pan from spinning when placed on a flat surface. Two workers are used for this step. (Kwok T.T. Vol. II, 217:6-218:3; P. Ex. 133k; P. Ex. 369).

280. The twelfth step for manufacturing the frying pan is known as laser marking. The purpose of this step is to mark the volume and diameter of the pan with a laser machine. One worker is used for this step. (Kwok T.T. Vol. II, 218:6-19; (P. Ex. 133l; P. Ex. 369).

281. The thirteenth step for manufacturing the frying pan is known as handle hole punching. The purpose of this step is to prepare the pan for the addition of the handle. One worker is used for this step. (Kwok T.T. Vol. II, 218:22-219:12; (P. Ex. 133m; P. Ex. 369).

282. The fourteenth step for manufacturing the frying pan is known as handle riveting. The purpose of this step is to add the handle to the pan. The addition of the handle is necessary in order to safely use this item as cookware and increases the value of the pan. Four workers are used for this step. (Kwok T.T. Vol. II, 219:15-25 (P. Ex. 133n; P. Ex. 369).

283. After the fourteenth step the frying pan is a finished product. (Kwok T.T. Vol. II, 220:2-6).

284. In total thirty-four workers worked on this one finished product. (Kwok T.T. Vol. II, 221:8-11; P. Ex. 369).

285. The other clad pans that MIL manufactures go through a substantially similar manufacturing process at MIL. This would include the clad metal open skillet pan, clad saucier, clad chef's pan, clad covered braiser, and clad butter warmer. (Kwok T.T. Vol. II, 221:12-16; 221:25-223:23; P. Exs. 371-375, Product Catalogues).

286. The Government failed to challenge that the clad products underwent double substantial transformation or offer any evidence that Meyer is not entitled to consider the imported clad metal discs to be "Thai-originating" material for purposes of its GSP calculations.

Pl's PFF&CL, pp. 41-50.

C

Lastly, plaintiff's papers relate a lengthy narrative contesting CBP's audit findings, and recounting how, in its view, CBP made numerous errors in its consideration of Meyer's first sale and GSP claims (Pl's PFF&CL, pp. 51-64) -- none of which influence consideration of this matter at this point, de novo, and need not, therefore, be related here. However, the plaintiff also contends CBP was wrong in denying GSP treatment to products imported by Meyer through the Thai supply chain by virtue of the inclusion of glass lids from China, noting that CBP headquarters, in its response to Meyer's internal advice request, denied GSP treatment to products imported by Meyer through Thailand that included glass lids from China even if the total percentage of Thai-originating product was above 35%. Pl's PFF&CL, p. 63, referencing Pl's Ex. 81 (Letter re: Statement of Fact contained in Internal Advice Response

with attachments).  The plaintiff also calls attention to the fact that this court determined by way of partial summary judgment that it was improper to disqualify an entire product or set just because it had glass lids imported from China if the product otherwise had 35% or more Thai-originating content.  <u>Id</u>. at 63 (citation omitted).

### IV

### A

Regarding its renewed objection to consideration of plaintiff's exhibits 119, 125, 154, 155, 156, 379, and 380 and trial testimony based thereon on the ground that the plaintiff failed to comply with Rule 1006 of the Federal Rules of Evidence, the defendant points out:

1.  Plaintiff's Exhibit 119 is a 3-year weighted average benchmarking study prepared by the transfer pricing team at PWC. Vol. 4 at 583:5-16.

2.  In providing his expert opinion, Mr. Pinkerton considered Plaintiff's Exhibit 119. Vol. 5 at 718:14-18.

3.  In connection with preparing Plaintiff's Exhibit 119, screening criteria is used to select comparable companies, financial statements and other financial reports are reviewed. Vol. 4 at 599:3-10.

4.  In connection with the preparation of Plaintiff's Exhibit 119, the PWC transfer pricing team extracted data from certain databases and placed it into an Excel file. Vol. 5 at 715:11-20.

5.  Mr. Pinkerton did not provide a copy of the Excel file, which was used to generate the benchmarking study, to the Government in response to the deposition and document subpoena. Vol. 5 at 715:21-715:2, 718:14-719:4.

6.  Mr. Pinkerton did not provide to the Government any of the financial statements, screening criteria, or work files of PWC used in preparing Plaintiff's Exhibit 119. Vol. 5 at 772:7-773:14.

7.  Meyer did not provide to the Government or the Court a list and copies of the documents used in preparing Plaintiff's Exhibit 119.  See Pl. Exs. moved into evidence.

8.  Plaintiff's Exhibit 125 is a study prepared by PWC on behalf of Meyer assessing transaction value under the first sale method for related parties for which Plaintiff's Exhibit 119 was a part.  Vol. 4 at 603:14-23.

9.  Plaintiff's Exhibit 125 is intended for Meyer's use and benefit and "is not intended for, nor may it be relied upon by, any other party."  Pl. Ex. 125 at MUS044865.

10.  Plaintiff's Exhibit 125 is dated May 13, 2016 and was prepared during the pendency of this litigation.  Pl. Ex. 125 at MUS044863.

11.  In preparing Plaintiff's Exhibit 125, PWC used financial data and sample transactions for the fiscal years 2010, 2011, and 2012.  Pl. Ex. 125 at MUS044866.

12.  In preparing Plaintiff's Exhibit 125, PWC's transfer pricing team:

(i)     prepared its benchmarking study (Plaintiff's Exhibit 119) relying on databases and applying data screens (Pl. Ex. 125 at MUS044882-885);

(ii)    reviewed underlying agreements, payment procedures and other documentation between the China Producer and Meyer Hong Kong (Pl. Ex. 125 at MUS044888);

(iii)  compared profit margins of Meyer Hong Kong and Meyer Trading Company based on financial information (Pl. Ex. 125 at MUS044889);

(iv)  analyzed two sample transactions by using detailed cost breakdown spreadsheets containing costed bills of materials and allocated amounts for labor expense, and manufacturing overhead, and direct expense (Pl. Ex. 125 at MUS044890);

(v)  reviewed purchase orders and commercial invoices through all steps of the two-tiered transaction (Pl. Ex. 125 at MUS044891-92); and

(vi)  reviewed financial statements of the China Producer (Pl. Ex. 125 at MUS044892).

13.  In Plaintiff's Exhibit 125, PWC states: "After agreeing on all contractual terms such as product specifications, prices and quantities with the distribution arms, Meyer Hong Kong will place a manufacturing order to the China Producer." Pl. Ex. 125 at MUS044867.

* * *

18.  Meyer did not provide to the Government or the Court a list and copies of the documents and information underlying Plaintiff's Exhibit 125. See Pl.'s Exs. moved into evidence.

19.  Plaintiff's Exhibits 154 (sku 76744-T), 155 (sku 50003-T), 156 (sku 74930-T), 379 (sku 30575-T), and 380 (sku 30382-T) are calculations prepared by Mr. Kwok, of the Thai Producer, to satisfy the third requirement for GSP eligibility under 19 U.S.C. § 2463(a)(2)(A) (i.e., "the sum of (a) the cost or value of the material produced in the BDC plus (b) the direct costs of processing operations performed in the BDC must not be less than 35% of the appraised value of such article at the time of its entry into the customs territory of the United States"). Vol. 1 at 181:15-182:22, 191:23-192:17, 194:11—195:21.

20.   Mr. Kwok only prepares GSP calculations if the customer requests them. Vol. 1 at 183:4-11.

21.   The GSP calculations are based on bills of materials, suppliers' invoices, expenses for gas, electricity, water, labor costs, and overhead (salaries of indirect production staff, depreciation, costs for repairs, loading tubes, local transportation, and percentage of raw materials) and the selling price noted on the calculation is the first sale price reflected on the invoice from the Thai Producer to Meyer Macau. Vol. 1 at 185-189.

22.  Meyer did not provide to the Government or the court a list and copies of the documents backing up the GSP calculations reflected in Plaintiff's Exhibits 154, 155, 156, 379, and 380.  See Pl.'s Exs. moved into evidence.

Def. PFF&CL, pp. 9-11.


As previously alluded to, the defendant proposes the following conclusions:  Plaintiff's Exhibits 119 (3-year weighted average benchmarking study), 125 (2016 Assessment of Transaction Value between the China Producer and Meyer Hong Kong), 154 (GSP calculation for sku 76744-T), 155 (GSP calculation for sku 50003-T), 156 (GSP calculation for sku 74930-T), 379 (GSP calculation for sku 30575-T), and 380 (GSP calculation for sku 30382-T) constitute summary documents and are subject to FRE 1006. As such, Meyer was required to (i) establish that the volume of the underlying documents could not be conveniently examined by the court; (ii) provide the Government with a list or description of

the underlying documents; and (iii) make the underlying documents available to the Government.  Id. at 11.

        "The purpose of the availability requirement is to give the opposing party an opportunity to verify the reliability and accuracy of the summary prior to trial." Amarel, supra, 102 F.3d at 1516. Plaintiff's Exhibit 125 claims that Meyer Hong Kong set the prices with the China producer when the evidence adduced at trial established otherwise.   The facts in the paragraphs above illustrate why compliance with FRE 1006 is required.  Meyer did not satisfy any of the prerequisites of FRE 1006.  Therefore, Plaintiff's Exhibits 119, 125, 154, 155, 156, 379 and 380 must be excluded as inadmissible.  Id., Def. PFF&CL, pp. 11-12 (citation omitted).  Similarly, testimony reciting information from these inadmissible documents should be disregarded. See Thompson v. United States, 342 F.2d 137,140 (5th Cir. 1965) (counsel should not be permitted to elicit testimony under the guise of refreshing recollection through use of a prepared document to obviate the necessity of introducing original records).  Accepting testimony based on inadmissible summaries would undermine the very reason for FRE 1006 and should be rejected.  Id. at 12.

                                   B

          The  defendant  also  argues  that  testimony  based  on

documents  that  were  not  produced  in  discovery  should  be

disregarded,  and  that  the  testimony  of  a  biased  witness  should  be

accorded  the  appropriate  weight.   It  points  out  that  the  rules  of

the  court  require  a  party  to  supplement  disclosures  and  responses.

USCIT  Rule  26(e).  Specifically,  with  respect  to  "an  expert  whose

report  must  be  disclosed  under  Rule  26(a)(2)(B),  the  party's  duty

to  supplement  extends  both  to  information  included  in  the  report

and  to  information  given  during  the  expert's  deposition."  <u>See</u>  CIT

Rule  37(c)(1);  <u>see</u>  <u>also</u>  <u>Ortiz-Lopez  v.  Sociedad  Espanola  de  Auxilio</u>

<u>Mutuo  Y  Beneficiencia  de  Puerto  Rico</u>,  248  F.3d  29,  34  (1st  Cir.

2001).

          During  trial,  the  plaintiff  elicited  testimony  from  Mr.

Pinkerton,  as  both  a  fact  witness  and  an  expert  witness,  that  was

based,  in  part,  on  documents  he  relied  upon  in  forming  his  expert

opinion  and  issuing  his  export  report,  such  as:

          --    the  PWC  benchmarking  analysis  (Pl.  Ex.  119);

          --    the  PWC  Assessment  of  Transaction  Value  (Pl.  Ex.
                125)  prepared  in  connection  with  this  litigation;

          --    the  PWC  Assessment  of  Transaction  Value  (Pl.  Ex.
                117)  for  transactions  between  the  Thai  Producer  and
                Meyer  Macau;

--   the documentation representing the document flow
     between the three entities in the two-tiered
     transactions; and

--   samples, costs sheets, videos, and interim steps
     that the Chinese steel blank undergoes in Thailand.

However, the defendant continues, not all of the
underlying documents upon which Mr. Pinkerton relied in offering
his expert opinion were produced to the government during
discovery, notwithstanding that such documents were the subject of
a subpoena to Mr. Pinkerton. Therefore, the defendant argues for
findings of fact as follows:

1.  At the time of his deposition, Mr. Pinkerton, as an
expert, was required to provide the Government with all
the documents he considered in forming his expert
opinion. Vol. 4 at 489:11-16.

2.  In connection with the deposition of Mr. Pinkerton as
an expert, the government served a subpoena with an
attached Schedule A, which sought certain documents. Vol.
5 at 716:3-13, 25.

3.  Among the documents sought of Mr. Pinkerton were
documents referenced in his expert report, documents
considered in forming the opinions in his expert report,
documents relied upon in forming the opinions in his
report, databases or other information repositories from
which he obtained information for his report.  Vol. 5 at
717:17-718:13.

4.  The benchmarking study that is Plaintiff's Exhibit 119 is one of the documents Mr. Pinkerton relied upon in forming his expert opinions.   Vol. 5 at 718:14-18.

5.  Plaintiff's Exhibit 119 was developed in or about 2016, during the pendency of this litigation. Vol. 4 at 583:5-16.

6.   In connection with the preparation of the benchmarking study that is Plaintiff's Exhibit 119, the PWC transfer pricing team extracted data from certain databases and placed it into an Excel file.  Vol. 5 at 715:11-20.

7.  In connection with preparing Plaintiff's Exhibit 119, the PWC transfer pricing team used screening criteria and reviewed financial statements to select comparable companies. Vol. 5 at 737:25-740:6.

8.  In obtaining comparables for the China Producer for the benchmarking study, Mr. Pinkerton relied on information provided by the China Producer to exclude certain manufacturers.  Vol. 4 at 595:12-597:4.

9.  Mr. Pinkerton did not provide a copy of the Excel file prepared by the PWC transfer pricing team, which was used to generate the benchmarking report, to the Government in response to the deposition and document subpoena.  Vol. 5 at 715:21-715:2, 718:14-719:4.

10.  Mr. Pinkerton did not search any of the databases used by the PWC transfer pricing team to gather information for the benchmarking study to determine whether they contained data from any of the Meyer entities involved in the transactions at issue. Vol. 5 at 719:12-18.

11.  Mr. Pinkerton testified that in many cases when PWC does a court presentation part of the documentation binder is the financials of the entity, so they can actually do the comps themselves to verify that PWC's calculations match what the financials state. Vol. 5 at 726:14-727:11.

12.  Mr. Pinkerton's expert opinion on first sale considered the information in the port binder.  Vol. 5 at 727:24-728:9.

13.  Mr. Pinkerton did not provide the documents in the port binder, and testified that there's thousands of documents, such as general ledgers, charts of accounts, debit/credit memos that he might have considered in forming his expert opinion that were not produced in response to the Government's subpoena.  Vol. 5 at 728:10-729:9.

14.  In connection with providing an opinion concerning the double substantial transformation issue, Mr. Pinkerton viewed physical samples but could not confirm that the samples submitted by Meyer at trial were the samples he viewed.  Vol. 4 at 488:4-9.

15.  Mr. Pinkerton did not provide the samples to the Government in connection with his expert report.  Vol. 4 at 488:18-20.

16.  Mr. Pinkerton was unable to recall which samples he looked at that were included in his expert report.  Vol. 4 at 489:2-7.

17.  Mr. Pinkerton has been representing Meyer since approximately 2006 when he was engaged to assist Meyer in conducting a review as to whether Meyer could use first sale appraisement on its transactions from the Thai

> Producer through Meyer Macau and unrelated China vendors
> through Meyer Trading Company.  Vol. 4 at 501:11-15.
>
> 18.  Mr. Pinkerton was retained to serve as an expert for
> Meyer during this litigation.

Def. PFF&CL, pp. 13-14.

The defendant proposes the following conclusions of law: Mr. Pinkerton's dual role as an advisor to Meyer and as an expert witness renders him a biased witness at trial and his testimony should only be afforded an appropriate amount of weight, if any at all.  Mr. Pinkerton's failure to provide subpoenaed documents to the government, and Meyer's failure to place such documents before the court at trial, should render inadmissible the information recalled about them by Mr. Pinkerton. However, if the court determines to consider such information, it should be afforded an appropriate amount of weight, if any at all.  Id. at 15.

C

The defendant also contends the plaintiff failed to establish that certain pots and pans made in Thailand from Chinese steel blanks are entitled to duty-free treatment under the GSP.

In order to be GSP-eligible, an imported article must satisfy the following conditions:

(1) the article must be the "growth, product or manufacture" of a beneficiary developing country (BDC);

(2) the article must be imported directly from a BDC into the customs territory of the United States; and

(3) the sum of (a) the cost or value of the material produced in the BDC plus (b) the direct costs of processing operations performed in the BDC must not be less than 35% of the appraised value of such article at the time of its entry into the customs territory of the United States.

19 U.S.C. § 2463(a)(2)(A). See Dal-Tile Corp. v. United States, 28 CIT 358, 393 (2004). In order to change a non-BDC raw material into an article produced in a BDC, the raw material must undergo a double or dual substantial transformation. E.g., Torrington Co. v. United States, 764 F.2d 1563, 1567 (Fed.Cir. 1985).

The defendant contends the facts of this case as applied to such requirements are clear:

1.   At trial, Meyer provided the Court with Plaintiff's Exhibits 133A-N depicting the steel blank (Pl. Ex. 133A) and the steps it undergoes until it becomes a finished pan (Pl. Ex. 133N).

2.   Meyer presented testimony from Mr. Kwok, a manager for the Thai Producer. Mr. Kwok explained that the blank is lubricated with oil then deep drawn into a shell. Vol. 2 at 205:11-20, 206:5-12, 206:22-207:7.

3.   After the deep drawing, the shell undergoes edge cutting, which makes the height of the pot "even," degreasing to "cleanse" the pot, bottom flattening to facilitate the next steps, and several rounds of

polishing with sand paper.   Vol. 2 at 208:7-210:6, 210:16-211:23.

4.  At step six, Mr. Kwok testified that the shell can be sold to sister companies that are engaged in the production of pots and pans.  Vol. 2 at 212:19-213:9.

5.  Specifically, Mr. Kwok testified that "Right now we do that. We sell it to a company called Meyer Italy," but he could not remember selling a stage six clad article to any company other than a Meyer-related entity.  Vol. 2 at 231:4-20.

6.  Mr. Kwok estimated these sales to be less than one percent of the Thai Producer's business.   Vol. 2 at 231:25-232:8

7.  Mr. Kwok testified that step seven removes scratches and dents from the bottom of the shell, step eight consists of interior polishing to "make the pot shiny," step nine is exterior polishing to make the pot "shinier and prettier," step ten is quality control and wrapping in plastic to prevent scratches in transport to the next processing step, step eleven is a second flattening of the bottom of the shell, step twelve is to mark the pan with its volume and diameter, step thirteen punches a hold in the shell to allow for the attachment of a handle, and step fourteen is the insertion of the handle. Vol. 2 at 213:18-219:18.

8.  The manufacturing process described as steps one through fourteen is similar for the other clad pots and pans made by the Thai Producer from the Chinese steel blanks, although an additional step to add a spout to a pot may occur. Vol. 2 at 221:12-223:23.

9.  Mr. Kwok also testified that approximately 70 to 80 percent of the Thai Producer's cookware was exported to the United States and, of that cookware, approximately 80 percent is aluminum cookware that is not eligible for GSP. Vol. 2 at 302:8-303:11; see also subheading 7615.19.30, HTSUS.

10.   Meyer received GSP benefits for some [o]f its
merchandise from the Thai Producer. See Pl. Ex. 81,
Attachment HQ H088815 at 11 (CBP determined that pots and
pans produced in Thailand from foreign steel coil undergo
a double-substantial transformation).

11.   The summaries referenced by Mr. Kwok during his
testimony and objected to by the Government (see section
[VI A,] above), did not segregate its costs, number of
workers, etc. to indicate which portion relates to
merchandise eligible for GSP but for which GSP treatment
was not granted.  See Pl. Exs. 154, 155, 156, 379, and
380.

Def. PFF&CL, pp. 16-17.

          In light of the forgoing, the defendant contends only one

transformation of the PRC steel blank occurs: when a flat blank is

deep drawn into a shell that is an unfinished pot or pan.  As

described above and witnessed by the court, none of the steps after

the deep drawing step constitute a second substantial

transformation because none produces a separate article of commerce

with a distinctive name, character, or use. See Torrington, 764

F.2d at 1567.  Specifically, there is no change in name in that

step 2 begins with an unfinished pot or pan and step 14 ends with

a finished pot or pan (defendant's emphasis).  There is no change in

character in that there is no annealing or galvanizing performed or

any change in chemical composition or mechanical properties from

step 2 to step 14 that may effect a change in character. See

Ferrostaal Metals Corp. v. United States, 11 CIT 470 (1987). Nor

was there any significant change in shape or form - the drawing
process gives the article its final form, not the subsequent
finishing operations.   See National Hand Tool Corp. v. United
States, 16 CIT 308 (1992), aff'd per curiam, 989 F. 2d 1201
(Fed.Cir. 1993). There is no change in use in that the use of the
articles from step 2 to step 14 is predetermined; they will be
finished and used as a specific pot or pan. See id., 16 CIT at
311-12.

        Further, the plaintiff has not established that the
product at step six is an intermediate, distinct article of
commerce, or that it is "readily susceptible to trade, and an item
that persons might well wish to buy and acquire for their own
purposes of consumption or production." Torrington, 764 F.2d at
1570. The record here shows that a de minimis level of sales of
products at step six were made solely to a related party for the
same purpose: the production of a pot or pan.   Vol. II at
212:19-213:19, 231:4-20, 231:25-232:8; Vol. III at 414:3-415:6.
Ergo, the plaintiff has failed to establish that there is a
commercially viable market for step six products.   See Azteca
Milling Co. v. United States, 12 CIT 1153, 703 F.Supp.949 (1998),
aff'd, 890 F.2d 1150 (Fed.Cir. 1989). Accordingly, the plaintiff

has failed to establish, as it must, that a double-substantial transformation has occurred.

Thus, the steel blanks may not count towards the 35 percent value added requirement for GSP, and the pots and pans produced by the Thai producer that are derived from the PRC steel blanks are ineligible for GSP treatment.

Additionally, given that the bulk of the Thai producer's cookware exported to the United States is made of aluminum and not eligible for GSP treatment, the number of employees and costs associated with the Thai factory must be segregated to understand any GSP calculations. Def. PFF&CL, pp. 17-18.

D

Additionally, the defendant argues that the plaintiff has failed to establish that its merchandise should be valued at the price between the manufacturer and the middleman. The applicable law is that imported merchandise must be appraised so that the final amount of duty can be fixed, and by law, Customs is required to appraise imported merchandise in the manner set forth in 19 U.S.C. §1401a. VWP of Am., Inc. v. United States, 175 F.3d 1327, 1330 (Fed.Cir. 1999). In a civil action commenced in the Court of International Trade to challenge a CBP appraisal, the agency

decision is "presumed to be correct" and the "burden of proving otherwise shall rest upon the party challenging such decision." <u>VWP</u> at 1342.

The primary method of valuation is the "transaction value" of the merchandise provided for under 19 U.S.C. § 1401a(b). Section 1401a(b) provides that the transaction value of imported merchandise "is the price actually paid or payable for the merchandise when sold for exportation to the United States," plus specified additions.

In a multi-tiered transaction, like that at issue in this case, when an importer seeks to use the transaction price paid between a manufacturer/producer and a middleman as the value for appraisement, it must prove through credible and admissible evidence that: (i) a bona fide sale occurred; (ii) the sale was for export to the United States; (iii) the transaction was at arm's length; and (iv) all other criteria for the transaction value were met. <u>See</u> 19 U.S.C. § 1401a(b)(1).

Under the <u>de</u> <u>novo</u> standard of review applicable here, Meyer must establish every element of its claim. Meyer must prove that "[t]he manufacturer's price constitutes a viable transaction value when the goods are clearly destined for export to the United

States and when the manufacturer and middleman deal with each other

at arm's length, in the absence of any non-market influences that

affect the legitimacy of the sale price." Nissho Iwai, 982 F. 2d

at 509. This standard assumes that the use of transaction value is

not otherwise precluded by valuation law. For example, that there

are no restrictions on the disposition or use of the merchandise;

there are no conditions or considerations for which a value cannot

be determined; or there is insufficient information concerning an

enumerated statutory addition to the price actually paid or

payable.

   The defendant points out, as reflected in its Exhibit 12

(T.D. 96-87), supra, the presumption is that transaction value is

based on the price actually paid or payable by the importer for the

imported merchandise, and the burden is on an importer to rebut

this presumption. Def. Ex. 12 at *1 (court's highlighting). This

exhibit also sets forth the documents and information necessary to

support a request that transaction value should be based on a first

sale transaction. See also Def. Ex. 14; Def. Ex. 15 (providing

guidance as to the types of documents and information needed for an

importer to show that it is entitled to use the transaction value

of the sale between the producer and middleman, even where that

transaction is between related parties). Recounting the statutory

and regulatory framework, as well as defendant's exhibits 12, 14
and 15, the defendant explains that in addition to bona fide sales
and sale for export to the United States, the plaintiff at trial
was required to establish arm's length transactions per its
following proposed findings of fact and conclusions of law:

> i. <u>Normal pricing practices of the industry in
> question</u>

1.   The industry in question is the manufacture and sale
of cookware. Vol. 1 at 18:18-20.

2.   In purchasing cookware, Meyer primarily dealt
directly with Meyer Macau as a middleman.  Vol. 1 at 83.

3.   Meyer rarely dealt with Meyer Hong Kong when
purchasing cookware.  Vol. 1 at 83.

4.   Meyer entered into a written Master Distribution
Agreement with Meyer Macau. Vol. 1 at 83; Pl. Ex. 124.

5.   Meyer did not enter into a written Master
Distribution Agreement with Meyer Hong Kong.  Vol. 1 at
117 -118.

6.   Meyer's Master Distribution Agreement requires Meyer
Macau to accept orders from Meyer if Meyer is not in
breach of the Master Distribution Agreement at the time
the order is placed.  Pl. Ex. 124 at MUS010378 (Section
5.1).

7.   Meyer Macau must charge Meyer the price negotiated
and agreed upon by the parties prior to the placement of
orders for the products; and Meyer must pay Meyer Macau
in cash for the products delivered by Meyer Macau within
21 days of the invoice. Pl. Ex. 124 at MUS010379 (Section
6).

8.    If the Master Distribution Agreement between Meyer and Meyer Macau is inconsistent with any other document or agreement between them the Master Distribution Agreement prevails to the extent of the inconsistency. Pl. Ex. 124 at MUS010391 (Section 22.5).

9.    Meyer's primary competitors in the United States are Newell Corporation (Calphalon); Group SEB (T-FAl and All Clad); Tramontina; and the Cookware Company (Green Pan). Vol. 1 at 90:19-91:15.

10.   Newell Corporation (Calphalon) sourced some of its cookware products from manufacturers in the PRC.  Vol. 1 at 139.

11.   Group SEB owned manufacturing capabilities around the world. Vol. 1 at 139:16-19.

12.   The Cookware Company sourced the majority of their products from the PRC. Vol. 1 at 140:13-24.

13.   Meyer negotiated with Ms. Sharon Lau of Meyer Macau for both the Thai Producer and the China Producer when seeking to purchase cookware.  Vol. 1 at 118:25-119:9.

14.   Meyer did not know whether Ms. Lau was negotiating for production by the Thai Producer or the China Producer.  Vol. 1 at 122:9-17.

15.   Meyer only sourced its cookware from Meyer-related entities, and never attempted to source its cookware form anyone else.  Vol. 1 at 116:20-117:2.

16.   Meyer was required to pay the middleman in cash within 21 days according to the master agreement.  Vol. 1 at 127.

17.   The invoice between Meyer and Meyer Macau called for payment in 20 days. Vol. 1 at 128; Pl. Ex. 190

18.   The purchase order is the contract between the middleman and Meyer. Vol. 1 at 138:8-19.

19.  Meyer monitored its profit level through its profit and loss statement annually, quarterly and monthly.  Vol. 1 at 145:2-21.

20.  The Thai Producer sells to Meyer Macau, Meyer Hong Kong, and Myrex Thailand Limited, each of which is a subsidiary of Meyer Holdings, and no one else. Vol. 1 at 159; Vol. 2 at 225, Pl. Ex. 152.

21.  Myrex Thailand Limited is a middleman that sells to local customers in Thailand and nearby "AEC" countries like Vietnam, Cambodia, Laos and Burma.  Vol. 1 at 226.

22.  Approximately 96 percent of the Thai Producer's cookware is sold to Meyer Macau, 2 percent to Meyer Hong Kong, and 2 percent to Myrex Thailand Limited. Vol. 1 at 160.

23.  Of the 96 percent of sales to Meyer Macau, approximately 70 to 80 percent of the goods go to the United States.  Vol. 2 at 229.

24.  Mr. Kwok was responsible for negotiating sales prices on behalf of the Thai Producers with four or five of Meyer Macau's marketing managers. Vol. 1 at 161.

25.  Products sold by the Thai Producer to Meyer Macau are for import into the United States and are shipped by the Thai Producers directly to the United States.  Vol. 1 at 161-62.

26.  The Thai Producer makes stainless steel, aluminum and clad pots and pans and also produces boxes, glass lids, handles and knobs and kitchen tools.  Vol. 1 at 166-67

27.  The Thai Producer seeks a profit margin on average of 3 percent and determines its prices to Meyer Macau by using the costs of the cookware plus the 3 percent margin. Vol. 1 at 176:11-14.

28.  The Thai Producer and Meyer Macau entered into a Master Manufacturing Agreement.  Vol. 1 at 178, Pl. Ex. 123

29. The Master Manufacturing Agreement requires Meyer Macau to purchase $100 million of cookware from the Thai Producer with $20 million allocated to the first and second quarters of the year and $30 million for the third and fourth quarters. Vol. 2 at 276-77; Pl. Ex. 123.

30. Section 6.2 of the Master Manufacturing Agreement provides that title in the products passes to Meyer Macau upon delivery irrespective of whether the price for such products had been wholly or partially paid or remains completely unpaid at that time. Vol. 2 at 279-80; Pl. Ex. 123.

31. The Thai Producer sets the price for products it sells to Meyer Macau, and, at times, will lower the price but will still make a profit.  Vol. 1 at 179.

32. With respect to production volume, the Thai Producer is the largest producer of pots and pans in Thailand. Vol. 1 at 181.

33. The Thai Producer does not engage in the manufacturing of cookware without first having a purchase order.  Vol. 2 at 230.

34. Approximately 85 percent of the Thai Producer's cookware is made of aluminum, which it purchased from Meyer Aluminum Thailand Limited in Thailand and Alann in the PRC. Approximately thirty percent of the aluminum purchased from Thailand.  Vol. 2 at 234-35, 281.

35. With respect to steel cookware, the Thai Producer purchased the steel from non- Meyer-related companies in Thailand and Japan.  Vol. 2 at 281-82

36. The Thai Producer's factory has produced between 75,000 and 100,000 pots a day, and is the largest cookware manufacturer in Thailand.  Vol. 2 at 234-35.

37. In addition to cookware, the Thai Producer also produces boxes, knobs, handles, and other non-cookware items, which go with the cookware or are sold to Meyer Thailand Limited. These items are purchased from

non-Meyer-related companies in Thailand, the United
States, Taiwan, the PRC, and Australia.  Vol. 2 at
243-255.

38.  The general manager of the Thai Producer is Joseph
Lau.  Vol. 2 at 267.

39.  Joseph Lau is also the general manager at Meyer
Macau and Meyer Hong Kong. Vol. 3 at 384:4-25.

40.  During the years 2010 and 2011, the Thai Producer
sold approximately $5,000,000 worth of cookware to Myrex
Thailand Limited, which constituted about 2 percent of
its sales.  Vol. 2 at [270:18-271:6.]

41.  Myrex Thailand Limited is a related party to Meyer,
the Thai Producer, Meyer Macau, and within the meaning of
19 U.S.C. § 1401a(g)1)(F).  Pl. Ex. 152.

42.  Meyer Macau solicits business as a trading interface
between customers and factories with respect to cookware,
including pots and pans.  Vol. 3 at 319-20.

43.  Meyer Macau acts as a middleman for the China
Producer.  Vol. 3 at 320:6-14.

44.  When a customer requests a cookware product, Ms. Lau
of Meyer Macau determines whether the Thai Producer or
the China Producer has the tooling to manufacture the
items.  Vol. 3 at 320:15-24.

45.  If only the China Producer has the tooling, Ms. Lau
assigns the order to Meyer Hong Kong, which has all the
order for the China Producer.  Vol. 3 at 320:22-24.

46.  Meyer Macau, not Meyer Hong Kong, negotiates prices
with the China Producer. Vol. 3 at 324:, 342:

47.  Ms. Lau of Meyer Macau negotiates prices with the
China Producer and takes customers to it.  Vol. 3 at 323,
324, 342, 351.

48.  Ms. Lau has no employment relationship with Meyer
Hong Kong.  Vol. 3 at 357.

49. Ms. Lau of Meyer Macau negotiates with Meyer for orders placed with the China Producer.  Vol. 3 at 341, 352, 391.

50. Ms. Lau of Meyer Macau decides whether the Thai Producer or the China Producer is more capable of fulfilling a cookware order.  Vol. 3 at 321:6-23.

51. For business sent to the United States, Ms. Lau testified that Meyer Macau's major competitors are Calphalon, T-Fal, Tramotina, Cuisinart, Pioneer Woman at Wal-Mart and Chrissy Teigen at Target.  Vol. 3 at 342:20-343:4.

52. Ms. Lau testified that in negotiating prices with the Thai Producer and with Meyer, Meyer Macau must take into consideration what its competitors are doing in the marketplace, i.e., the United States, in order not to lose business.  Vol. 3 at 344:8-17.

53. Meyer Macau goes to the factories to obtain price quotes. Vol. 3 at 350-351.

54. The China Producer and Meyer Hong Kong do not reach a price independently for cookware.  Vol. 3 at 390:9-24; 391:17-392:9.

55. Meyer Hong Kong does not do pricing agreements with Meyer. Vol. 3 at 390:20-22.

56. Ms. Lau does not know what Meyer Hong Kong's role is in the process but, historically, it has operated as described above.  Vol. 3 at 391:12-392:14.

57. Ms. Lau believes documents reflecting the payment of royalties exist and that the percentage of a price associated with a royalty is disclosed by Meyer Macau if requested. Vol. 3 at 392:15-393:19.

58. Ms. Lau is unaware of any agreement between Meyer Macau and Meyer Hong Kong or Meyer Macau and the China Producer.  Vol. 3 at 393:20-394:2.

59.  Meyer Macau committed to contract requiring $100 million of orders to the Thai Producer because Meyer Macau is confident that it can obtain the business and it does not want the Thai Producer selling to everyone. Vol. 3 at 394:11-23.

60.  Ms. Lau is unaware of a volume arrangement with the China Producer similar to the one in place with the Thai Producer.  Vol. 3 at 394:24-395:2.

61.  The China Producer does not often reject an order from Meyer Macau that the Thai Producer is unable to produce, although a very few times they raise an objection asking why can't the Thai Producer do the job. Vol. 3 at 395:3-12.

62.  Mr. Kam testified that the China Producer sells "work in progress" shells such as that reflected in Pl. Ex. 131F to Meyer Italy and from the Thai Producer.  Vol. 3 at 414:3-415:6.

63.  The China Producer sells to Meyer Hong Kong, Meyer Macau, Meyer Italy and MCN, the sales department of Meyer in China.  Vol. 3 at 415:10-19.

64.  Mr. Kam testified that he provides tours to Meyer Macau customers but recalls only Christina who handles Meyer Japan and Matthew from Meyer UK. Vol. 3 at 418:4-21; 433:16-21.

65.  Mr. Kam did not know who did the marketing for the China Producer. Vol. 3 at 454: 11-18.

66.  Mr. Kam testified that in his job responsibilities or at attendance in management meetings he gained knowledge of assistance from the Chinese government to the China Producer.  Vol. 3 at 461:4-13.

67.  The databases used by PWC to obtain information in order to select comparable companies for its benchmarking study are limited to information from publically-traded companies.  Vol. 4 at 682:10-18.

68.  Meyer, Meyer Macau, Meyer Hong Kong, the Thai Producer and the China Producer are not publicly-traded companies.  Vol. 4 at 683:5-10.

69.  The entries at issue in this action, submitted by Meyer at trial, contain some or all of: entry summary (CBP Form 7501); entry/immediate delivery (CBP Form 3461); shipping documentation (arrival notice/invoice); tooling invoice; merchandise invoices between the middleman and Meyer, and the Thai or China producer and the middleman; packing lists from the middleman to Meyer, and the Thai or China producers to the middlemen; and bill of lading. Pl. Exs. 157-196, 377, 378.

70.  Plaintiff's Exhibit 157 contains a revised invoice from the Thai Producer to Meyer Macau reducing the unit price for sku no. 10417-T.  Pl. Ex. 157.

71.  Meyer Macau had 60 days to make payment to the Thai Producer. See, e.g., Pl. Ex. 157 at MUS000953.

72.  Meyer had 20 days to make payment to Meyer Macau. See, e.g., Pl. Ex. 157 at MUS000948.

73.  At trial, Meyer did not provide the Court with any purchase orders or any proofs of payment for any of the entries at issue. See, e.g., Pl. Exs. 157-196, 377, 378 (entries at issue in this action).

74.  None of the documents submitted by Meyer at trial contain any purchase orders between the Thai Producer or the China Producer and Meyer Macau or Meyer Hong Kong. See Pl. Exs. moved into evidence.

75.  None of the documents submitted by Meyer at trial contain any purchase orders between Meyer and Meyer Macau or Meyer Hong Kong.  See Pl. Exs. moved into evidence.

76.  None of the documents submitted by Meyer at trial contain proof of payment by Meyer of any invoices from Meyer Macau or Meyer Hong Kong. See Pl. Exs. moved into evidence.

77.  None of the documents submitted by Meyer at trial contain proof of payment by Meyer Macau or Meyer Hong Kong of any invoices from the Thai Producer or the China Producer.  <u>See</u> Pl. Exs. moved into evidence.

78.  Mr. Pinkerton "believe[d]" that the screening criteria for comparables to the Thai Producer provided in the benchmarking study (Pl. Ex. 119) was over 100 million baht. Vol. 5 at 741:18-21.

79.  In the fourth quarter of 2011, the exchange rate between U.S. dollars and Thai baht was $1 equals 30 Thai baht.  <u>See</u>  https://www.poundsterlinglive.com/bank-of-england-spot/historical-spot-exchange-rates/usd/USD-to-THB-2011.

80.  Converting 100 million Thai baht to U.S. dollars results in an amount of approximately $3,333,333. <u>See</u> https://www.poundsterlinglive.com/bank-of-england- spot/ historical-spot-exchange-rates/usd/USD-to-THB-2011.

81.  The Thai Producer had a contract in place with Meyer Macau that guaranteed a minimum of $10,000,000 worth of business each year.  Pl. Ex. 123 at MUS010361-362.

82.  Whether a company sold pots and pans to the United States was not a part of the screening criteria for benchmarking comparables.  Vol. 5 at 742:9-13.

83.  Mr. Pinkerton did not know whether one of the screening criteria for benchmarking comparables was whether a company sold pots and pans globally, but he did not think so.  Vol. 5 at 742:14-20.

84.  Mr. Pinkerton did not believe that the volume of production was considered in the quantitative screening for benchmarking study.  Vol. 5 at 740:7-9.

85.  In selecting comparable companies, PWC does not consider the volume of production.  Vol. 5 at 740.

86.  In selecting comparable companies, PWC does not know if the databases it uses contain audited financial information.  Vol. 5 at 733.

87.  In selecting comparable companies, PWC does not consider whether those companies sell to the United States.  Vol. 5 at 742.

88.  In selecting comparable companies, PWC does not consider whether those companies sell globally.  Vol. 5 at 742.

89.  In selecting comparable companies, PWC did not consider whether the companies are transacting in a three-tier structure, nor did PWC do any research to obtain that information. Vol. 5 at 743.

90.  PWC did not know whether any of the companies it identified as comparable are subject to volume contracts similar to those in place for [the Thai producer] and [the China producer].  Vol. 5 at 745-746.

91.  Mr. Pinkerton testified that for Chinese companies the information in the databases is not detailed or accurate.  Vol.4 at 690.

92.  The databases used by PWC to locate comparable companies contain public companies.  Vol. 4 at 682.

93.  Mr. Pinkerton testified that he did not believe the Meyer companies are publicly traded.  Vol. 4 at 683.

94.  When asked to identify the Thai Producer's competitors, Mr. Kwok identified the companies that manufacture Zebra and Seagull brand cookware.  Vol. 1 at 180.

95.  Mr. Kwok testified that he did not believe the Thai Producer's competitors' market share in the United States would be much.  Vol. 2 at 270.

96.  Mr. Kwok testified that he did not know from where these competitors purchased raw materials.  Vol. 2 at 271.

97.  Mr. Kwok testified that he did not know if the Thai Producer's competitors were part of an organizational structure similar to that of Meyer.  Vol. 2 at 271-272.

98.  Zebra does not sell to the U.S.  Vol. 3 at 405.

99.  PWC does not have information about any potential non-market economy effect for comparable companies.  Vol. 5 at 786.

100. The PWC studies did not factor in statutory additions.  Vol. 4 at 662-663.

101. The PWC benchmarking study for manufacturers in Thailand states that the "markup on total services cost (operating income/total cost)" ranged from -9.4 percent to 12.9 percent in 2011 and from -14.7 percent to 14 percent in 2012.  Pl. Ex. 119 at MUS045253.

102. The PWC benchmarking study for manufacturers in China indicated that the "markup on total services cost (operating income/total cost)" ranged from -10.5% to 10.5% in 2011 and from -17.3% to 3.2% in 2012.  Pl. Ex. 125 at MUS045255.

 ii.  "All costs plus a profit equivalent to the firm's overall profit"

1.    "To substantiate an all costs plus profit claim, the importer should be prepared to provide records and documents of comprehensive product related costs and profit, such as financial statements, accounting records including general ledger account activity, bills of materials, inventory records, labor and overhead records, relevant selling, general and administrative expense records, and other supporting business records."  Def. Ex. 15 at 9.

2.    At trial, Meyer presented no financial statements of Meyer Holdings.  See Pl.'s Exs. moved into evidence.

3.    Over half of the first-line, non-dormant entities for which Meyer Holdings owns all or a large portion of

shares are in the cookware industry.  See Pl. Ex. 152;
Section IV at ¶19.

4.   At trial, Meyer presented no financial statements of
any of its related companies (see Pl. Ex. 152) that
manufacture or sell cookware, including the Thai
Producer, the China Producer, Meyer Macau or Meyer Hong
Kong.  See Pl.'s Exs. moved into evidence.

5.   At trial, Meyer did not present its financial
statements.  See Pl.'s Exs. moved into evidence.

6.   Meyer Hong Kong is a parent company of the China
Producer.  Pl. Ex. 152.

7.   Mr. Kwok testified that the Thai Producer attempts
to achieve a profit of 3 percent.  Vol. 1 at 176:

8.   Mr. Kam testified that the China Producer attempts
to achieve a profit of 3 to 5 percent.  Vol. 3 at 420.

9.   The benchmarking analysis of comparable
manufacturers prepared by PWC (the benchmarking
analysis), objected to by the Government . . ., states
that the China Producer's profit for 2011 was 1.65
percent (OPM or operating profit margin) or 1.60 percent
(FCM or full cost markup).  Pl. Ex. 119 at MUS045255.

10.  Mr. Kam testified that he did not know the China
Producer's profit for 2011. Vol. 3 at 454:

11.  The benchmarking analysis, objected to by the
Government . . ., states that the Thai Producer's profit
for 2011 was 2.95 percent (OPM) or 3.01 percent (FCM).
Pl. Ex. 119 at MUS045253.

12.  The Thai Producer does not sell to unrelated
companies.  Vol. 1 at 159, Vol. 2 at 225.

13.  The China Producer does not sell to unrelated
companies.  Vol. 2 at 415.

14.   There are over 100 products at issue in this action that are imported from Thailand. <u>See</u> Pl. Exs. 157-196, 377, 378.

15.   There are over 32 products at issue in this action that are imported from the PRC. <u>See</u> Pl. Exs. 157-196.

16.   Meyer has not provided any cost or profit information or cost or profit analysis for the products in this case imported from the PRC, other than the two products identified in the PWC report (71892-C and 82365-C). Pl. Ex. 125 at 26.

17.   Meyer has not provided any profit information or analysis for the products in this case imported from Thailand other than that contained in GSP summaries. <u>See</u> Pl. Exs. 154, 155, 156, 379, and 380, to which the Government has objected.

18.   Both the Thai Producer and the China Producer are "limited risk manufacturers." Vol. 5 at 753:16-18.

19.   Limited risk means that the Thai Producer and the China Producer "don't have risk, they don't carry capital risk, they don't carry exchange risk, which is why they get compensated on the low profit margin." Vol. 5 at 753:20-23.

20.   Ms. Brenner testified that Customs has issued an Informed Compliance Publication (Def. Ex. 15) that provides information to importers concerning using transaction value for related party transactions. Vol. 5 at 873:20-874:16.

21.   Ms. Brenner testified that for the "costs plus" test Customs considers the "firm" to usually be the parent. Vol. 5 at 875:9-876:3.

22.   If a parent does not satisfy the terms of the "costs plus" test, Customs has on occasion used other information, such as another subsidiary in a company that really dominant and selling a lot that provides a good comparison and could be considered the "firm." Vol. 5 at 876:10-878:12.

Def. PFF&CL, pp. 18-35.

In addition, the defendant proposes findings of fact with respect to two critical aspects of this case as follows:

. . . <u>Absence of non-market influence on price</u>

1.   The PRC is a non-market economy. 255 F.Supp.3d at 1361.

2.   PWC has provided no information addressing the absence of a non-market influence on price in any of the studies it prepared.  <u>See</u> Pl. Exs. 1, 4, 117, 119, 125.

3.   PWC does not have information about any potential non-market economy effect for comparable companies. Vol. 5 at 786.

4.   The Thai Producer receives some raw materials for the manufacture of its cookware from companies in the PRC. Vol. 1 at 167:12-15; Vol. 2 at 206:16-18, 220:14:17, 253:20-24; 281:2-10; Pl. Exs. 154-156, 379, 380.

5.   The China Producer is located in the PRC.  <u>See</u>, <u>e</u>.<u>g</u>., Pl. Ex. 162 at MUS001036.

6.   Although Mr. Kam testified initially that, as one of the top five managers at the China Producer, he would have knowledge about local, provincial, or national PRC governmental subsidies, he acknowledged that Ken Chan, the general manager of the China Producer, not he, would know whether there was any type of subsidy from the PRC. Vol. 3 at 449:11-451:11.

7.   The China Producer does not own the land on which the factory sits but has a right to use the land for a certain period of time.  Vol. 3 at 455:23-456:14.

8.   Mr. Kam testified that he does not know whether any of the Chinese companies that provide water, electricity or other materials used in the production of the China

Producer's goods receive subsidies from China at the national, regional, or local levels. Vol. 3 at 451:12-21.

. . . <u>Statutory additions</u>

1.   The transaction value for merchandise exported to the United States includes certain statutory additions. 19 U.S.C. § 1401a(b).

2.   One of the statutory additions is the value of assists.  19 U.S.C. § 1401a(b)(1)(c).

3.   For the entries in this case, Mr. Pinkerton does not know whether there were any assists.  Vol. 5 at 800.

4.   The PWC studies did not factor in statutory additions. Vol. 4 at 662-663.

Def. PFF&CL, pp. 25-36.


Based on the foregoing, the defendant proposes the following conclusions of law:


. . . <u>Arm's length transaction</u>

  . . . <u>Normal Pricing Practices of the Industry in Question</u>

    . . . <u>Meyer Hong Kong and the China Producer</u>

Meyer has not established that the price from the China Producer to Meyer Hong Kong was "settled in a manner consistent with the normal pricing practices of the industry" as provided in 19 C.F.R. § 152.103(l)(1)(ii) because the companies selected by PWC for its benchmarking study were not shown to sell to the United States market.

Meyer has not established that the price from the China Producer to Meyer Hong Kong was "settled in a manner consistent with the normal pricing practices of the

industry" as provided in 19 C.F.R. § 152.103(l)(1)(ii) because PWC does not have information about any potential non-market economy effect of the PRC for comparable companies.

Meyer has not established that the price from the China Producer to Meyer Hong Kong was "settled in a manner consistent with the normal pricing practices of the industry" as provided in 19 C.F.R. § 152.103(l)(1)(ii) because, in selecting comparable companies, neither Meyer nor PWC provided sufficient information on the China companies to demonstrate that they manufacture merchandise of the same class or kind as the China Producer.

Meyer has not established that the price from the China Producer to Meyer Hong Kong was "settled in a manner consistent with the normal pricing practices of the industry" as provided in 19 C.F.R. § 152.103(l)(1)(ii) because Meyer has not established that there are "normal pricing practices of the industry" in China where the operating income/total cost figures vary widely from 1.2 percent to 19.8 percent in 2010, -10.5 percent to 10.5 percent in 2011, and -17.3 percent to 3.2 percent in 2012.

Meyer has not established that the price from the China Producer to Meyer Hong Kong was "settled in a manner consistent with the normal pricing practices of the industry" as provided in 19 C.F.R. § 152.103(l)(1)(ii) because the databases used by PWC in selecting comparable companies were limited to publicly traded companies.

Meyer has not established that transactions between Meyer Hong Kong and the China Producer constitute viable first sale transaction values because Meyer Macau, not Meyer Hong Kong, acts as the middleman for the China Producer.

Meyer has not established that transactions between Meyer Hong Kong and the China Producer are at arm's length because there is no evidence of arm's length negotiations between Meyer Hong Kong and the China Producer, or between Meyer Hong Kong and Meyer. Instead, the testimony adduced at trial shows that the negotiations are between

Meyer Macau and the China Producer and Meyer Macau and Meyer.

Meyer has not established that transactions between Meyer Hong Kong and the China Producer are at arm's length because Meyer Hong Kong and the China Producer do not reach prices independently. Instead, Meyer Macau fulfills the function of reaching prices for the China Producer.

Meyer has not established that transactions between Meyer Hong Kong and the China Producer are at arm's length because Meyer Macau "assigns" orders to the China Producer and Meyer Macau, not Meyer Hong Kong, confers with the China Producer to obtain price quotes.

Meyer has not established through the PWC study, Pl. Ex. 125, that transactions between Meyer Hong Kong and the China Producer constitute viable, arm's length transaction values because that study is based on incorrect information.  For example, the study:

> (i)   does not acknowledge that Meyer Macau, not Meyer Hong Kong, serves as the middleman for merchandise ordered by Meyer and manufactured by the China Producer[;]

> (ii)  states that Meyer Hong Kong receives orders from Meyer when, in fact, Meyer Macau "assigns" orders to Meyer Hong Kong based on Meyer Macau's assessment of whether the China Producer or the Thai Producer is the most capable factory for the order[;]

> (iii) states that Meyer Hong Kong and the China Producer agree on all contractual terms, when, in fact, the testimony presented at trial established that Meyer Macau negotiates with the China Producer[;].

> (iv)  makes no mention of Meyer Macau's role in transactions between Meyer Hong Kong and the China Producer[; and]

> (v)    does not reveal that Meyer Hong Kong, Meyer
>        Macau, and the Thai Producer have the same
>        general manager: Joseph Lau.

Meyer has not established that prices between the China Producer and Meyer Hong Kong are "settled in a manner consistent with the normal pricing practices of the industry" because it has not demonstrated that the cookware industry in the PRC normally works off prices that are set by entities other than the buyer and seller, or that the cookware industry in the PRC normally has orders assigned to it by an entity that is neither the buyer or seller.

Further, Meyer has not shown that the price negotiated for the cookware manufactured by the China Producer has not been influenced by the non-market status of the PRC, which, as this Court observed, has not been recognized by the United States as a "market economy." Mr. Kam, a manager of the China Producer, testified that he does not know if the local, regional, or national government of the PRC subsidizes the China Producer or any of the companies that provide the China Producer with production materials.   However, Mr. Kam stated that he did gain knowledge about assistance from the Chinese government.

. . .   <u>Meyer Macau and the Thai Producer</u>

Meyer has not established that prices between the Thai Producer and Meyer Macau are "settled in a manner consistent with the normal pricing practices of the industry" as provided in 19 C.F.R. § 152.103(l)(1)(ii) because it has not demonstrated specifically what the normal pricing practices are for Thai manufacturers of cookware, i.e., pots and pans, that are exported to the United States.

Meyer has not established that the price from the Thai Producer to Meyer Macau was "settled in a manner consistent with the normal pricing practices of the industry" as provided in 19 C.F.R. § 152.103(l)(1)(ii) because the companies selected by PWC for its benchmarking study were not shown to be comparable to the

Thai Producer, which is the largest cookware manufacturer in Thailand.

Meyer has not established that the Thai manufacturers of pots and pans used in the benchmarking study are, in fact, comparable to the Thai Producer. For example, Meyer provided no evidence that any of the Thai Producer comparables sell pots and pans to the United States.

Nor did Meyer establish that the comparables are "limited risk" manufacturers whose profit margins are reduced because they have entered into a "minimum order" contract.

Meyer has not established that the price from the Thai Producer to Meyer Macau was "settled in a manner consistent with the normal pricing practices of the industry" as provided in 19 C.F.R. § 152.103(l)(1)(ii) because the databases used by PWC in selecting comparable companies were limited to publically-traded companies.

Meyer has not established that the price from the Thai Producer to Meyer Macau was "settled in a manner consistent with the normal pricing practices of the industry" as provided in 19 C.F.R. § 152.103(l)(1)(ii) because, in selecting comparable companies, PWC did not provide sufficient information on the comparable companies to show that the profit figures involved merchandise of the same class or kind.

Meyer has not established that the price from the Thai Producer to Meyer Macau was "settled in a manner consistent with the normal pricing practices of the industry" as provided in 19 C.F.R. 152.103(l)(1)(ii) because Meyer has not established that there are "normal pricing practices of the industry" in Thailand where the operating income/total cost figures vary widely from -4.8 percent to 29.9 percent in 2010, -9.4 percent to 12.9 percent in 2011, and -14.7 percent to 14 percent in 2012.

. . . <u>All Costs Plus a Profit Equivalent
to the Firm's Overall Profit</u>

The meaning of the term "the firm," set forth in 19 C.F.R. § 152.103(i)(l)(iii), is not provided by 19 U.S.C. § 1401a, the value statute, or by CBP Regulations. In other sections of 19 C.F.R. Part 152, the terms "seller," and "producer," are used. However, for section 152.103(i)(l)(iii), CBP used the term "firm," rather than "seller" or "producer" indicating that the "firm" is not necessarily the seller or producer. CBP normally considers the term "firm" referenced in 19 C.F.R. §152.103(l), interpretive note 3, to mean the parent company. Def. Ex. 15 at 9. Courts "defer even more broadly to an agency's interpretations of its own regulations than to its interpretation of statutes, because the agency, as the promulgator of the regulation, is particularly well suited to speak to its original intent in adopting the regulation." <u>Gose v. United States</u>, 451 F.3d 831, 837 (Fed.Cir. 2006) (citing to <u>Cathedral Candle Co. v. U.S. Int'l Trade Comm'n</u>[,] 400 F.3d 1352, 1363-64 (Fed.Cir. 2005)[,] and <u>Am. Express Co. v. United States</u>, 262 F.3d 1376, 1383-83 (Fed.Cir. 2001)).

Accordingly, for the "all costs plus a profit" test, financial statements from the parent company are needed to determine the parent's overall profit, which is one of the variables in the formula. To satisfy this test, the sale price between the related producer and middleman must be adequate to ensure recovery of all the seller's costs plus a profit equivalent to the parent company's overall profit. Def. Ex. 15 at 9.

Meyer has not met the requirements of 19 C.F.R. § 152.103(i)(l)(iii) because it has not provided the financial statements of its parent company, Meyer Holdings, to evaluate whether the relationship or any non-market influences affected the sales price or to evaluate whether the profits of the China Producer and the Thai Producer are equivalent to the costs and profit of the Meyer group overall. <u>See Meyer</u>, 255 F.Supp.3d at 1361.

Meyer has not met the requirements of 19 C.F.R. §
152.103(i)(l)(iii) because it has not provided the
financial statements of any of the companies in the Meyer
group that manufacture or sell cookware to evaluate
whether the relationship or any non-market influences
affected the sales price, or to evaluate whether the
profits of the China Producer or the Thai Producer are
equivalent to the costs and profit of the Meyer group
overall.

The Thai Producer may not constitute "the firm" for the
purposes of 19 C.F.R. § 152.103(i)(l)(iii) because it
does not sell to unrelated parties and, therefore, all of
its sales are potentially affected by a relationship.

The Thai Producer may not constitute "the firm" for the
purposes of 19 C.F.R. § 152.103(i)(l)(iii) because the
majority of its sales are to the United States and, thus,
are potentially affected by the same relationship.
Comparing one sale to a set of sales that involve the
same relationship provides no way of disaggregating the
effect that the relationship may have had on the sales
price or determining whether it is "arm's length."

The China Producer may not constitute "the firm" for the
purposes of 19 C.F.R. § 152.103(i)(l)(iii) because all of
its sales are to related parties and, thus, are
potentially affected by the relationship. Comparing one
sale to a set of sales that involve the same relationship
provides no way of disaggregating the effect that the
relationship may have had on the sales price or
determining whether it is "arm's length."

For the purposes of 19 C.F.R. § 152.103(i)(1)(iii), Meyer
has not established that the price from the Thai Producer
to Meyer Macau was "adequate to ensure recovery of all
costs plus a profit which is equivalent to the firm's
overall profit realized over a representative period of
time (e.g., on an annual basis), in sales of merchandise
of the same class or kind" because, even if the court
were to conclude that the Thai Producer may be considered
"the firm" for the purposes of this regulation, Meyer has
not produced evidence at trial to establish the costs and
profit of any of the products manufactured by the Thai

Producer to evaluate whether they are equivalent to the Thai Producer's overall profit.

For the purposes of 19 C.F.R. § 152.103(i)(1)(iii), Meyer has not established that the price from the Thai Producer to Meyer Macau was "adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit realized over a representative period of time (e.g., on an annual basis), in sales of merchandise of the same class or kind" because, even if the court were to conclude that the Thai Producer may be considered "the firm" for the purposes of this regulation, Meyer has not produced evidence during trial to establish the Thai Producer's overall costs and profit during the relevant time period.

For the purposes of 19 C.F.R. § 152.103(i)(1)(iii), Meyer has not established that the price from the China Producer to Meyer Hong Kong was "adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit realized over a representative period of time (e.g., on an annual basis), in sales of merchandise of the same class or kind" because, even if the Court concludes that the China Producer may be considered "the firm" for the purposes of this regulation, Meyer has not produced evidence at trial to establish the costs and profit of 24 of the 26 products manufactured by the China Producer in this case to evaluate whether they are equivalent to the China Producer's overall profit. For the two sample transactions for the years 2010-2012, identified in the PWC study (Pl. Ex. 125 at MUS044890), the profit margins identified are not "equivalent to" the China Producer's stated profit in the benchmarking study (Pl. Ex. 119 at MUS045254).

For the purposes of 19 C.F.R. § 152.103(i)(1)(iii), Meyer has not established that the price from the China Producer to Meyer Hong Kong was "adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit realized over a representative period of time (e.g., on an annual basis), in sales of merchandise of the same class or kind" because, even if the Court concludes that the China

Producer may be considered "the firm" for the purposes of this regulation, Meyer has not produced evidence to establish the China Producer's overall costs and profit during the relevant time period.

. . . <u>Absence of non-market influence on price</u>

Meyer has not established that the prices from the China Producer or the Thai Producer to Meyer Hong Kong and Meyer Macau were not influenced by the non-market economy effect of the PRC. Meyer attempted to elicit testimony from Mr. Kam that, although the China Producer is located in the PRC and obtains raw materials from other entities located in the PRC, there is no influence on the China Producer's prices. However, Mr. Kam lacked knowledge to establish such an absence of influence.

Although the Thai Producer receives some raw materials from entities located in the PRC, Meyer did not attempt to establish that the Thai Producer's price was not influenced by prices for materials that themselves were influenced by the non-market economy effect of the PRC.

Finally, Meyer provided no financial information from its parent company, Meyer Holdings, notwithstanding that this court observed, due to the relatedness of the parties to the transaction, that "financial information pertaining to the parent is also relevant to examining whether any non-market influences affect the legitimacy of the sales price." <u>Meyer</u>, 255 F.Supp.3d at 1361. This court further noted that the parent's financial documents could reveal whether "parental support or guidance has a market-distortive effect on the cost of inputs or of financing" thereby resulting in a '"booked' profit" "unrepresentative of sales or merchandise of the same class or kind that have been made without the distortion of non-market influences." <u>Id</u>.

. . . <u>Statutory Additions</u>

Meyer has not established that the transaction prices between the Thai Producer and Meyer Macau and the China Producer and Meyer Hong Kong present viable transaction values because it failed to provide sufficient evidence

regarding the amounts of any statutory additions as se[t] forth in 19 U.S.C. § 1401a(b)(1). Specifically, at trial, Meyer provided no information about the value of assists, and Mr. Pinkerton did not know the value of any assists.

Meyer has not established that the price from the Thai Producer to Meyer Macau is an acceptable first sale value because 19 U.S.C. § 1401a(b)(1) provides that if sufficient information about statutory additions is not available, transaction value may not be used. At trial, Meyer has provided no information about the value of assists, and Mr. Pinkerton did not know the value of any assists.

Def. PFF&CL, pp. 37-45.

V

Upon due and lengthy deliberation, the court finds defendant's recital of the facts from trial, above, accurate, and they are hereby adopted as the findings of the court. Plaintiff's proposed findings of fact are not inaccurate, but they do not provide a complete picture of what is necessary to its case for establishing entitlement to first sale valuation.

Furthermore, based on the applicable law and the evidence adduced at trial, the plaintiff has failed to meet its burden of establishing its entitlement to GSP dispensation of duty-free treatment for cookware manufactured by the Thai producer from steel discs obtained from the PRC, because the manufacturing process did not result in a double substantial transformation of them.

Based on the applicable law and the evidence adduced at trial, the plaintiff has also failed to establish that it should be entitled to use the transaction value between the China producer and Meyer Hong Kong or the Thai producer and Meyer Macau ("first sale") for the appraisement of the imported cookware.

Regarding plaintiff's arguments that because Meyer Holdings is an investment holding company without cookware operations, is not a party to any of the transactions between Meyer Hong Kong and the China producer and does not engage in the sale of merchandise of the same class or kind as the China producer, and that the China producer is the appropriate "firm" to analyze under the "all costs plus profit test" (see P. Ex. 125, 2016 China Producer Assessment covering 2010-2012), whether it is true that for the "all costs plus profit" test no CBP regulation requires that the "firm" mentioned in 19 C.F.R §152.103(l)(1)(iii) be the "parent" of the importing party (see Pinkerton T.T. Vol. IV, 511:15-512:2), costs are obviously critical to that determination, and the real costs of inputs from the PRC are suspect, given its status as a nonmarket economy country.

Even if "true" costs of such inputs could be determined, Meyer Holding presumptively has had the ability to influence the

price paid or payable for them, for example by providing its subsidiaries access to credit and capital on terms that are not available to competitors without the same level of bargaining power with creditors, or even at "below market" rates.  Without financial statements, the court has no concept of the extent to which the finances of the Meyer group units are truly independent "silos" of one another, or the extent to which there might have been state influence or assistance to some degree.  Statutory assists do not encompass financial assistance, of course, but the broader concern here is over market-distortive influence, either with respect to the plaintiff directly or the provision of inputs generally.

The most that plaintiffs' witnesses could testify to was that they were unaware of any such assistance, and to a person they flatly denied that the PRC government provided any assistance or influence whatsoever, arguably a dubious proposition.  At trial, the defendant only lightly explored the extent to which such considerations might be considered market-distortive.  But then again, the defendant never had the ability to probe deeper, in part because it was never provided the financial information it requested in discovery in order to be able to ask or answer probing questions.

The court understands that the Meyer parent is not subject to this litigation and that the plaintiff, as its "independent" subsidiary, can claim an inability to obtain such information from it.  However, given that the parent has an interest in seeing these types of matters resolved favorably, it is therefore presumed to be forthcoming, even unprompted, to provide whatever CBP deems necessary to assist in their resolution, and the fact that in that regard there has apparently been considerable "resistance" throughout this case to that not-unreasonable discovery request and the "assistance" that the parent could have provided its subsidiary to address necessary questions with respect to concerns over non-market influences, speaks volumes.

All of the foregoing leads the court to doubt that accurate ascertainment of the "true" value of the "price paid or payable" at the first sale level in the customs duty sense has been demonstrated in this case.  Whether the same can be said with respect to the second-level "price paid or payable", i.e., by Meyer itself as importer, the court need not opine, for no party has proposed an alternative method of appraisement in any event.  Such matters are best left to the parties in any further negotiations as a result of this opinion.

Court No. 13-00154                                            Page 120

        Second, and more broadly, as a result of its consideration

of the issues presented here, this court has doubts over the extent

to which, if any, the "first sale" test of <u>Nissho Iwai</u> was intended

to be applied to transactions involving non-market economy

participants or inputs.  In that regard, the Court of Appeals for

the Federal Circuit could provide clarification.

        Judgment for the defendant will enter accordingly.

So ordered.


Decided:  New York, New York
          March 1, 2021


                              __/s Thomas J. Aquilino, Jr.___
                                       Senior Judge