**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. RICHARD J. EATON, SENIOR JUDGE**

---------------------------------------------------------------- **X**

**MEYER CORPORATION U.S.,**  :
:
       **Plaintiff,**  :
:
       *v.*  :        **Court No. 13-154**
:
**UNITED STATES OF AMERICA**  :
       **Defendant.**  :
---------------------------------------------------------------- **·X**

### PLAINTIFF'S POST-TRIAL BRIEF

NEVILLE PETERSON LLP
*Counsel for Plaintiff*

John M. Peterson
Richard F. O'Neill
Patrick B. Klein
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Dated: June 5, 2025

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

PLAINTIFF'S POST-TRIAL BRIEF ............................................................................ 1

SUMMARY OF ISSUES ............................................................................................... 1

PROCEDURAL HISTORY ........................................................................................... 5

SUMMARY OF TRIAL PROCEEDINGS .................................................................... 9

I.    Plaintiff's Witnesses ......................................................................................... 9

II.   Defendant's Witnesses ..................................................................................... 22

STANDARD OF REVIEW .......................................................................................... 23

ARGUMENT ................................................................................................................ 24

I.    Plaintiff's Merchandise is Entitled to Appraisement on the Basis of "Transaction Value" According to the "First Sale" Prices From HIL to MMC and from MZQ to MHK. .......................................................................................................... 24

    A.    Transaction Value Generally .............................................................. 24

    B.    19 C.F.R § 152.103(l)(1)(ii): The "Normal Pricing Practices" Test .................. 27

    C.    19 C.F.R. § 152.103(l)(1)(iii): The "All Costs Plus a Profit" Test ..................... 28

II.   The Trial Record Shows that Plaintiff's First Sales Satisfy the "Normal Pricing Practices" Test. ................................................................................................ 32

III.  The Trial Record Shows that Plaintiff's "First Sale" Transactions Satisfy the "All Costs Plus a Profit" Test. ................................................................................ 34

IV.   Any Remaining GSP Issues Can be Resolved on Remand ................................ 35

CONCLUSION ............................................................................................................. 36

## TABLE OF AUTHORITIES

**Cases**

*Campbell v. Wettstein*, 476 F.2d 642 (C.C.P.A. 1973) .................................................................. 34

*Cyber Power Sys. (USA) Inc., v, United States*, 622 F. Supp. 3d 1397 (Ct. Int'l Tr. 2023) ......... 23

*Doe v. United States*, 129 F.4th 1362 (Fed Cir. 2025)................................................................... 32

*EOS of N. Am., Inc. v. United States*, 37 C.I.T. 637 (2013).......................................................... 30

*Excelsior Import Assoc. v. United States*, 79 Cust. Ct. 144 (1977). ............................................ 23

*Garg Tube Exp. LLP v. United States*, 740 F. Supp. 3d 1575 (Ct. Int'l Tr. 2024). ...................... 32

*Hale v. Dep't of Transp.*, 772 F.2d 882 (Fed. Cir. 1985) ............................................................. 23

*Intercontinental Marble Corp. v. United States,* 381 F.3d 1169 (Fed. Cir. 2004)....................... 30

*Jarvis Clark Co. v. United States*, 733 F.2d 873 (Fed. Cir. 1984)............................................... 25

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................................. 32

*Meyer Corp. U.S v. United States* 2016 Ct. Int'l Tr. LEXIS 104* (2016).................................... 6

*Meyer Corp. U.S v. United States*, 2016 Ct. Int'l Tr. LEXIS 18* (2016)..................................... 6

*Meyer Corp. U.S. v. United States*, 123 F.4th 1306 (Fed. Cir. 2024) .................................. 8, 9, 36

*Meyer Corp. U.S. v. United States*, 2021 Ct. Int'l Tr. LEXIS 26* (2021)..................................... 6

*Meyer Corp. U.S. v. United States*, 255 F. Supp. 3d 1348 (Ct. Int'l Tr. 2017) ...................... 5, 6

*Meyer Corp. U.S. v. United States*, 43 F.4th 1325 (Fed. Cir. 2022)..................................... 5, 7, 17

*Meyer Corp. U.S. v. United States*, 614 F. Supp. 1376 (Ct. Int'l Tr. 2023) ............................. 7, 8

*Nissho Iwai Am. Corp. v. United States,* 982 F.2d 505 (Fed. Cir. 1992)................................. 3, 25

*Penn-Texas Corp. v. Morse*, 242 F.2d 243 (7th Cir. 1957) .......................................................... 24

*St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763 (Fed. Cir. 1993) ......................... 23

*Target Corp. v. United States*, 31 C.I.T. 154 (2007) .................................................................... 25

*Torrington Co. v. United States*, 764 F.2d 1563 (Fed. Cir. 1985). ................................................ 4

*United States v. Lopez*, 2022 WL 1446678 (W.D.N.C. 2022)...................................................... 24

*Universal Elecs. Inc. v. United States*, 112 F.3d 488 (Fed. Cir. 1997)........................................ 23

*Welter v. Hurt*, 2025 U.S. Dist. LEXIS 63498 (C.D. Cal. 2025)................................................. 34

**Statutes**

19 U.S.C. § 1401a .................................................................................................................. passim

19 U.S.C. § 2463 ............................................................................................................................. 4

28 U.S.C. § 2639 ........................................................................................................................... 23

**Other Authorities**

*Customs Headquarters Ruling H088815 of September 11, 2011* ................................................ 20

*Determining the Acceptability of Transaction Value for Related Party Transactions (an
    Informed Compliance Publication)*, U.S. Customs and Border Protection (April 2007).......... 29

*Treasury Decision 91-7*................................................................................................................. 5

**Treatises**

Mark K. Neville Jr., *The Customs Valuation Agreement: Origins, Standards and
    Interpretations* (1st ed. 2023) ............................................................................................... 31

**Regulations**

19 C.F.R. § 152.103 ............................................................................................................... passim

19 C.F.R. § 177.9 ......................................................................................................................... 30

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD J. EATON, SENIOR JUDGE

------------------------------------------------------------------ X

MEYER CORPORATION U.S.,

        Plaintiff,

        *v.*                                Court No. 13-154

UNITED STATES OF AMERICA
        Defendant.

------------------------------------------------------------------ X

## PLAINTIFF'S POST-TRIAL BRIEF

In accordance with this Court's April 21, 2025 Order, *see* ECF 208, plaintiff submits this Post-Trial Brief addressing evidence received at the trial of this matter conducted on October 7-11, 2019[1] before Hon. Thomas J. Aquilino and the legal issues which the evidence addressed. For the reasons set out herein, plaintiff submits that, based on the preponderance of evidence received at trial, this Court should enter judgment for plaintiff with respect to (1) the proper basis of the dutiable "transaction value" under 19 U.S.C. § 1401a(b) of plaintiff's imported cookware products, and (2) the eligibility of certain cookware originating from Thailand for duty-free entry pursuant to the Generalized System of Preferences ("GSP"), remanding this issue to Customs for calculation of refund amounts.

## SUMMARY OF ISSUES

Plaintiff, Meyer Corporation U.S, of Vallejo, California ("MUS"), is the importer of record of certain pots, pans and other cookware which is the subject of this action.

### I.    Transaction Value: "First Sale" Issue

---

[1] Undersigned counsel was not present at the trial.

The subject merchandise reaches the United States via two supply chains. First, Meyer Industries Thailand ("MIL") manufactures steel and aluminum cookware in Thailand. It sells those goods "for export to the United States" to Meyer Marketing (Macau Commercial Offshore) ("MMC"), headquartered in the Special Administrative District of Macau, which, in turn, resells the products to plaintiff, again "for export to the United States."

Second, Meyer Zhaoqing Metal Products Co. of Guandong, P.R.C. ("MZQ") manufactures steel and aluminum cookware in China. It sells those goods "for export to the United States" to Meyer Manufacturing Co. Ltd, Hong Kong ("MHK"). MHK, in turn, resells the cookware to plaintiff, again "for export to the United States."

All of the Meyer entities – MUS, MIL, MMC, MZQ, and MHK – are "related" parties for purposes of the Customs valuation statute, 19 U.S.C. § 1401a(g)(1).[2]

Customs appraised the imported merchandise in liquidation on the basis of the "second sale" prices at which the goods were sold to MUS. Plaintiff contends that the goods should be appraised on the basis of the "first sale" prices at which the cookware is sold "for exportation to

---

[2] 19 U.S.C. § 1401a(g)(1) provides:

**(g) Special rules**

(1) For purposes of this section, the persons specified in any of the following subparagraphs shall be treated as persons who are related:

    (A) Members of the same family, including brothers and sisters (whether by whole or half-blood), spouse, ancestors, and lineal descendants.

    (B)  Any officer or director of an organization and such organization.

    (C) An officer or director of an organization and an officer or director of another organization, if each such individual is also an officer or director in the other organization.

    (D) Partners.

    (E) Employer and employee.

    (F) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.

    (G) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

the United States" from MIL to MMC, and from MZQ to MMC, pursuant to the "first sale" rule of appraisement set out by the Federal Circuit in *Nissho Iwai Am. Corp. v. United States,* 982 F.2d 505 (Fed. Cir. 1992).

There is no dispute that the sales from MIL to MMC, and from MZQ to MHK are *bona fide* sales and are sales "for export to the United States," *id.* at 509*,* satisfying two of the three prongs of the *Nissho-Iwai* test.  What remains in dispute, and was the subject of trial, is whether the relationship between the buyers and sellers improperly influenced the "price actually paid or payable" for the merchandise in those sales, such that the sales do not provide an appropriate basis for determining "transaction value" pursuant to 19 U.S.C. § 1401a(b). Plaintiff submits, and the trial evidence demonstrates, that the sales satisfy the criteria for accepting related party prices in transaction value, as set forth in the Customs regulations, 19 C.F.R. § 152.103(l)(1). Specifically, the buyers and sellers set prices in accordance with the "normal pricing practices" of their industry, as provided in 19 C.F.R. § 152.103(l)(1)(ii). In addition, the "first sale" prices are "adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit realized over a representative period of time (e.g., on an annual basis), in sales of merchandise of the same class or kind" as provided in 19 C.F.R. § 152.103(l)(1)(iii). Related party prices must be accepted when either of these tests is satisfied, even if Customs does not conclude from an examination of the "circumstances of the sale" that the buyer and seller deal with each other as though unrelated. *See* 19 C.F.R. § 152.103(l)(1)(i).

Fact and expert testimony adduced at trial demonstrates that the tests for acceptability of a related party "transaction value" are satisfied, and that the imported goods should be appraised at the "first sale" prices, in accordance with the long-established rule in *Nissho-Iwai, supra*.  Indeed,

the government did not, in its case-in-chief, introduce any evidence contradicting the testimony or exhibits introduced by MUS.

## II.    Eligibility of Certain Thai Cookware for Duty Free GSP Treatment

The second issue presented at trial is whether certain Thai-origin cookware qualifies for duty-free entry under the GSP, 19 U.S.C. § 2463(a).[3]

For merchandise to qualify for duty free GSP entry, three requirements must be satisfied. First, the goods must be the product of a "substantial transformation" in a beneficiary developing country ("BDC") – a working or processing which results in the creation of a new and different article of commerce, having a name, character or use different from its constituent parts or materials. *See Torrington Co. v. United States*, 764 F.2d 1563 (Fed. Cir. 1985). Second, the goods must be "imported directly" from the BDC to the United States, without entering the commerce of any other country. Third, a "value-content" requirement must be satisfied, in that the cost of beneficiary country materials, plus the "direct cost of processing operations" performed in the BDC must equal 35% of the appraised value of the imported merchandise.

It is not disputed that the subject goods undergo a "substantial transformation" by virtue of manufacturing operations in Thailand, nor that they are "imported directly' into the United States. Whether they satisfy the "35% value content rule will depend, in significant part, on this Court's determination concerning whether the goods are subject to appraisement on the basis of the *Nissho Iwai* "first sale" rule.

Prior "law of the case" determinations have resolved some of the issues attendant to the GSP question presented here. First, in *Meyer Corp. U.S. v. United States*, 255 F. Supp. 3d 1348

---

[3] At relevant times, Thailand was designated a "beneficiary developing country" whose products were eligible for duty-free treatment under the GSP, provided that statute's rules of origin were satisfied.

(Ct. Int'l Tr. 2017) ("*Meyer I*"), this Court (Musgrave, J.) addressed the question of the GSP eligibility of certain imported cookware "sets" consisting of an aluminum or steel pot or pan of Thai origin packed with a glass lid made in China (which is not a GSP beneficiary). Rejecting the government's position that the presence of the Chinese glass lid disqualified the set from GSP eligibility altogether, the Court noted that the GSP statute provided duty free treatment for "articles," rather than goods. Thus, relying in part on *Treasury Decision 91-7*, the Court held that the Thai-origin pots and pans, if they met the applicable rules of origin, could receive duty-free GSP treatment, but the Chinese-origin glass lids could not, either separately or as part of the set.[4]

Second, in *Meyer Corp. U.S. v. United States*, 43 F.4th 1325 (Fed. Cir. 2022) ("*Meyer III*"), the Federal Circuit upheld this Court's holding that certain pan shells formed in Thailand using steel discs of Chinese origin were not "substantially transformed constituent materials" whose value could be counted as qualifying Thai material value for purposes of calculating the GSP's 35% value content limitation.

The resolution of the GSP issues remaining in the case will rest on this Court's appraised value determination and the "law of the case" rulings previously issued.

## **PROCEDURAL HISTORY**

Having been on this Court's docket for a dozen years and having made two trips to the Federal Circuit, this case has a long procedural history.

---

[4] Assuming this Court rules that the appraised value of the sets should be based on the "first sale" prices, plaintiff and defendant will need to agree on a method for apportioning the value of the set to the Thai-and-Chinese components, so the extent of duty-free GSP treatment can be determined. Plaintiff proposes that this be done on remand, after the Court resolves the appraised value issue.

After issuing two decisions disposing of procedural motions,[5] the court eight years ago issued its decision in *Meyer I*. in which, as noted above, the Court granted partial summary judgment on the question of which components of certain cookware "sets" were potentially eligible for duty free treatment under the GSP, while denying the motion for summary judgment on the issue of the proper basis of appraisement of the goods.

A bench trial of this action was held before Hon. Thomas J. Aquilino from October 7 to 11, 2019.

In *Meyer Corp. U.S. v. United States*, 2021 Ct. Int'l Tr. LEXIS 26* (2021) ("*Meyer II*"), the Court issued a lengthy opinion with extensive findings of facts, and entered judgment for defendant. The Court's decision rested on two principal findings; first, that the plaintiff had failed to show that the "first sale" transactions were free from "non-market economy" influences, such as Chinese subsidies or dumping of Chinese-origin inputs (which, it surmised, might have affected the prices paid for items such as the Chinese clad discs which were used to make "pan shells" and cookware in Thailand). The Court held that Plaintiff had not carried its burden of proof. One of the reasons the Court held that plaintiff had failed to carry its burden was because it had not produced the financial reports of its parent company, Meyer International Holdings ("MIH"), in the British Virgin Islands. The Court surmised that these records might have disclosed improper

---

[5] In *Meyer Corp. U.S v. United States*, 2016 Ct. Int'l Tr. LEXIS 18* (2016), the Court, following an *in camera* review, denied plaintiff's motion seeking to compel the defendant to disclose portions of documents produced in discovery which had been redacted based on claims of deliberative process privilege and investigative privilege (although defendant did make some additional materials available to plaintiff's counsel).

In *Meyer Corp. U.S v. United States* 2016 Ct. Int'l Tr. LEXIS 104* (2016), the Court denied plaintiff's motion *in limine* seeking to preclude the government from introducing evidence at trial asserting that the "firm" whose profits must be considered in the "all costs plus a profits" test of 19 C.F.R § 152.103(l)(1)(iii), was MIH, the British Virgin Islands holding company which is parent to the other Meyer entities. The Court held this was an issue more properly presented in the then pending Motions for Summary Judgement.

financial benefits flowing from MIH to the other Meyer companies, or non-market economy influences being routed through MIH.

On appeal, the Federal Circuit vacated in part this Court's post-trial decision. In *Meyer III*, the Court of Appeals noted that the acceptability of a price for purposes of transaction value did not turn on the presence of "non-market economy country" influences. The GATT Valuation Agreement, on which the United States' Customs valuation statute is based, does not distinguish between market and non-market economy countries in its analysis. Distortions such as dumping and subsidization are handled by other statutes, such as the antidumping and countervailing duty laws; the valuation laws are not properly used to fight dumping. The Circuit vacated this Court's finding on valuation and remanded the case.[6]

On remand, this Court (Aquilino, J.) purported to "affirm" the determination the Federal Circuit had vacated. *Meyer Corp. U.S. v. United States*, 614 F. Supp. 1376 (Ct. Int'l Tr. 2023) ("*Meyer IV*"). The Court restated its prior conclusions about non-market economy country influences verbatim, replacing the prior decision's references to "non-market economy country" with ellipses. The Court also reiterated its views that plaintiff had failed to meet its burden of proof because it had not produced or volunteered MIH's financials. MIH was now suspected—indeed, presumed—to have channeled to its operating subsidiaries some form of aid which might have distorted the cost of producing the imported goods:

> The fact that the government herein was not provided with the financial information pertinent to plaintiff's parent company hampered its ability to discern whether or not the parent of the plaintiff provided any form of assistance to reduce costs.

---

[6] As noted above, *Meyer III* affirmed this Court's finding that Chinese origin disks used to make "pan shells" in Thailand were not "substantially transformed constituent materials" for purposes of the GSP's 35% value content requirement.

*Meyer IV* at 1380.[7] Despite conceding that the holding company MIH "is not subject to this litigation" and that MUS. could validly "claim an inability to obtain such information from it," the Trial Court concluded, speculatively, that the absence of MIH data—not pursued by the Government nor shown to be relevant to any of the issues in this case —absolved it of any further obligation to review the trial record or and conclude whether the "first sales" or the "second sales" provide a legally viable basis for transaction value. Nor did the government ever introduce any evidence suggesting the presence of improper influences.

In *Meyer Corp. U.S. v. United States*, 123 F.4th 1306 (Fed. Cir. 2024) ("Meyer V"), the Federal Circuit again vacated this court's decision awarding judgment to defendant. It held that, instead of examining the record at trial, the trial court had relied upon an impermissible speculation and improperly dismissed plaintiff's case as if was applying a discovery sanction and:

> . . . failed to comply with our remand order instructing it to "reconsider whether Meyer may rely on the first-sale price" by disregarding the trial record and instead applying an improper evidentiary presumption. The trial court's opinion makes clear that it suspected Meyer of being dishonest in its reporting of "costs" for use in the "all costs plus profit" test. See id. at 1379 (trial court repeating its prior statement that, even ignoring non-market economy effects, "the costs of the inputs from [China] are suspect"); id. at 1380 ("[T]he foregoing leads the court to doubt that accurate ascertainment of the 'true' value of the 'price paid or payable' at the first sale level in the customs duty sense has been demonstrated in this case."). In reaching this conclusion, the trial court cites no record evidence to support its belief that Meyer inaccurately reported costs. Rather, the court relied entirely on speculation that, because Meyer did not produce the Meyer Holdings financial documents, the documents might have shown underreported costs.

*Id.* at 1312.

In again vacating and remanding this Court's decision, the Federal Circuit noted:

---

[7]The Court overlooked the obvious fact that if, in fact, such assistance had been furnished to the Chinese or Thai producers, those costs would have been recorded in the books and records of the Chinese and Thai producers, of which all such books were available to Customs during the audit which prompted the denial of first sale treatment which prompted this litigation.

The trial court should evaluate, on the extensive record before it, whether Meyer has met its burden to show that its first-sale price is a viable transaction value under 19 U.S.C. § 1401a(b)(2)(B). As discussed above, there are two alternate ways that Meyer may prove its case: the "all costs plus profit" test and the "normal pricing practices" test. See 19 C.F.R. § 152.103(l)(1). Because Meyer raised both tests as possible bases for using first-sale price, see J.A. 106, 108, so too should the trial court consider both tests in its opinion. We note that this decision should not be read as putting a thumb on the scale regarding the outcome on remand. Rather, it is an acknowledgement that Meyer was entitled to have its case heard on the merits of the record it presented, not disposed of based on conclusory speculation.

*Id.* at 1313.

We now turn to an analysis of the "extensive" trial record before this Court.

## SUMMARY OF TRIAL PROCEEDINGS

### I.    Plaintiff's Witnesses

Plaintiff MUS called five (5) witnesses at trial of the matter.

Its first witness, **S. Darrin Johnson**, is a consultant with STJ Global, LLC, a consultancy specializing in assisting cookware and houseware companies. *See* Transcript ("Tr.") at 70:10-11. For 23 years, he was employed by Meyer in a variety of positions, most recently as Manager Director of U.S. and Latin American operations. *See* Tr. at 71:12-16. He has extensive experience and served as a Director of the U.S. Cookware Manufacturers Association, a domestic industry group. *See* Tr. at 74:21 – 75:13. As Managing Director of Meyer, he "had full top-to-bottom responsibilities and control of the organization from accounting to human resources to business development, marketing, sales, operations, distribution, warehousing -- all capabilities basically involved in the day-to-day business" of the plaintiff. *See* Tr. at 79:21 – 80:4. He testified to the roles and functions of the various Meyer operating companies involved in this action – MUS, MMC, MHK, MIL and MQZ. He explained that all of these entities were owned by MIH, the British Virgin Islands holding company, but that MIH never became involved in any of the

9

companies' day-to-day operations and that the companies were able to function without any MIH involvement. *See* Tr. at 81:4-11.

He testified that during his tenure as Managing Director of MUS he engaged with MMC pursuant to a Master Distribution Agreement dated May 16, 2003 and that he interacted with Ms. Sharon Lau of MMC, who was in charge of pricing and product development for that company. *See* Tr. at 84:15 – 86:17. Mr. Johnson testified that although MUS and MMC were related parties, they negotiated prices in the same manner that unrelated companies would:

> Q: (By Mr. Donley) Did anyone ever tell you that you had to accommodate whatever MMC wanted to do with a contract?
>
> A: I'm sorry. I didn't hear.
>
> Q: Did anyone tell you from MIH that you had to accommodate MMC in any contract negotiations you had?
>
> A: No.
>
> Q: How did you go about setting a price with MMC?
>
> A: Well, we submitted our request to MMC but we didn't set pricing with MMC.
>
> Q: What did you do? Did you negotiate?
>
> A: We had to negotiate, yes.
>
> Q: And would MMC always meet your price?
>
> A: No.
>
> Q: Did MMC ever come back with a counteroffer?
>
> A: Yes.
>
> Q: And in terms of that negotiation, describe for us how that would work.
>
> A: Well, in certain cases we would be told, "We're sorry. We can't hit the price that you're asking for." Most of the time they would say, "Here's what we can do." We had to then assess, okay, do we have room, based on the targeted retail and our margin structure in the U.S., could we work on a shorter margin ourselves to make

it work. But at the end of the day, we would have to say yes or no to that, and ultimately decide if we would accept that product or say, "Okay. We can't make the program work based on that pricing, so we're going to pass." It just depended on the situation by situation. Sometimes they were able to say, "Yes, we can." Sometimes we can't. But we tried to use that competitive information to give MMC clear understanding on why we were asking for what we were asking for based on the market.

*See* Tr. at 87:3 – 88:24.

Asked whether MUS treated negotiations with MMC in the same manner that it negotiated with unrelated companies, Mr. Johnson replied "It was exactly the same." *See* Tr. at 89:14-18.  He further testified that he considered MUS's negotiations with MMC to be at "arms' length." *See* Tr. at 89-18 – 90:18.

Mr. Johnson also testified that in some cases, as with the retailer Costco, MIL sold merchandise directly to Costco in an unrelated party sale "for export to the United States," with MUS receiving a selling commission. In other cases, MUS sold merchandise directly to Costco out of its distribution center in Fairfield, California. *See* Tr. at 101-17: 103:12.

In addition, Mr. Johnson also negotiated with Sharon Lau of MMC for the purchase of product made in the Chinese factory of MQZ. *See* Tr. at 109:15-24.

On cross-examination, Mr. Johnson confirmed that he negotiated prices with Sharon Lau of MMC for goods made in both the MIL (Thailand) and MZQ (China) factories:

Q: (By Ms. Farrell) And for purposes of both the China producer and the Thai producer, the person with whom you negotiated with Sharon Lau?

A: Yes.

Q: Did the negotiation occur by, I guess, like, you would send an order and she would send it back to you writing in something different?

A: Well, the negotiations, we didn't just automatically submit an order. We would have to submit a request, initially, based on a new product being developed. And then that information was given there. And then Sharon would work with whoever she worked with in other entities -- to -- put that altogether and come back to us and say this is what price we can offer.

*See* Tr. at 119:5–24.

Plaintiff's second witness, **Siu Kai Kwok,** has been employed by MIL in Thailand for 27 years, and for 13 years prior to trial, served as the company's Finance Manager, and previously served as the company's Costing Manager. He testified that MIL has one factory in Thailand employing between 2,000 and 3,000 workers, in four (4) manufacturing divisions: CE (aluminum), HA (hard anodized), AP (advanced automated production) and SS (stainless steel). He also testified that MIL sells approximately 96% of its product to MMC, and about 2% each to MHK in Hong Kong and Myrex, a Thai corporation. *See* Tr. at 158:18-160:25.

Mr. Kwok testified that in setting prices for goods, he deals with 4 or 5 marketing managers at MMC, and is aware that goods produced by MIL are destined for the United States. *See* Tr. at 161:8-162:8. He identified a number of MIL-produced pots, including some sets featuring Thai aluminum or steel pots packed with glass lids of Chinese origin. He also identified a number of bills of lading and invoices for goods sold by MIL to MMC, which were destined for shipment to the United States. He testified that MIL is responsible for the inland freight on goods shipped from the factory to Laem Chabang, Thailand, the port of export. *See* Tr. at 173:14 -174:11.

He also testified that prices from MIL to MMC are set on a "cost-plus" basis, to that MIL would be able to recover all of its costs plus a profit:

Q: (By Ms. Elderidge) How does MIL determine its prices to MMC for pots and pans?

A:      It      would      be      the      cost      plus      the      profit      margin.

Q: And do you have a certain profit margin you seek to get from selling goods from MIL to MMC?

A: Yes.

Q: And what is that margin of profit?

A: On average that's three percent.

Q: On average meaning, it's sometimes above three percent, sometimes it's below three percent; is that right?

A: Yes.

Q: As part of your job responsibilities, do you keep aware of a range of profits or profits by any of your competitors?
A: The competitors we just talk about how do you differentiate from them?

Q: Other Thai producers of kitchenware, pots and pans?

A: Yes.

 Q: And how does your profit margin compare with their profit margin to your knowledge?

A: I think ours is more than the average.

Q: In calculating a rate of profit for a sales of goods from MIL to MMC that you know are going to go to Meyer US, do you make any distinction between U.S. sales that are going through MMC and sales to other Meyer companies throughout the world?

A: There is no distinction.

Q: To your knowledge, are goods sold from MIL to MMC ever sold at a loss?

A: No.

*See* Tr. at 176:3-177:19.

After identifying the Master Manufacturing Agreement between MIL and MMC, Mr. Kwok indicated that MIL and MMC negotiate prices for goods being sold by MIL to MMC are negotiated. He testified that MIL sets its prices to MMC based on costs, and that he always tries to make a profit. In some cases where MMC rejects a price, Mr. Kwok indicated that he may offer a lower price but would not sell at a loss. *See* Tr. at 178:12 – 179:23. This unrefuted testimony

establishes that in "first sale' transactions from MIL to MMC, the price is set at a level which satisfies Customs' "all costs plus a profit test" codified at 19 C.F.R. § 152.103(l)(1)(iii).

Mr. Kwok also identified several GSP calculation sheets which were received in evidence, and narrated a film shown to the Court demonstrating the process of manufacturing a pan shell and creating a finished pan.

On cross-examination, Mr. Kwok testified that he negotiates with MMC on the basis of price, but may adjust a price is there is a particularly large volume ordered (because per-pan costs decline). However, if MIL would incur a loss, Mr. Kwok testifies that he rejects the price. *See* Tr. at 238:7–239:10.

Plaintiff's third witness, **Sharon Lau,** testified that she works for MMC, as sales director and that her company is the interface with various factories, including MIL and MZQ. When she receives an order for MUS, one of her responsibilities is to decide what factory should be assigned to manufacture the order, based on the availability of tooling, materials and cost. *See* Tr. at 320:11-321:22.

Ms. Lau also testified about the method she uses to negotiate prices with the various factories:

> Q: (By Mr. Donley) Now when you receive an order from MUS, before you respond to that order or request for a quote from MUS, you would speak with MIL?
>
> A: Right.
>
> Q: And would you negotiate a price with them for the product?
>
> A: I would.
>
> Q: And how would you do that?
>
> A: Okay. We discuss with MIL and we agree on a quotation system, kind of like a quotation system. Because I cannot wait every time for MIL to give me a quotation, but when I give a quotation to customers, sometimes, like, I have to do like 50 quotations a day, as many

as 50. I need to have a system that give me theoretical cost, and I give the quotation to customer, and finally they agree that they would buy the item, I would go to MIL or MZQ what price -- can I use the price, and I stop negotiating with them. If they say no, I try to negotiate.

Q: MIL doesn't simply say yes to you when you come back and say I want this price?

A: No -- but most of the time, yes, because the system was agreed between MIL -- agreed by MIL, the data.

Q: But are there times when a particular order may not fall within the usual parameters of that system?

A: Yes.

Q: And in those cases, would you then negotiate with MIL?

A: Correct.

*See* Tr. at 323:11 – 323:20.

Ms. Lau further testified that she used a similar negotiating process to fix prices with MUS, her customer.  MUS would give her a target price, based on what they thought they would be able to sell the goods to *their* customer at. If she was unable to meet MUS's target, she might try other methods to conclude the sale, for example by offering a different product, a different handle or a lighter gauge material. *See* Tr. at 326:9 – 328:19. She testified that MMC issued invoices to MUS regularly, was paid for them, and that, if MUS failed to pay the invoices, MMC would cease selling to them. *See* Tr. at 340:6-12.

She also testified that MMC made direct sales to a number of unrelated United States retailers, including Costco, Hy-Cite, Amway, Canadian, QVC, Sears, Target and Walmart, to name a few. She testified that her price negotiations with these entities were at arms-length, and were the same as the negotiations she did with MUS, *see* Tr. at 340:14-342:8, and that she also negotiated prices with MQZ.

15

Ms. Lau also testified that from time to time, some of MUS' United States retail customers asked MUS to participate in "price rollbacks" – lowering retail prices for a period of time. When this happens, MUS asks MMC if it can lower its prices to MUS, and a negotiation ensues. Ms. Lau, in turn, engages in price negotiations with MIL to determine whether MIL can also lower its prices. These negotiations anticipate that greater orders will be placed during rollback periods. If it is determined that re-pricing the goods makes financial sense and allows each of the Meyer entities to participate in the rollback, they will do so. In some cases, however, the Meyer companies determine not to participate in the rollback. *See* Tr. at 346:22-349:20. Ms. Lau testifies that she performs the same analysis when retails that MMC sells to directly ask the company to participate in "rollbacks." *See* Tr. at 350:4 -350:22.

On cross-examination, Ms. Lau explained that in some cases – either due to lack of capacity, lack of tooling or other reasons – MIL is unable to produce an order, then on MMC's behalf she will negotiate a price with the Chinese plant, MGQ, and direct the order there. She also explained that royalties paid by MMC are included in the prices (and therefore should not be added thereto). *See* Tr. at 391:17 -393:16.

In addition, Ms. Lau noted that it keeps records of profitability on all sales from that makes, whether to MUS, Walmart or other entities that MMC sells to directly. *See* Tr. at 403:12-24. She further testified on cross examination as follows:

Q: (By Ms. Farrell) Does Meyer Macau keep up the profit between say between Meyer Macau and MIL?

A: Yes.

Q: And Meyer Macau and MZQ?

A: Yes.

Q: And Meyer Macau and Meyer Europe, the Italian Meyer?

16

A: Yes.

Q: So you would have documentation reflecting the profitability between –

A: The margin.

Q: The margin between those events?

A: Um-hmm, yeah.

*See* Tr. at 404:21 – 405:9.  This is further evidence that MMC's pricing meets the "all costs plus a profit" test set out in 19 C.F.R. § 152.103(l)(1)(iii).

Plaintiff's fourth witness was Mr. **Kan Ming Kam**, the stainless steel production department manager of MZQ. He testified that he tracks materials costs and, in developing pricing for new products builds in a profit margin of 3 to 5 percent. *See* Tr. at 420:20-23. He also testified at length that, to his knowledge, MZQ had never received financial assistance from the Chinese government on a local or provincial level, owned the land its plant was situated on, obtained its utility services from private suppliers, and had never been directed by any government or the Chinese Communist Party to hire any particular employees. *See* Tr. 421:15-425:6.[8]

On cross-examination, Mr. Kam affirmed that the MQZ policy was to make a profit of 3 to 5 percent on all products, and that at times MZQ had a profit margin above that range and had margins of less than 3 percent. *See* Tr. 447:2-448:10. He testified at length concerning MZQ's sourcing of raw materials for manufacturing, including such items as steel, knobs for pot lids and packing materials.

---

[8] In *Meyer III*, the Court of Appeals for the Federal Circuit made clear that the existence of "state controlled economy' influences was not relevant for purposes of determining the transaction value of imported merchandise.

17

Plaintiff's fifth and final witness was **Craig John Pinkerton,** the Director for Customs and International Trade for the global accounting firm Pricewaterhouse Coopers ("PwC"). He testified that he had a bachelor's degree from the University of Florida, had been a licensed Customhouse Broker since 1998, and had been engaged in Customs and international trade practice for 24-1/2 years. *See* Tr. at 475:19 – 477:26. He has experience in all field of Customs and international trade, authored many articles in the area, given speeches, and been appointed a Special Master in connection with a criminal customs valuation proceeding.  Following an extensive voir dire, Mr. Pinkerton was deemed eligible to provide opinion testimony as an expert witness pursuant to Federal Rule of Evidence 702. *See* Tr. at 500:17-22.

Mr. Pinkerton testified concerning the tests and methods he used to determine that goods sold by MIL to MML were sold pursuant to bona fide sales, and were sold for exportation to the United States. He also explained the regulatory tests which Customs has established for establishing the acceptability of a related party price as the basis of dutiable "transaction value" – the "normal pricing practices" test set out in 19 C.F.R. § 152.103(l)(1)(ii), and the "all costs plus a profit" test set out in 19 C.F.R. § 152.103(l)(1)(iii). *See* Tr. at 502:21-509:23.

Mr. Pinkerton testified that he had performed a "normal pricing practices" test for MIL using an accepted methodology which compared MIL's profits on sales to MMC with profits earned by comparable companies whose financial results are publicly reported. Addressing the "all costs plus a profit" test of 19 C.F.R. § 152.103(l)(1)(ii), he testified:

> Q: (By Mr. Donohue) Okay. Let's then talk about the second test, normal pricing practices test. How did you -- how did you go about that -- it's already read into the record. We're going to assume, Mr. Pinkerton, that you know what the normal prices practices test is?
>
> A: Yes. Interpretive note two. So for the normal prices practices, again, we look at guidance that's been accepted by Customs in the past rulings. My direct dealings and experience working with ports and reg audit, and more recently centers of

excellence. And primarily -- primarily, the test that we do which has been widely recognized and accepted, is a comparison of a company to an industry as a whole. We look at -- we compare the profits of MIL to other manufacturers of cookware. We do a company to industry profits comparison test, where we, again, compare the profitability or tested party of MIL to other manufacturers in Thailand of cookware.

Q: When you're doing that test, is the basis the profit earned by MIL overall or is it the profit earned by MIL on sales for export to the United States against similarly-situated producers?

A: We look at MIL's profit overall because, unfortunately, when you obtain comparable financial information, which is -- obviously we're getting financials of other independent third-parties. They're not segmented. We can't obtain comp profits on one side of the supply chain. We have apples to apples comparison.

Q: Exactly. That makes it an apples to apples comparison?

A: That's correct.

Q: And conducting this normal pricing practices test, how do you calculate a rate of profit earned either by MIL or let's call them the testing companies?

A: We use a profit level indicator. And, again, basing it off guidance provided by Customs and their preference for the PLI, we use full-cost markup, which is taking the formula's income divided by total cost. Total cost would be cost of goods sold plus GNA. And there is also OPM, operating profit margin, which is income divided by sales.

Q: And when you conducted that test, did MIL compare favorably or unfavorably to the tested companies?

A: They compared favorably.

Q: And to the best of your knowledge, is this form of test considered standard or acceptable within the accounting profession?

A: This is -- it's quite uniform. It's quite standard. There's rulings on point that accept a comparative analysis, industry analysis using the methodology that we use. I believe the first ruling was in 2000 involved a company called Sayco which I worked on. I believe, to my knowledge, that was the first ruling that accepted a company to industry comparison.

*See* Tr. at 517:3 – 519:21. Mr. Pinkerton testified that he had prepared this type of study for MIL

in 2006, presented it to Customs, and Customs had agreed to allow MUS to enter goods made by

MIL using the *Nissho-Iwai* "first sale" rule. He prepared a similar study in 2007 for goods made by MGQ, and again received CBP's approval to enter goods using the "first sale" from MZQ to MHK. *See* Tr. at 533:3 – 535:17.

Customs conducted a regulatory audit of MUS's Customs entries in 2008, and in a 2009 audit report, rejected the company's use of "first sale appraisements" for merchandise produced by MIL and MGQ. Customs "determined Meyer met the criteria for bona fide sale, and clearly destined for exportation to the United States, but did not meet the arms-length and statutory additions test set forth in the Nissho Iwai case for first sale transaction value." *See* Tr. at 542:12-17. Meyer asked the Customs auditors to seek internal advice from Customs Headquarters concerning the applicability of "first sale" appraisement to Meyer's entries. In response, the agency issued *Customs Headquarters Ruling H088815 of September 11, 2011* Disallowance of "first sale" as the basis for Customs appraisement in the liquidation of entries led to protested assessments, and, upon denial of plaintiff's protests, to this litigation.

At trial, Mr. Pinkerton testified that he and his PwC team had in 2016 conducted a pair of "update" studies of the MIH and MZQ supply chains, covering the years 2010, 2011, and 2012 – contemporaneous with the dates of entry of the merchandise at bar -- comparing the profitability of those firms on sales to MMC with sales of comparable cookware producers. *See* Tr. at 585:9-15. The studies were received into evidence, *see* Plaintiff's Trial Exhibit ("PTX") 117, 119, 125. Mr. Pinkerton testified to the process he utilized to select the comparable companies and indicated that he had calculated an "interquartile range"[9] of the comparable companies' profits, with a range

---

[9] An "interquartile range" is calculated by looking at the entire range of results from a pricing study, then eliminating any results in the lower 25% range and over the 75% portion of the range. This accepted methodology eliminates outliers and improves the accuracy of the comparisons.

of -0.2% to 3.8% profitability. MIL had a profit range of 2.7% for this period, falling within the interquartile range. *See* Tr. at 594:9-24. In all, Mr. Pinkerton testified that PwC had performed a total of five (5) pricing studies for the Meyer companies, and the MIL profit range fell within the interquartile range in all of the studies. *See* Tr. at 595:4-8.

Also received into evidence was the 2016 study performed by Mr. Pinkerton and PwC, testing the profitability of MZQ against comparable companies whose financial results are publicly available for the years 2010-2012. Here again, the study calculated an interquartile profit range of 0.8% to 4.6%. MIL's profit for this time period was 2.09%, falling comfortably in the interquartile range. *See* Tr. at 597:16-598:6.

Mr. Pinkerton also testified that when studying the Meyer' companies profit levels for the period 2010-2012, he confirmed that the "bona fide sale" and "clearly destined for" prongs of the *Nissho-Iwai* "first sale" test had been satisfied. *See* Tr. at 599:23-601:5.

Finally, Mr. Pinkerton was asked to furnish his opinion on the ultimate issue in this action relating to the appraised value of plaintiff's goods at bar:

> Q: Have you informed an opinion that you can state with a reasonable degree of certainty, as to whether the United States erred in determining that merchandise sold from MIL to MMC and MZQ to MHK did not meet the first sale test?
>
> A: Yes, my opinion is they did error.
>
> Q: Okay. Yes, you formed an opinion, the opinion is they erred?
>
> A: Yes, that correct.

*See* Tr. at 647: 3-13.

## II.    Defendant's Witnesses

Remarkably, after Plaintiff MUS rested its case in chief, the government did not put on a witness to refute or critique any of plaintiff's testimony, plaintiff's exhibits admitted into evidence, nor to offer an expert opinion contrary to that provided by Mr. Pinkerton of PwC.

The government called as a witness Monika Brenner, Esq., then Chief of the Valuation and Special Programs Branch at Customs Headquarters in Washington, D.C. She discussed *Treasury Decision 98-67*, a list of documentary materials that Customs expects to be submitted by importers seeking permission to use the *Nissho Iwai* "first sale" test, and introduced into evidence a Customs "Informed Compliance Publication" on valuation. She also discussed the "all costs plus a profit" test for validating a related party price under 19 C.F.R. § 152.103(l)(1)(iii), and indicated that Customs generally views the parent company of a tested firm as the "firm" whose profits those of the tested company are to be compared to. She further indicated that if a tested company did not have a "parent" with sales of merchandise of the same class or kind, a party could turn to the "normal pricing practices test of 19 C.F.R. § 152.102(l)(1)(ii) to validate a related party price, or look to another entity, such as a subsidiary, to make the comparison. *See* Tr. at 875:15-878.18. She also admitted, on cross-examination, that Customs does not always designate the parent company as the "firm" for purposes of the "all costs plus a profit" test. *See* Tr. at 906:24 – 907:11. She also testified generally concerning factors Customs examines in determining whether related party prices are acceptable as a basis for transaction value.[10]

---

[10] As noted above, undersigned counsel was not present at the trial of this matter. However, it appears that, not being a percipient witness as to the facts of this case, and not being offered as an expert, Ms. Brenner did not meet the requirements for competence demanded of a trial witness. Undersigned counsel would likely have moved for a protective order against her testifying.

## STANDARD OF REVIEW

This Court reviews, *de novo*, the legal component of the decisions made by CBP. *See Universal Elecs. Inc. v. United States*, 112 F.3d 488, 492 (Fed. Cir. 1997). Pursuant to 28 U.S.C. § 2639(a)(1), the factual basis of CBP's decision is entitled to a statutory presumption of correctness before this Court. This is not a true presumption of the kind governed by Federal Rule of Evidence 301, but merely a device for allocating to plaintiff the initial burden of proof on contested factual issues that arise from the protested decision. *Cyber Power Sys. (USA) Inc., v, United States*, 622 F. Supp. 3d 1397, 1400 (Ct. Int'l Tr. 2023).

At trial, when the burden of proof rests on the plaintiff, the plaintiff must demonstrate through a preponderance of the evidence that CBP's determination is incorrect. *See* 28 U.S.C. § 2639(a)(1) ("in any civil action commenced in the Court of International Trade under section 515, 516, or 516A of the Tariff Act of 1930, the decision of the Secretary of the Treasury, the administering authority, or the International Trade Commission is presumed to be correct. The burden of proving otherwise shall rest upon the party challenging such decision.") Once the plaintiff introduces evidence countering the presumption of correctness, the burden shifts and the Court must decide the case, in most instances, according to the preponderance of the evidence. *See, e.g., Excelsior Import Assoc. v. United States*, 79 Cust. Ct. 144, 147 (1977).

A preponderance of the evidence has been defined as "the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it." *St. Paul Fire & Marine Ins. Co. v. United States*, 6 F.3d 763, 769 (Fed. Cir. 1993) (quoting *Hale v. Dep't of Transp.*, 772 F.2d 882, 885 (Fed. Cir. 1985)).  The preponderance of the evidence standard is the usual standard of evidence in civil litigation. As the Supreme Court has noted, no special showing is required. A plaintiff may make its showing through direct or circumstantial evidence.

The standard and its application are not affected where, as here, the plaintiff seeks judicial review of a decision to which a statutory presumption of correctness attaches.

In a bench trial, "the court must find the facts specially and state its conclusions of law separately." U.S.C.I.T R. 52(a)(1). In so doing, "a court's duty is to find the facts, weigh the evidence, and choose from among conflicting inferences and conclusions those which the court considers most reasonable." *United States v. Lopez,* 2022 WL 1446678, *6 (W.D.N.C. 2022) (citing *Penn-Texas Corp. v. Morse*, 242 F.2d 243, 247 (7th Cir. 1957)).

## ARGUMENT

I.    **Plaintiff's Merchandise is Entitled to Appraisement on the Basis of "Transaction Value" According to the "First Sale" Prices From HIL to MMC and from MZQ to MHK.**

A.    **Transaction Value Generally**

Merchandise imported into the United States is generally appraised according to its "transaction value" which is defined in Section 402(b) of the Tariff Act of 1930, as amended 19 U.S.C. § 1401a(b) as follows:

(1) The transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold for exportation to the United States, plus amounts equal to—

    (A) the packing costs incurred by the buyer with respect to the imported merchandise;

    (B) any selling commission incurred by the buyer with respect to the imported merchandise;

    (C) the value, apportioned as appropriate, of any assist;

    (D) any royalty or license fee related to the imported merchandise that the buyer is required to pay, directly or indirectly, as a condition of the sale of the imported merchandise for exportation to the United States; and

    (E) the proceeds of any subsequent resale, disposal, or use of the imported merchandise that accrue, directly or indirectly, to the seller.

The price actually paid or payable for imported merchandise shall be increased by the amounts attributable to the items (and no others) described in subparagraphs (A) through (E) only to the extent that each such amount (i) is not otherwise

24

> included within the price actually paid or payable; and (ii) is based on sufficient information. If sufficient information is not available, for any reason, with respect to any amount referred to in the preceding sentence, the transaction value of the imported merchandise concerned shall be treated, for purposes of this section, as one that cannot be determined.

In *Nissho-Iwai Am. Corp. v. United States*, 982 F.2d 505 (Fed. Cir. 1992), the Court of Appeals recognized that, in multi-tiered transactions, there may be two or more sales of merchandise "for export to the United States." In such cases, the court held, the "transaction value" may be based on the first such "sale for exportation" which is made on an "arms-length" basis. In *Target Corp. v. United States,* 31 C.I.T. 154, 160 (2007), this Court acknowledged the Nissho Iwai decision, and indicated that in a three-tiered transaction in which there is both a manufacturer's price and middleman's price, either may serve as the basis for transaction value, but "only one price is legally proper," and that it "is the duty of this court to find the correct result by making the necessary findings of fact at a trial." *Id.* (citing *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984)) (emphasis added).

This case features both "manufacturer's prices" – the prices from MIL to MMC and from MGQ to MHK – as well as "middlemen's prices" – the prices from MMC and MHK to MUS. It is undisputed that all of these sales are bona fide sales and are "sales for exportation to the United States." The principal issue for trial was whether the manufacturers' sales were made at "arms-length" prices, such that they are an acceptable basis for transaction value under *Nissho-Iwai, supra*.

In this case, all of the parties to the sales transactions are "related parties" as defined in Section 402 of the Tariff Act of 1930. A price between related parties is acceptable as the basis for transaction value, provided certain conditions are met. Section 402(b)(2)(B) of the Tariff Act of 1930, 19 U.S.C. § 1401a(b)(2)(B) provides:

25

(B) The transaction value between a related buyer and seller is acceptable for the purposes of this subsection if an examination of the circumstances of the sale of the imported merchandise indicates that the relationship between such buyer and seller did not influence the price actually paid or payable; or if the transaction value of the imported merchandise closely approximates—

    (i) the transaction value of identical merchandise, or of similar merchandise, in sales to unrelated buyers in the United States; or

    (ii) the deductive value or computed value for identical merchandise or similar merchandise;

but only if each value referred to in clause (i) or (ii) that is used for comparison relates to merchandise that was exported to the United States at or about the same time as the imported merchandise.

Thus, a related party price may be used as the basis for transaction value if an examination of the "circumstances of the sale of the imported merchandise demonstrates that the relationship between the buyer and seller did not influence the price paid or payable." *Id.* But even if Customs determines that the relationship did influence the price paid or payable, Customs must accept the related party transfer price if it "closely approximates" any of the "test values" identified in section (b)(2)(B), *supra.*

The trial in this case focused on the question of whether the relationship between the manufacturers and middlemen in the Meyer group's transactions influenced the price paid or payable for the imported cookware.

Customs has by regulation adopted tests which are used for evaluating whether the relationship of buyer or seller influenced the price paid or payable for imported goods. These tests – the "normal pricing practices" test and the "all costs plus a profit" test – were the focus of the trial. If a related party sale passes either of these tests, it is deemed acceptable as the basis of transaction value. It is not necessary to pass both.

**B.      19 C.F.R § 152.103(l)(1)(ii): The "Normal Pricing Practices" Test**

Section 152.103 of the Customs Regulations, 19 C.F.R. § 152.103(l), deals with the determination of transaction value in sales between related parties. It indicates that "The [Customs Center of Excellence and Expertise] director shall not disregard a transaction value solely because the buyer and seller are related." Customs may, but need not, apply additional scrutiny to prices between a related buyer and seller, based on an examination of the circumstances surrounding the sale. Interpretive Note (i) of the regulation indicates that "Customs may have previously examined the relationship or may already have sufficient detailed information concerning the buyer and seller to be satisfied that the relationship did not influence the price actually paid or payable. In such case, if Customs has no doubts about the acceptability of the price, the price will be accepted without requesting further information from the importer."

The regulation also adopts tests for determining whether the related party price is acceptable for appraisement purposes. Section 152.103(l)(1)(ii) sets out the "normal pricing practices" test:

> (ii) Interpretative note 2. If it is shown that the buyer and seller, although related, buy from and sell to each other as if they were not related, this will demonstrate that the price has not been influenced by the relationship, and the transaction value will be accepted. If the price has been settled in a manner consistent with the normal pricing practices of the industry in question, or with the way the seller settles prices for sales to buyers who are not related to him, this will demonstrate that the price has not been influenced by the relationship.

As indicated by Mr. Pinkerton's trial testimony, the usual and accepted way of applying the "normal pricing practices" test is to conduct a study of the profitability of companies whose financial data is publicly available, and establish the range of profitability of the companies examined. The lowest 25% of margins and the highest 25% of margins are then dropped, leaving an "interquartile range" of profit levels (i.e., from 25-75% of the range). The profitability of the seller in the sale offered for transaction value is then compared to the interquartile range. If it falls

within that range, this is a strong indication that the "price paid or payable" is not influenced by the relationship of seller and buyer.

This "benchmark" study method is similar to the commonly-accepted method for setting and evaluating "transfer prices" between related parties for income tax purposes. However, while the selection of comparable companies ("comps") in a transfer pricing study may usually be done without regard to the industries they are in, because the "normal pricing practices' test refers to "the industry in question," Customs prefers that "comps" be taken from the industry involved in producing the imported merchandise. As Mr. Pinkerton testified at trial, in performing his benchmarking studies of the Meyer entities, he generally selected companies in the cookware or houseware industries as "comps."

As noted herein, PwC performed benchmarking studies for both MIL and MZQ for the years 2010-2012, the years covered by the imports at bar, and in both cases found the seller's profits to be squarely within the interquartile ranges. *See* Tr. at 595:4-8.

### C.    19 C.F.R. § 152.103(l)(1)(iii): The "All Costs Plus a Profit" Test

Section 152.103(l)(1)(iii) of the Customs Regulations, 19 C.F.R. § 152.103(l)(1)(iii), provides another method used by Customs to evaluate related party prices – the so-called "all costs plus a profit" test. The regulation provides:

> (iii)    Interpretative note 3. If it is shown that the price is adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit realized over a representative period of time (e.g., on an annual basis), in sales of merchandise of the same class or kind, this would demonstrate that the price has not been influenced.
>
> Example. A foreign seller sells merchandise to a related U.S. importer. The foreign seller does not sell identical merchandise or similar merchandise to any unrelated parties. The transaction between the foreign seller and the U.S. importer is determined by Customs to be unaffected by the relationship.  How should the merchandise be appraised? Transaction value

> based on the price actually paid or payable. A transaction value between a related buyer and seller is acceptable if the relationship did not affect the price actually paid or payable. This is so even if similar merchandise is being sold at a higher price, which includes a higher percentage for profit and general expenses.

Trial testimony showed repeatedly that the various Meyer entities negotiate prices for imported cookware as though they were unrelated. The testimony also showed that the sellers, MIL and MZQ, were profitable during the period involved with the sales of the merchandise at bar. These selling companies also earned a profit on goods they manufactured and which MMC sold to unrelated parties, such as Walmart, Hy-cite and others.

One legal issue for this Court to resolve is the meaning of the term "firm," as used in 19 C.F.R. § 152.103(l)(1)(iii). The regulation does not specify a minimum or particular level of "profit" which a seller in a related party sale must earn, but requires a "profit which is equivalent to the firm's overall profit realized over a representative period of time (e.g., on an annual basis), in sales of merchandise of the same class or kind."

In an uncodified policy statement interpreting this Regulation, Customs has stated that the term "firm" is "normally" interpreted to be the parent company of the seller. "In applying this test, CBP normally considers the 'firm's overall profit … to be the profit of the parent company." *See Determining the Acceptability of Transaction Value for Related Party Transactions (an Informed Compliance Publication)*, U.S. Customs and Border Protection (April 2007), at 9. Therefore, under the "normal" Customs rule, the profit earned in sales by the party selling the goods for export to the United States is to be compared to the profit earned by the seller's parent company in its sales elsewhere of goods that are of the same class or kind. This interpretation, when applied to the facts of this case, is not consistent with the wording of the regulation.

It should be noted that Informed Compliance Publications ("ICPs") are not regulations adopted after notice and comment in accordance with the Administrative Procedure Act ("APA"), nor do they have the regulatory status of rulings which represent the "official position" of Customs with respect to an issue. *See* 19 C.F.R. § 177.9(a). This Court has indicated that ICPs are "neither binding on the court nor entitled to deference." *EOS of N. Am., Inc. v. United States*, 37 C.I.T. 637, 654 (2013). The Federal Circuit has affirmed decisions where the Trade Court has declined to grant deference to statements appearing in an ICP. *See Intercontinental Marble Corp. v. United States,* 381 F.3d 1169 (Fed. Cir. 2004).

Plaintiff submits that the "firm" referred to in the regulation must be defined as the firm which charged the price in the related party sale—i.e., the seller. The seller's "parent" company is never mentioned in the regulation.

Comparison of a seller's profit to that of a parent company may be impossible in certain cases, such as this one, where the parent company of MIL and MQZ is MIH, a holding company domiciled in the British Virgin Islands. MIH does not make or sell anything, much less merchandise of the "same class or kind" as the merchandise at bar. There was considerable controversy earlier in this litigation, where the Court of International Trade dismissed this action based on plaintiff's failure to furnish in discovery the financial statements of MIH – information which admittedly was not in plaintiff's possession. The Court of Appeals ultimately vacated that decision (twice) and remanded the case for decision on the trial record compiled in 2019. That the Circuit Court remanded this case, rather than affirming the decision, is indicative that the MIH financials are not necessary to the resolution of this case.

Here, the profit earned by the MIL and MZQ cannot be compared with the profit earned by the parent company, MIH, because MIH is a holding company, not an operating company—

thus, by definition, MIH is not a seller of goods. Mr. Pinkerton of PWC was well aware of the

limitations created by the policy statement, and—absent any contrary direction from Customs—

he followed the regulatory language and compared the manufacturing companies rate of profit on

goods sold for export to the United States against the rate of profit by each producer as a whole.

Accordingly, Mr. Pinkerton reported that the two rates of profit were "equivalent within a normal

range." This allowed a comparison of profits on the sales undergoing examination against profits

on the seller's overall sales.

Consistent with Customs' own regulation, PWC defined the "firm" properly as a seller of

goods. As explained, this approach conflicts with Customs' non-binding ICP policy statement.

One commentator recently discussed the issue of how to define the "firm" at length:

> An early question that arises is, Whose cost and profit? The "all costs plus a profit"
> postulate does not refer to either a buyer or a seller when it uses the more general
> term "firm," but it can be deduced that the profit compared is the seller's profit
> because it is profits arising from "sales" rather than from "purchases" or "resales"
> which would reflect on the buyer's profit experience.

*See* Mark K. Neville Jr., *The Customs Valuation Agreement: Origins, Standards and*

*Interpretations* (1st ed. 2023), at 310. The treatise notes that in scores of customs rulings

addressing this question:

> CBP has not always trod a consistent path. In some instances, CBP has referred to
> the foreign seller's costs and profit. CBP has also measured the acceptability of
> pricing based on the buyer's costs and overall profit. In some rulings, CBP has
> expressed the criterion in terms of the exporter's costs and profit. There is even a
> ruling in which CBP has referred to the manufacturer's costs and profit.

*Id.*

This case provides the platform for this Court to render an authoritative interpretation of

the term "firm" as it appears in 19 C.F.R. § 152.103(l)(1)(iii). As the commenter noted above, CBP

has never provided any explanation or rational basis for its preference to examine the parent

31

company's profits. Nor has it been consistent in its approach. The regulation only refers to a single "firm." Certainly, application of any such preference is impossible in this case, where the parent admittedly does not sell goods, and thus has no profit from the sale of goods. The best interpretation is that the "firm" referred to in the regulation is the seller of the goods undergoing appraisement and that the comparison should be between the profit by the producer on sales for export to the United States against the overall profit of the producer, which is precisely what PWC did here. This comports with the comparison made by Plaintiff's expert witness, Mr. Pinkerton.

The Court has a duty to interpret regulations without deference to the views of the agency. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024); *Doe v. United States*, 129 F.4th 1362 (Fed Cir. 2025); *Garg Tube Exp. LLP v. United States*, 740 F. Supp. 3d 1575 (Ct. Int'l Tr. 2024). Defining the "firm" for purposes of 19 C.F.R. § 152.103(l)(1)(iii) as being the seller of the imported merchandise is consistent with the statutory intent. It allows for consideration, as here, of sales other than related party sales. It also ensures that dissimilar companies will not be used in the comparison. As we have seen in this case, in some cases the "parent" may be a holding company, and no comparison may be possible. But it should also be borne in mind that companies such as MIL and MGQ are set up as limited risk contract manufacturers, while some such companies may have parents which are full services manufacturers, and distributors, not comparable in their operations.

## II.    The Trial Record Shows that Plaintiff's First Sales Satisfy the "Normal Pricing Practices" Test.

Plaintiff's uncontested trial proof demonstrates repeatedly that the manufacturer "first sales" by MIL and MZQ satisfy the "normal pricing practices" test.

Plaintiff's witness S. Darrin Johnson testified that he negotiated prices with MMC, the middleman buyer-reseller, on an arms-length basis and that these negotiations included offers,

rejections, counteroffers and, in some cases, an inability to come to an agreement. These negotiations included those for purchase of cook ware from MIL, the Thai producer, and MZQ, the Chinese producer.

Plaintiff's witness Siu Kai Kwok testified that, as Finance Manager of MIL, he negotiated prices with Ms. Lau of MMC, with the goal of achieving a 3-to-5 percent profit margin, and also tracked the profit margins of other Thai cookware manufacturers. He testified that MIL's profit margin was "more than the average", compared to its competitors. He testified that his pricing to MMC is based on costs, and that he always seeks to make a profit.

Plaintiff's witness Sharon Lau indicated that as sales director of MMC, she set up a quotation system for pricing and then negotiates with MIL and MQZ. She testified that she used a similar process to negotiate prices with MUS, her customer. Perhaps most importantly, she testified that MMC made direct sales to unrelated customers, and that her negotiations with these customers were on the same arms-length terms as her negotiations with Meyer customers.

The most significant evidence relating to the "normal pricing practices" test came from plaintiff's expert, Craig Pinkerton of PwC. He performed benchmark tests for MIL and MZQ beginning in 2006 and testified that Customs had accepted these and for years allowed Meyer to import using "first sale" appraisement. He testified that he was familiar with the test, had performed it many times for many clients, and that Customs had always accepted his results. The test is performed by measuring the profitability of other, unrelated companies in a related industry, calculating a range of profit levels from the tested companies ("comps"), and deriving an interquartile range. He performed such studies for MIL and MZQ for the years 2010-2012 – contemporaneous with the imports at bar – and that the MIL and MZQ profit levels for these years

"compared favorably," i.e., fell within the interquartile ranges. Mr. Pinkerton's studies were received into evidence.

Ultimately, Mr. Pinkerton offered his expert opinion that Customs had erred by concluding that the related party sales from MIL to MMC and from MZQ to MHK did not meet the statutory and regulatory tests for being acceptable as the basis of "transaction value."

Again, it is incumbent to point out that defendant offered no witnesses and no evidence countering either the testimony of the plaintiff's lay witnesses, the results of the benchmark studies put into evidence, nor the expert opinion of Mr. Pinkerton.

While the credibility of witness testimony and weight of the evidence is for the Court to determine, the general rule is that a litigant will prevail on the basis of the preponderance of the evidence when its evidence is unopposed. *Campbell v. Wettstein*, 476 F.2d 642 (C.C.P.A. 1973); *Welter v. Hurt*, 2025 U.S. Dist. LEXIS 63498 (C.D. Cal. 2025).

## III. The Trial Record Shows that Plaintiff's "First Sale" Transactions Satisfy the "All Costs Plus a Profit" Test.

Un-contradicted evidence on the trial record also establishes that the plaintiff's "first sale" transactions satisfy the "all costs plus a profit" test of 19 C.F.R. § 152.103(l)(1)(iii).

S. Darrin Johnson's testimony confirmed that when he negotiated prices with MMC, there was an open negotiation between the parties, at arms-length, as though they were unrelated.

Mr. Kwok of MIL testified that in negotiating price for MIL goods to be sold to MMC, for export to the United States, he had a 3 to 5 percent profit margin target. He believed this profit margin was higher than those of his competitors. He testified that MIL never sells goods to MMC at a loss. He testified that while he might accept a lower-than-usual profit in certain cases, he never sold at a loss.

Ms. Lau of MMC testified that she negotiated prices with MIL and sometimes her offers were rejected, no doubt because the prices would not allow MIL to hit the profit range identified by Mr. Kwok. Ms. Lau testified that she kept records of profitability for all sales, whether to MUS or to unrelated customers. She testified that she kept up the profit on sales from MIL and MMC, as well as margins earned on sales to her customers.

Mr. Kam of MZQ also testified that his company's goal was to make a profit of 3 to 5 percent on all of its sales to MMC, and that while the profit margin was sometimes lower, it was often higher. Mr. Pinkerton of PWC testified that, in performance the "normal pricing practices" tests, he verified the profitability of both MIL and MZQ , and found their profit levels to be within the interquartile profit ranges for comparable companies.

As noted above, Mr. Pinkerton used the selling companies as the "firm' in making his determination regarding the "all costs plus a profit" test.  We submit that this is a correct reading of the relevant regulation. He also found that both selling companies recovered their costs and made a profit.

Here again, the defendant offered no evidence or witnesses to refute plaintiff's claims that the related party "first sale" prices did not allow the sellers to recall all of their costs plus a profit. The preponderance of credible evidence favors plaintiff.

## IV.    Any Remaining GSP Issues Can be Resolved on Remand.

Most of the issues concerning plaintiff's claims for duty-free treatment for certain cookware imported from Thailand have been resolved. There is no question that the transformation of metal into pots and pans in Thailand constitutes a single "substantial transformation." This Court has ruled that Chinese-origin glass lads packed in sets with Thai pots and pans are not eligible for GSP treatment. The Federal Circuit has ruled that the conversion of Chinese-origin discs in

Thailand into pan shells does not create a "substantially transformed constituent material" whose value may be counted against the GSP's 35% value content requirement.

The only issue remaining is whether the goods for which GSP is claimed meet the statute's 35% value content requirement. That issue turns on this Court's final determination regarding the proper dutiable value of plaintiff's Thai-origin merchandise. Once that determination is made, and the entries are returned to Customs for reliquidation, the parties can resolve which imports qualify for GSP and which do not.

## **CONCLUSION**

In a prior phase of this proceeding, the Court of Appeals for the Federal Circuit held:

. . . we read *Nissho Iwai* as merely restating the statutory requirements for a transaction value, rather than introducing a new requirement separate from the arm's-length requirement. The decision lays out two requirements, both enumerated in the statute, and then elaborates on the second:

The manufacturer's price constitutes a viable transaction value when [1] the goods are clearly destined for export to the United States [§ 1401a(b)(1)] and [2] when the manufacturer and the middleman deal with each other at arm's length [§ 1401a(b)(2)(B)], in the absence of any non-market influences that affect the legitimacy of the sales price.

982 F.2d at 509. In context, "nonmarket influences" just refers to influences growing out of the relationship of buyer and seller that distort the "price paid or payable," which Customs must consider under 19 U.S.C. § 1401a(b)(2)(B).

*Meyer V* at 1333. Plaintiff submits that the clear preponderance of the evidence on the trial record shows that has satisfied the requirements for having the sales from MIL and MZQ qualified as the legally correct "transaction value" for its imported merchandise.    The    Court    should    enter judgment for plaintiff.

Respectfully submitted,

NEVILLE PETERSON LLP
*Counsel for Plaintiff*


/s/ John M. Peterson
John M. Peterson
Richard F. O'Neill
Patrick B. Klein
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Dated: June 5, 2025

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. RICHARD J. EATON, SENIOR JUDGE**
-----------------------------------------------------------------X
:
**MEYER CORPORATION U.S.,**                                     :
:
       **Plaintiff,**                                      :
:
       *v.*                                                :       **Court No. 13-154**
:
**UNITED STATES OF AMERICA**                                   :
       **Defendant.**                                      :
-----------------------------------------------------------------·X

## <u>CERTIFICATE OF COMPLIANCE</u>

      Pursuant to the U.S. Court of International Trade Standard Chambers Procedures, and in

reliance upon the word count feature of the word processing program used to prepare the instant

Memorandum, I, Patrick B. Klein, of Neville Peterson LLP, who is responsible for the instant

Memorandum, certify that it contains 11,653 words.

                                                      Respectfully submitted,

                                                     /s/ Patrick B. Klein
                                                     Patrick B. Klein