UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

-------------------------------------------------------------------- X

MEYER CORPORATION, U.S.,                            :
                                                    :
                          Plaintiff,                :
                                                    :
            v.                                      :        Court No. 13-00154
                                                    :
UNITED STATES,                                      :
                                                    :
                          Defendant.                :

-------------------------------------------------------------------- X

## <u>DEFENDANT'S SUPPLEMENTAL BRIEF</u>

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel*
PAULA S. SMITH, ESQ.                    BEVERLY A. FARRELL
Office of Assistant Chief Counsel       Senior Trial Attorney
International Trade Litigation           Civil Division, Dept. of Justice
U.S. Customs and Border Protection      Commercial Litigation Branch
                                        26 Federal Plaza – Suite 346
                                        New York, NY 10278
                                        Tel. (212) 264-9230 or 0483
                                        Attorneys for Defendant

Dated: June 11, 2025

## TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................ 5

  A.  Meyer's Claims ........................................................................................... 5

  B.  Motion for Partial Summary Judgment ....................................................... 5

  C.  The Trial ...................................................................................................... 6

  D.  The Trial Court's Decision .......................................................................... 7

  E.  The First Appeal and Remand .................................................................. 10

  F.  The Trial Court's Remand Decision .......................................................... 11

  G.  The Second Appeal and Remand .............................................................. 11

III. BASED ON THE UNDISPUTED FACTS AND THE APPLICATION  OF LAW TO
     THOSE FACTS, PLAINTIFF HAS FAILED TO  ESTABLISH ITS ENTITLEMENT TO USE
     THE FIRST SALE PRICE .................................................................................. 12

  A.  Standard Of Review .................................................................................. 12

  B.  Statutory Scheme ...................................................................................... 12

  C.  Meyer Failed To Provide Purchase Orders And Proofs Of Payment Between The
      Manufacturer/Producer And The Middleman ............................................ 14

  D.  In Evaluating The Record Made Before The Court, Plaintiff's Exhibits 119 and 125 And
      The Testimony Based On Them Should Be Excluded For Failure To Comply With Rule 1006
      Of The Federal Rules Of Evidence ............................................................ 15

  E.  Testimony Based On Documents That Were Not Produced In Discovery Should Be
      Disregarded ............................................................................................... 17

  F.  Meyer Failed To Establish That The Relationship  Of The Parties Did Not Affect The First
      Sale Transaction Price  Under The Two Valuation Tests Meyer Chose To Use At Trial ........ 18

    1.  Normal pricing practices of the industry in question .................................... 19

      a.  Meyer Hong Kong and the China Producer .............................................. 19

      b.  Meyer Macau and the Thai Producer ...................................................... 21

    2.  All costs plus a profit equivalent to the firm's overall profit ......................... 22

IV.  CONCLUSION ................................................................................................ 27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Air Safety, Inc. v. Roman Catholic Archbishop of Boston*,
  94 F.3d 1 (1st Cir. 1996) ............................................................................................. 15

*Am. Express Co. v. United States*,
  262 F.3d 1376 (Fed. Cir. 2001) ................................................................................... 23

*Amarel v. Connell*,
  102 F.3d 1494 (9th Cir. 1996) ..................................................................................... 15

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*,
  400 F.3d 1352 (Fed. Cir. 2005) ................................................................................... 23

*Gose v. United States*,
  451 F.3d 831 (Fed. Cir. 2006) ..................................................................................... 23

*Jarvis Clark Co. v. United States*,
  733 F.2d 873 (Fed. Cir. 1984) ..................................................................................... 11

*Meyer Corporation, U.S. v. United States*,
  123 F.4th 1306 (Fed. Cir. 2024) .................................................................................. 12

*Meyer Corporation, U.S. v. United States*,
  2021 WL 777788 (Ct. Int'l Trade Mar. 1, 2021) ................................................... passim

*Meyer Corporation, U.S. v. United States*,
  255 F. Supp. 3d 1348 (Ct. Int'l Trade 2017) ..................................................... 6, 12, 13

*Meyer Corporation, U.S. v. United States*,
  43 F.4th 1325 (Fed. Cir. 2022) .................................................................................... 10

*Meyer Corporation, U.S. v. United States*,
  614 F. Supp. 3d 1376 (Ct. Int'l Trade 2023) ............................................................... 11

*Nissho Iwai Am. Corp. v. United States*,
  982 F.2d 505 (Fed. Cir. 1992) ............................................................................. 2, 3, 13

*Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico*,
  248 F.3d 29 (1st Cir. 2001) .......................................................................................... 17

*Park B. Smith, Ltd. v. United States*,
  347 F.3d 922 (Fed. Cir. 2003) ..................................................................................... 12

*Subaru Distributing Corp. v. Subaru of Am., Inc.*,
  2002 WL 413808 (S.D.N.Y. Mar. 18, 2002) ............................................................... 13

*Thompson v. United States*,
  342 F.2d 137 (5th Cir. 1965) ....................................................................................... 16

*Torrington Company v. United States*,
  764 F.2d 1563 (Fed. Cir. 1985) ........................................................... 7

*United States v. Bray*,
  139 F.3d 1104 (6th Cir. 1998) ............................................................ 15

*VWP of Am., Inc. v. United States*,
  175 F.3d 1327 (Fed. Cir. 1999) ................................................ 1, 2, 14

**Statutes**

19 U.S.C. § 1401a ........................................................................... 1, 22

19 U.S.C. § 1401a(a)(1) ......................................................................... 4

19 U.S.C. § 1401a(a)(1)(A) .................................................................... 2

19 U.S.C. § 1401a(b)(1) ......................................................................... 2

19 U.S.C. § 1401a(b)(2) ......................................................................... 4

19 U.S.C. § 1401a(b)(2)(B) ............................................................ 12, 13

28 U.S.C. § 2640(a)(1) ......................................................................... 12

28 U.S.C. § 2641 ................................................................................. 12

**Regulations**

19 C.F.R. § 152.103(j)(2) ....................................................................... 4

19 C.F.R. § 152.103(*l*) ........................................................................... 4

19 C.F.R. § 152.103(*l*)(1)(i) .................................................... 9, 13, 18

19 C.F.R. § 152.103(*l*)(1)(ii) ................................................. 13, 19, 21

19 C.F.R. § 152.103(*l*)(1)(iii) ............................................... 14, 22, 24

T.D. 96-87 .......................................................................................... 13

**Rules**

Fed. R. Evid. 1006 ....................................................... 3, 15, 16, 17

USCIT Rule 26(a)(2)(B) ...................................................................... 17

USCIT Rule 26(e) ............................................................................... 17

USCIT Rule 37(c)(1) ........................................................................... 17

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

```
------------------------------------------------------------------ X
MEYER CORPORATION, U.S.,                            :
                                                    :
                              Plaintiff,            :
                                                    :
               v.                                   :          Court No. 13-00154
                                                    :
UNITED STATES,                                      :
                                                    :
                              Defendant.            :
------------------------------------------------------------------ X
```

### DEFENDANT'S SUPPLEMENTAL BRIEF

In accordance with the Court's April 21, 2025 Order, ECF No. 208, and our pending consent motion, ECF No.209, defendant, United States (the Government), respectfully submits this supplemental brief addressing the second remand of this action from the U.S. Court of Appeals for the Federal Circuit (Federal Circuit).

## I.    INTRODUCTION

On its second remand to this Court, the only issue remaining in this matter is whether plaintiff Meyer Corporation U.S. (Meyer) has met its burden at trial of establishing entitlement to use the first sale transaction value between the manufacturer/producer and the middleman for U.S. Customs and Border Protection's (Customs or CBP) assessment of duties rather than the second sale transaction value between the middleman and the importer.

Imported merchandise must be appraised so that the final amount of duty can be fixed, and by law, Customs is required to appraise imported merchandise in the manner set forth in 19 U.S.C. § 1401a. *VWP of Am., Inc. v. United States*, 175 F.3d 1327, 1330 (Fed. Cir. 1999). In a civil action commenced in the Court of International Trade (the trial court) to challenge a Customs appraisal, the appraisal decision is "presumed to be correct" and the "burden of proving

otherwise shall rest upon the party challenging such decision." *VWP* at 1342.  Under 19 U.S.C. § 1401a(a)(1)(A), the default method of valuation for the appraisal of imported merchandise is the transaction value of the merchandise provided for under 19 U.S.C. § 1401a(b)(1).  Transaction value is defined as the price actually paid or payable for the merchandise when sold for exportation to the United States.  Section 1401a(b)(1).

In a multi-tiered transaction, like that at issue in this case, when an importer seeks to use the transaction price paid between a manufacturer/producer and a middleman as the value for appraisement, it must prove through credible and admissible evidence that: (i) a bona fide sale occurred; (ii) the sale was for export to the United States; (iii) the transaction was at arm's length; and (iv) all other criteria for the transaction value were met.  *See* 19 U.S.C. § 1401a(b)(1).  Under the *de novo* standard of review applicable here, Meyer must establish every element of its claim.  Meyer must prove that "[t]he manufacturer's price constitutes a viable transaction value when the goods are clearly destined for export to the United States and when the manufacturer and middleman deal with each other at arm's length, in the absence of any non-market influences that affect the legitimacy of the sale price."  *See Nissho Iwai Am. Corp. v. United States*, 982 F.2d 505, 508 (Fed. Cir. 1992).

At the administrative level, CBP rejected Meyer's request to use first sale (the sale between the producer and middleman) as the transaction value for the appraisal of the merchandise.  Instead, CBP accepted the second sale between Meyer and the middleman for appraisal, the value in Meyer's revised entry papers.  Thus, CBP did not make a determination that Meyer's second sale transaction value was ineligible for use under section 1401a(a)(1)(A).  Nor has Meyer asserted or established, either at the administrative level or during this litigation,

that the transaction value between it and the middleman is false, inaccurate, or not the product of arm's length dealing. Accordingly, the second sale transaction value is statutorily viable.

At trial, plaintiff did not meet its burden of proof when it failed to include fundamental documents such as the purchase orders and proof of payment between the manufacturer/producer and the middleman. Without the purchase order, it is impossible to identify or confirm the first sale price. And the proof of payment is necessary to confirm (assuming we had information about the purchase order price) that the price was honored and not reduced because of the relationship between the parties. Lacking these two pieces of critical information, it is impossible to know whether the "manufacturer and the middleman deal[t] with each other at arm's length, in the absence of any non-market influences that affect the legitimacy of the sales price." *Nissho Iwai*, 982 F.2d at 510. Similarly, plaintiff failed to comply with Rule 1006 of the Federal Rules of Evidence (FRE)[1] when it did not provide the supporting documents for its Trial Exhibits 119 (3-year weighted average benchmarking study prepared by the transfer pricing team at Price Waterhouse Coopers (PWC); and 125 (study prepared by PWC on behalf of Meyer

---

[1] FRE 1006, as amended in 2024, provides:

(a) Summaries of Voluminous Materials Admissible as Evidence. The court may admit as evidence a summary, chart, or calculation offered to prove the content of voluminous admissible writings, recordings, or photographs that cannot be conveniently examined in court, whether or not they have been introduced into evidence.

(b) Procedures. The proponent must make the underlying originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

assessing transaction value under the first sale method for related parties for which Exhibit 119 was a part) and then provided testimony based on these documents.[2]

Moreover, where transactions such as those at issue here are between related parties, Meyer must establish by using one of the prescribed tests that the parties' relationship did not affect the price. *See* 19 U.S.C. 1401a(b)(2)(A)-(B); 19 C.F.R. 152.103(j)(2), (l). Having failed to do so, Meyer did not and could not establish that the first sale transaction was at arm's length.

These fundamental failures are fatal to plaintiff's claim that the imported merchandise should have been appraised at the transaction value represented by the first sale price. Because the second sale value is statutorily viable and satisfies , no resort to section 1401a(a)(1)(B)-(F) is necessary.[3] Instead, because Meyer failed to meet its burden at trial establishing the first sale transaction value as statutorily viable, the Court should affirm CBP's use of the second sale transaction value provided by Meyer during the administrative phase of this matter for the

---

[2] Meyer also failed to provide supporting documents for Trial Exhibits 154 (calculation for eligibility under the Generalized System of Preferences (GSP), 155 (GSP calculation), 156 (GSP calculation), 379 (GSP calculation), and 380 (GSP calculation). Because the Federal Circuit affirmed the trial court's determination that Meyer's cookware produced in Thailand had not undergone a double substantial transformation and were not entitled to GSP treatment, these exhibits are not relevant to the remand.

[3] With respect to the appraisal of merchandise, section 1401a(a)(1)(B)-(F) provides:

(B) The transaction value of identical merchandise provided for under subsection (c), if the value referred to in subparagraph (A) cannot be determined, or can be determined but cannot be used by reason of subsection (b)(2).
(C) The transaction value of similar merchandise provided for under subsection (c), if the value referred to in subparagraph (B) cannot be determined.
(D) The deductive value provided for under subsection (d), if the value referred to in subparagraph (C) cannot be determined and if the importer does not request alternative valuation under paragraph (2).
(E) The computed value provided for under subsection (e), if the value referred to in subparagraph (D) cannot be determined.
(F) The value provided for under subsection (f), if the value referred to in subparagraph (E) cannot be determined.

appraisement of Meyer's imported merchandise and dismiss Meyer's claims seeking appraisal using first-sale transaction values.

## II.   <u>BACKGROUND</u>

This action has a long history ranging from briefing on a partial motion for summary judgment, to a week-long trial, to two appeals to and remands from the Federal Circuit.  To assist the Court with rendering a decision in this reassigned matter, we provide the following background.

### A.  <u>Meyer's Claims</u>

In its amended consolidated complaint covering Court Nos. 13-00154, 13-00181, and 13-00182, ECF No. 8, Meyer alleges four causes of action: (1) entitlement to first sale valuation because the price was settled in a manner consistent with normal pricing practices in the industry; (2) entitlement to first sale valuation because the price reflects the recovery of all costs plus profit; (3) GSP treatment for certain sets of pots and pans manufactured by the Thai producer even though containing lids from a non-GSP country; and (4) GSP treatment for certain pots and pans made in Thailand from metal circular blanks from a non-GSP country because these goods have been doubly substantially transformed.  The parties moved to designate Court No. 13-00154 as a test case, which the Court granted on December 2, 2013, ECF No. 20.

In the summer of 2017, the parties discovered that the consolidated complaint did not contain any entries involving the double substantial transformation issue asserted in the fourth cause of action.  To resolve this discrepancy, the parties agreed to sever Entry No. 304-0211185-7 from one of the suspended cases, Court No. 15-00091, and merge that entry into the test case, Court No. 13-00154.  ECF No. 105.

### B.  Motion for Partial Summary Judgment

In 2016, the parties filed cross-motions for partial summary judgment on two issues: (1) whether certain cookware sets were disqualified from GSP preferential treatment due to the presence of a non-beneficiary developing country (BDC) component; and (2) whether the sets are properly appraised on the basis of first sale transaction value.  *Meyer Corporation, U.S. v. United States*, 255 F. Supp. 3d 1348, 1350 (Ct. Int'l Trade 2017) (*Meyer Partial Summary Judgment*).  The issue of whether certain raw materials undergo a double substantial transformation in Thailand was reserved.  *Id.* at 1351 n.2.

With respect to the effect of the presence of non-BDC components in a set, the Court determined that the BDC components of the set would be afforded GSP treatment but that the value of the non-BDC components would be appraised and duty determined using the rate associated with the classification of the set.  *Id.* at 1355-59.

As to the first sale issue, the Court noted that the issue of the second sale was not before the Court.  *Id.* at 1361.  Rather, only the claim for first sale treatment was before the Court and the burden was on Meyer to show through the record developed before the Court that the manufacturer/producer and middleman dealt with one another at arm's length.  *Id.*  Following the guidance of *Nissho Iwai*, the Court ultimately determined that disputed issues of material fact precluded its ability to render a decision on first sale treatment.  *Id*. at 1362.  After this decision the parties met and conferred on whether the remaining issues could be resolved without further litigation.  When the parties determined that they could not, preparation for trial began.

### C.  The Trial

A trial was held in this action from October 7, 2019 to October 11, 2019.  Meyer presented direct testimony from five witnesses: Stewart Darrin Johnson, formerly a managing

director of Meyer from 2006 to 2019; Siukai Kwok, a financial manager at Meyer Industries,

Ltd. (Thai Producer); Sharon Lau, a sales director at Meyer Marketing (Macau Commercial

Offshore) Company Limited (middleman Meyer Macau); Kan Ming Kam, a production manager

of the stainless steel department at Meyer (ZhaoQing) Metal Products Company Limited (China

Producer); and Craig Pinkerton, a director of customs international trade practice at

PricewaterhouseCoopers (PWC), proffered as an expert witness.  Meyer did not present

testimony from Meyer Manufacturing Company Limited (middleman Meyer Hong Kong) or

Meyer International Holdings Limited (Meyer Holdings), the parent company of the Meyer

entities.

The Government cross-examined each of Meyer's witnesses, and presented direct

testimony from one witness: Monika Brenner, Chief of the valuation and special programs

branch of CBP.

### D.  The Trial Court's Decision

After a week-long trial, the Court of International (the trial court) found that the subject

merchandise, certain cookware imported from the People's Republic of China (PRC) and

Thailand, was not entitled to first sale valuation as that concept is articulated in *Nissho Iwai*,

and that certain of the subject merchandise imported from Thailand was not entitled to duty-free

treatment under the GSP because certain components had not undergone a dual (double)

substantial transformation as required by *Torrington Company v. United States*, 764 F.2d 1563

(Fed. Cir. 1985).  *Meyer Corporation, U.S. v. United States*, Court No. 13-00154, 2021 WL

777788 (Ct. Int'l Trade Mar. 1, 2021) (*Meyer I*).

The trial court found the Government's recital of the facts from trial both accurate and

more complete than plaintiff's and, therefore, adopted them as the findings of the Court.  *Meyer*

*I*, \*50.  Although noting that Meyer's proposed findings of fact were not inaccurate, the trial court found that they did not provide a complete picture of what is necessary to its case for establishing entitlement to first sale valuation.  *Id.*  Indeed, the Court "concur[red] with the defendant," stating that:

> proofs of purchase orders and payments are normally and critically necessary to establishing entitlement to first sale dispensation when a claim therefor is challenged by CBP.  When requested by CBP to provide reasonable proof, it is not unreasonable to expect importers to provide such proof so CBP can reasonably expect to satisfy a claim.  Plaintiff's case before the court is somewhat cavalier in this regard, focusing on minutiae and essentially asking the court at various points to take plaintiffs 'word' that certain facts were true, without corroborating evidence in support. . . .

*Meyer I*, \*12.

The recitation of the agreed facts and the Government's separate facts adopted by the Court are attached to this supplemental brief.  *See* Attachments A (agreed facts) and B (Government's facts adopted by the Court).  Included among the findings of fact that the trial court adopted are:

- Mr. Pinkerton testified that to establish a bona fide sale, among other things, he looks to the document flow between the three entities in the supply chain: the purchase order between Meyer and the middleman; the purchase order between the middleman and the producer; the invoice from the producer to the middleman; the invoice from the middleman to Meyer; and proof of payment between these entities.  Vol. 4 at 502:21-503:22.
- The first document usually reviewed to determine a bona fide sale is the purchase order between the entities in the supply chain.  Vol. 4 at 503:5-6.
- The next document to establish a bona fide sale is proof of payment, typically a wire transfer, between the entities in the supply chain.  Vol. 4 at 503:9-10.
- At trial, Meyer did not present any purchases orders between the entities in the Meyer supply chain:  Meyer to Meyer Macau; Meyer Macau to the Thai Producer; Meyer to Meyer Hong Kong; or Meyer Hong Kong to the China Producer.  *See* Pl. Exs. moved into evidence.
- At trial Meyer did not present any proofs of payment between the entities in the supply chain:  Meyer to Meyer Macau; Meyer Macau to the Thai Producer; Meyer to Meyer Hong Kong; or Meyer Hong Kong to the China Producer.  *See* Pl. Exs. moved into evidence.

- In Plaintiff's Exhibit 125, PWC states: "After agreeing on all contractual terms such a product specifications, prices and quantities with the distribution arms, MHK [Meyer Hong Kong] will place a manufacturing order to MZQ [the China Producer]." Pl. Ex. 125 at MUS044867.
- Meyer negotiated with Ms. Sharon Lau of Meyer Macau for both the Thai Producer and the China Producer when seeking to purchase cookware. Vol. 1 at 118:25-119:9.
- Meyer did not know whether Ms. Lau was negotiating for production by the Thai Producer or the China Producer. Vol. 1 at 122:9-17.
- Meyer Macau acts as a middleman for the China Producer. Vol. 3 at 320:6-14.

Although the trial court agreed with the Government that proofs of purchase orders and payments are normally and critically necessary to establishing entitlement to first sale and the facts it adopted established that Meyer had failed to provide that documentary evidence at trial, in holding that Meyer had not established entitlement to first sale valuation, the trial court focused on two points. First, it found that "the real costs of inputs from the PRC are suspect, given its status as a nonmarket economy country." *Meyer I* at *50. Next, it observed that, even if the true costs could be determined, parent Meyer Holding:

> presumptively has had the ability to influence the price paid or payable for them, for example by providing its subsidiaries access to credit and capital on terms that are not available to competitors without the same level of bargaining power with creditors, or even at 'below market' rates. Without financial statements, the court has no concept of the extent to which the finances of the Meyer group units are truly independent 'silos' of one another, or the extent to which there might have been state influence or assistance to some degree.

*Id.* at *51.

In adopting the Government's findings of fact, the court found that Meyer had not established under the "circumstances of sale" test that the relationship did not influence the price. In accordance with 19 C.F.R. § 152.103(*l*)(1)(i), the following circumstances can demonstrate that the relationship did not influence the price: (1) the price was settled in a manner consistent with the normal pricing practices of the industry in question; (2) the price was settled in a manner consistent with the way the seller settles prices for sales to buyers who are not related to

it; or (3) the price is adequate to ensure recovery of all costs plus a profit that is equivalent to the firm's overall profit realized over a representative period of time in sales of merchandise of the same class or kind. *See Meyer I* at *50 ("Based on the applicable law and the evidence adduced at trial, the plaintiff has also failed to establish that it should be entitled to use the transaction value between the China producer and Meyer Hong Kong or the Thai producer and Meyer Macau ('first sale') for the appraisement of the imported cookware.").

Based on the foregoing and questioning whether the true value of the price paid or payable at the first sale level had been demonstrated, the trial court granted judgment to the Government. *Id.* Meyer appealed the judgment in *Meyer I*.

### E. **The First Appeal and Remand**

On appeal, Meyer raised two issues: (1) whether the cookware from Thailand, a beneficiary developing country under the GSP, was eligible for duty-free treatment because it had undergone a double substantial transformation; and (2) whether Meyer was entitled to use the first-sale price for the dutiable value of its cookware. *Meyer Corporation, U.S. v. United States*, 43 F.4th 1325, 1328 (Fed. Cir. 2022) (*Meyer II*). The Federal Circuit reviewed the trial court's determination that Meyer's pots and pans manufactured in Thailand are not eligible for duty-free treatment because they were made of from steel discs from China that only undergo one substantial transformation. The Federal Circuit affirmed the holding because the trial court had not clearly erred in its factual and legal analysis. *Id.*

Next, the Federal Circuit held that the trial court had misread the "in the absence of any nonmarket influences that affect the legitimacy of the sales price" language provided by *Nissho Iwai* and erred by imposing a requirement that Meyer prove that the first sale prices were

unaffected by China's status as a nonmarket economy. *Meyer II* at 1332-33. The appellate court affirmed in part and vacated in part and remanded the matter to the trial court.

### F.  **The Trial Court's Remand Decision**

On remand from *Meyer II*, the trial court noted that an "extensive record" had been developed at trial and was more than sufficient to reconsider the first sale issue after the Federal Circuit's remand decision. *Meyer Corporation, U.S. v. United States*, 614 F. Supp. 3d 1376, 1381 (Ct. Int'l Trade 2023) (*Meyer III*). Further, the Court concluded that Meyer "had more-than-adequate opportunity to make its case for first-sale treatment. . . ." *Id.* Finally, because the parent holding company "has an interest in seeing these types of matters resolved favorably," the trial court concluded that the resistance to produce the parent's financials "speaks volumes" and supported doubting whether an accurate assessment of the true value of the price paid or payable had been demonstrated. *Id*. at 1380. The Court held that valuing the merchandise using the first sale price was unwarranted and affirmed its earlier judgment. *Id*. at 1381. Meyer appealed this judgment.

### G.  **The Second Appeal and Remand**

On appeal, Meyer raised three issues:  (1) whether the trial court properly followed the Federal Circuit's remand instructions; (2) whether the trial court erred as a matter of law in holding that Meyer was required to provide the parent company's financials to show the absence of any nonmarket influences; and (3) whether the trial court failed to discharge its obligation under *Jarvis Clark Co. v. United States*, 733 F.2d 873 (Fed. Cir. 1984), by accepting the second sale as the basis for transaction value without examining whether those sales suffered from the same alleged defects that resulted in the rejection of the first sale prices.

11

The Federal Circuit agreed with Meyer that the trial court failed to comply with its remand instructions "by disregarding the trial record and instead applying an improper evidentiary presumption." *Meyer Corporation, U.S. v. United States*, 123 F.4th 1306, 1312 (Fed. Cir. 2024) (*Meyer IV*). In remanding the case, the Federal Circuit explained that the trial court "should evaluate, on the extensive record before it, whether Meyer has met its burden to show that its first sale price is a viable transaction value under 19 U.S.C. § 1401a(b)(2)(B)." *Meyer IV* at 1313. For the reasons discussed below, based on the record made before the trial court, Meyer has failed to establish entitlement to first sale transaction value.

### III. BASED ON THE UNDISPUTED FACTS AND THE APPLICATION OF LAW TO THOSE FACTS, PLAINTIFF HAS FAILED TO ESTABLISH ITS ENTITLEMENT TO USE THE FIRST SALE PRICE

#### A. Standard Of Review

This Court reviews, *de novo*, decisions made by Customs. *See Park B. Smith, Ltd. v. United States*, 347 F.3d 922, 924 (Fed. Cir. 2003). Pursuant to 28 U.S.C. § 2640(a)(1), the Court is charged with rendering its determinations based on the record *properly* made before it. Also, except for certain scenarios not at issue here, the Federal Rules of Evidence "shall apply to all civil actions in the Court of International Trade." 28 U.S.C. § 2641.

With respect to establishing the entitlement to use the first sale transaction price between a foreign manufacturer and a middleman to appraise the value of imported merchandise, the burden is on the plaintiff to demonstrate through a preponderance of the evidence that the first sale is a statutorily viable one.

#### B. Statutory Scheme

In the *Meyer Partial Summary Judgment*, this Court determined that the preferred method for appraisal of imported merchandise is on the basis of transaction value. *Id.* at 1359. For

transactions like Meyer's, where the manufacturer and middleman are related, first sale may be used "if it is a viable transaction value, and it is viable if the price paid can be determined to have been reached 'at arm's length, in the absence of any non-market influences that affect the legitimacy of the sales price.'" *Id.* (quoting *Nissho Iwai America Corp. v. United States*, 982 F.2d 505, 509 (Fed. Cir. 1992)).

Establishing entitlement to the first sale price require significant information and documentation detailing the roles of the parties in the transactions and reflecting each step in the exportation to the United States where more than one sale is at issue. *See Subaru Distributing Corp. v. Subaru of Am., Inc.*, No. 98 CIV. 5566 (CM), 2002 WL 413808, *35 (S.D.N.Y. Mar. 18, 2002) (in a contract dispute observing that T.D. 96-87 sets forth the documentation needed for determining transaction value in multi-tiered transactions). Among the types of documentary evidence needed for first sale analysis include invoices, sales contracts, purchase orders, proof of payment, bills of lading, shipping contracts and any additional documents, such as email or other correspondence that demonstrate how the parties dealt with one another. Gov't Trial Exhibit 12 (T.D. 96-87).

Where, as here, the parties to the transaction are related, then it is necessary to provide Customs with information demonstrating that transaction price of the related party sale is acceptable, as provided in 19 U.S.C. § 1401a(b)(2)(B), because the circumstances of the sale show that the parties' relationship did not influence the price. Customs regulation 19 C.F.R. § 152.103(l)(1)(i) sets forth acceptable tests that an importer may use to show that the relationship did not affect the price. It is Meyer's burden to establish that one of the acceptable tests has been met. Meyer has attempted to employ two of the acceptable tests – that the price was settled in a manner consistent with the normal pricing practices of the industry in question, 19 C.F.R. §

152.103(l)(1)(ii), or alternatively, that the price is adequate to ensure recovery of all costs plus a profit that is equivalent to the firm's overall profit realized over a representative period of time in sales of merchandise of the same class or kind, 19 C.F.R. § 152.103(i)(l)(iii). Meyer has failed to establish that either of these tests have been met.

Further, in a civil action commenced in the Court of International Trade to challenge a Customs appraisal, the appraisal decision is "presumed to be correct" and the "burden of proving otherwise shall rest upon the party challenging such decision." *VWP of Am., Inc. v. United States*, 175 F.3d 1327, 1330 (Fed. Cir. 1999).

### C. Meyer Failed To Provide Purchased Orders And Proofs Of Payment Between The Manufacturer/Producer And The Middleman

In *Meyer I*, this Court agreed with the Government that proofs of purchase orders and payments are normally and critically necessary to establishing entitlement to first sale transaction value when that claim is challenged. *Meyer I* at *12. Meyer's expert at trial, Craig Pinkerton, testified that to establish a bona fide sale he looks to the document flow between the three entities in the supply chain: the purchase order between Meyer and the middleman; the purchase order between the middleman and the producer; the invoice from the producer to the middleman; the invoice from the middleman to Meyer; and proof of payment between these entities. Vol. 4 at 502:21-503:22. Indeed, he stated that the first document usually reviewed to determine a bona fide sale is the purchase order between the entities in the supply chain. Vol. 4 at 503:5-6. Nevertheless, notwithstanding the critical information provided by a purchase order, *i.e.*, setting the price to be paid, Meyer failed to enter into evidence any first sale purchase orders. *See* Pl. Exs. moved into evidence.

Moreover, Mr. Pinkerton testified that the next document to establish a bona fide sale is proof of payment, typically a wire transfer, between the entities in the supply chain. Vol. 4 at

503:9-10.  Such a document is necessary to confirm that the price agreed to on the purchase order was what was actually paid.  At trial, Meyer failed to enter into evidence any proofs of payment between the first sale entities.  *See* Plaintiff's Trial Exhibits moved into evidence.

This failure of evidentiary proof alone is sufficient to deny Meyer first sale treatment. Yet, Meyer's evidentiary failures at trial do not end here.  As discussed below, Meyer also failed to comply with FRE 1006.

### D.  In Evaluating The Record Made Before The Court, Plaintiff's Exhibits 119 and 125 And The Testimony Based On Them Should Be Excluded For Failure To Comply With Rule 1006 Of The Federal Rules Of Evidence

By its terms, FRE 1006 requires that the documents whose information is to be summarized be so voluminous that they would be inconvenient for a court to examine.  *United States v. Bray*, 139 F.3d 1104, 1109 (6th Cir. 1998).  In other words, "the documents must be sufficiently numerous to as to make comprehension "difficult and . . . inconvenient."  *Id.* (internal quotation omitted, ellipsis in original).  FRE 1006 also requires that the proponent make the documents underlying the summary available for examination or copying.  "The purpose of the availability requirement is to give the opposing party an opportunity to verify the reliability and accuracy of the summary prior to trial."  *Amarel v. Connell*, 102 F.3d 1494, 1516 (9th Cir. 1996) (internal quotation and citation omitted).

To satisfy this requirement, a party must identify the exhibit as a summary; provide a list or description of the underlying documents; and state when the documents could be reviewed. *Air Safety, Inc. v. Roman Catholic Archbishop of Boston*, 94 F.3d 1, 8 (1st Cir. 1996).  "Where a party fails to make available materials underlying a summary exhibit, that summary exhibit is inadmissible."  *Amarel*, 102 F.3d at 1516.  It does not matter whether an opponent sought discovery of the documents underlying the summary document because FRE 1006 "operates

independently of discovery rules" and a party has an "absolute right to subsequent production of material under Rule 1006, should that material become incorporated in a chart, summary or calculation." *Air Safety*, 94 F.3d at 8.

With respect to two documents on which Meyer bases its claim to entitlement for first sale transaction valuation, Plaintiff's Exhibits 119 (a 3-year weighted average benchmarking study) and 125 (a study prepared by PWC assessing transaction value under the first sale method for related parties), Meyer failed to comply with FRE 1006. Both of these documents constitute summarized information. As such, Meyer was required to (i) establish that the volume of the underlying documents could not conveniently be examined by the Court; (ii) provide the Government with a list or description of the underlying documents; and (iii) make the underlying documents available to the Government. No list of the underlying documents summarized by the studies was provided nor were the underlying documents themselves made available for review before trial. As noted above, the purpose behind FRE 1006 is to assure the trustworthiness of the summary by allowing both an opponent and the Court to test the completeness and accuracy of the summary.

Indeed, at trial, testimony from Ms. Lau established that Meyer Macau acts as a middleman for the China Producer. Vol. 3 at 320:6-14. Yet, Plaintiff's Exhibit 125 claimed that "[a]fter agreeing on all contractual terms such a product specifications, prices and quantities with the distribution arms, MHK [Meyer Hong Kong] will place a manufacturing order to MZQ [the China Producer]." Pl. Ex. 125 at MUS044867. This statement is clearly contrary to the testimony elicited during trial. Without access to the documents summarized by these exhibits, both the Court and the Government were left unable to further test their trustworthiness. Moreover, testimony reciting information from these inadmissible documents should be

16

disregarded. *See Thompson v. United States*, 342 F.2d 137,140 (5th Cir. 1965) (counsel should not be permitted to elicit testimony under the guise of refreshing recollection through use of a prepared document to obviate the necessity of introducing original records). Accepting testimony based on inadmissible summaries would undermine the very reason for FRE 1006 and should be rejected. Accordingly, these documents and the testimony based on them should be excluded. Without such testimony or summaries, Meyer cannot meet its burden of showing through a preponderance of the evidence that it is entitled to use first sale transaction value.

### E. Testimony Based On Documents That Were Not Produced In Discovery Should Be Disregarded

The rules of this Court require a party to supplement disclosures and responses. USCIT Rule 26(e). Specifically, with respect to "an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition." *See* C.I.T. Rule 37(c)(1); *see also Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico*, 248 F.3d 29, 34 (1st Cir. 2001).

Meyer elicited trial testimony from Mr. Craig Pinkerton, as both a fact witness and an expert witness, that was based, in part, on documents Mr. Pinkerton relied upon in forming his expert opinion and issuing his export report, such as:

- the PWC benchmarking analysis (Pl. Ex. 119);

- the PWC Assessment of Transaction Value (Pl. Ex. 125) prepared in connection with this litigation;

- the PWC Assessment of Transaction Value (Pl. Ex. 117) for transactions between the Thai Producer and Meyer Macau;

- the documentation representing the document flow between the three entities in

17

the two-tiered transactions; and

- samples, costs sheets, videos, and interim steps that the Chinese steel blank undergoes in Thailand.

However, not all of the underlying documents upon which Mr. Pinkerton relied in offering his expert opinion were produced to the Government, notwithstanding that such documents were the subject of a subpoena to Mr. Pinkerton.  *See* Attachment B, ¶¶ 5, 6, page 1; ¶¶ 2, 9, 13, page 3.  Mr. Pinkerton's failure to provide subpoenaed documents to the Government, and Meyer's failure to place such documents before the Court at trial, should render inadmissible the information recalled about them by Mr. Pinkerton.

### F.   Meyer Failed To Establish That The Relationship Of The Parties Did Not Affect The First Sale Transaction Price Under The Two Valuation Tests Meyer Chose To Use At Trial

As discussed above, Meyer's failure to provide admissible evidence to establish its entitlement to first sale valuation is fatal to its claims.  Yet, Meyer also failed to show under the two valuation tests it offered to the Court at trial that the relationship of the parties did not affect the transaction price between the manufacturer/producer and the middleman.  Throughout this case, Meyer has argued that the transaction price between the China Producer and China middleman Meyer Hong Kong, and the Thai Producer and Thai middleman Meyer Macau was a viable price because an examination of the circumstances of the sale of the imported merchandise indicates that the relationship between such buyer and seller did not influence the price actually paid or payable.

At trial, to establish the requisite absence of influence, Meyer used two alternative valuation tests set forth in CBP's regulations:  (1) the price was settled in a manner consistent with the normal pricing practices of the industry; or (2) the price was adequate to ensure

recovery of all costs plus a profit equivalent to the firm's overall profit realized over a representative period of time in sales of merchandise of the same class or kind. *See* 19 C.F.R. § 152.103(l)(1)(i).

After trial, the trial court adopted the Government's findings of fact and in its remand decision affirmed the judgment of the trial decision, which would include the previous adoption of the Governments findings of fact. *See* Attachment B. These factual findings, based on the facts developed during trial, reveal that Meyer has failed to establish that either of the two tests it offered at trial support using the first sale price.

1. **Normal pricing practices of the industry in question**

   a. *Meyer Hong Kong and the China Producer*

The information provided by PWC in plaintiff's Trial Exhibits 119 and 125 along with Mr. Pinkerton's testimony should be disregarded for the reasons presented above. Yet, even if considered, the facts developed at trial and adopted by the trial court reveal that Meyer has not established that the price from the China Producer to Meyer Hong Kong was "settled in a manner consistent with the normal pricing practices of the industry" as provided in 19 C.F.R. § 152.103(l)(1)(ii) because:

- the companies selected by PWC for its benchmarking study were not shown to sell to the United States market. Attachment B, ¶ 87, page 11.

- in selecting comparable companies, neither Meyer nor PWC provided sufficient information on the China companies to demonstrate that they manufacture merchandise of the same class or kind as the China Producer. Attachment B, ¶ 91, page 11.

19

- Meyer has not established that there are "normal pricing practices of the industry" in China where the operating income/total cost figures vary widely from 1.2 percent to 19.8 percent in 2010, -10.5 percent to 10.5 percent in 2011, and -17.3 percent to 3.2 percent in 2012.  Attachment B, ¶ 102, page 12.

- Meyer, Meyer Macau, Meyer Hong Kong, the Thai Producer and the China Producer are not publicly traded companies.  Attachment B, ¶ 68, page 9.

- the databases used by PWC in selecting comparable companies were limited to publicly traded companies.  Attachment B, ¶ 67, page 9.

- Meyer Macau, not Meyer Hong Kong, acts as the middleman for the China Producer.  Attachment B, ¶ 16, page 2.

- there is no evidence of arm's length negotiations between Meyer Hong Kong and the China Producer, or between Meyer Hong Kong and Meyer.  Instead, the testimony adduced at trial shows that the negotiations are between Meyer Macau and the China Producer and Meyer Macau and Meyer.  Attachment B, ¶¶ 14, 15, 17, page 2; ¶¶ 2, 4, 5, 13, pages 5-6.

- Meyer Hong Kong and the China Producer do not reach prices independently.  Instead, Meyer Macau fulfills the function of reaching prices for the China Producer.  Attachment B, ¶ 46, page 8.

- Meyer Macau "assigns" orders to the China Producer and Meyer Macau, not Meyer Hong Kong.  Attachment B, ¶¶ 45, 47, 50, page 8.

- Trial Exhibit 125, the PWC study is based on incorrect information.  For example, the study:

  (i)    does not acknowledge that Meyer Macau, not Meyer Hong Kong, serves as the middleman for merchandise ordered by Meyer and manufactured by the

20

China Producer.

(ii)     states that Meyer Hong Kong receives orders from Meyer when, in fact, Meyer Macau "assigns" orders to Meyer Hong Kong based on Meyer Macau's assessment of whether the China Producer or the Thai Producer is the most capable factory for the order.

(iii)     states that Meyer Hong Kong and the China Producer agree on all contractual terms, when, in fact, the testimony presented at trial established that Meyer Macau negotiates with the China Producer.

(iv)     makes no mention of Meyer Macau's role in transactions between Meyer Hong Kong and the China Producer.

(v)     does not reveal that Meyer Hong Kong, Meyer Macau, and the Thai Producer have the same general manager: Joseph Lau.

Attachment B, ¶¶ 14, 15, 16, 17, page 2; ¶¶ 2, 4, 5, 13, pages 5-6; ¶¶ 45, 46, 47, 50, page 8; ¶¶ 38, 39, page 7.

- Plaintiff has not demonstrated that the cookware industry in the PRC normally works off prices that are set by entities other than the buyer and seller, or that the cookware industry in the PRC normally has orders assigned to it by an entity that is neither the buyer or seller.  *See* Plaintiffs Trial Exhibits moved into evidence.

- Meyer has not demonstrated that the cookware industry uses volume contracts similar to those in place for the China Producer.  Attachment B, ¶ 90, page 11.

### b. *Meyer Macau and the Thai Producer*

The information provided by PWC in plaintiff's Trial Exhibits 119 and 125 along with Mr. Pinkerton's testimony should be disregarded for the reasons presented above.  Yet, even if considered, the facts developed at trial and adopted by the trial court reveal that Meyer has not established that the price from the Thai Producer to Meyer Macau was "settled in a manner consistent with the normal pricing practices of the industry" as provided in 19 C.F.R. § 152.103(l)(1)(ii) because:

- it has not demonstrated specifically what the normal pricing practices are for Thai manufacturers of cookware, *i.e.*, pots and pans, that are exported to the United States.  *Se*e Plaintiff's Trial Exhibits moved into evidence.

- the companies selected by PWC for its benchmarking study were not shown to be comparable to the Thai Producer, which is the largest cookware manufacturer in Thailand.  Pl. Exhibit 119; Attachment B, ¶ 32, page 7.

- Meyer has not established that the Thai manufacturers of pots and pans used in the benchmarking study are, in fact, comparable to the Thai Producer.  For example, Meyer provided no evidence that any of the Thai Producer comparables sell pots and pans to the United States.  Attachment B, ¶ 87, page 11.  Nor did Meyer establish that the comparables are "limited risk" manufacturers whose profit margins are reduced because they have entered into a "minimum order" contract.  Attachment B, ¶ 85, page 11.

- the databases used by PWC in selecting comparable companies were limited to publicly traded companies.  Attachment B, ¶ 67, page 9.

- in selecting comparable companies, PWC did not provide sufficient information on the comparable companies to show that the profit figures involved merchandise of the same class or kind.  Pl. Trial Exhibit 125.

- Meyer has not established that there are "normal pricing practices of the industry" in Thailand where the operating income/total cost figures vary widely from -4.8 percent to 29.9 percent in 2010, -9.4 percent to 12.9 percent in 2011, and -14.7 percent to 14 percent in 2012.  Attachment B, ¶ 101, page 12.

## 2.  All costs plus a profit equivalent to the firm's overall profit

The meaning of the term "the firm," set forth in 19 C.F.R. § 152.103(i)(l)(iii), is not provided by 19 U.S.C. § 1401a, the value statute, or by CBP Regulations.  In other sections of 19 C.F.R. Part 152, the terms "seller," and "producer," are used.  However, for section 152.103(i)(l)(iii), CBP used the term "firm," rather than "seller" or "producer" indicating that the "firm" is not necessarily the seller or producer.  CBP normally considers the term "firm" referenced in 19 C.F.R. §152.103(l), interpretive note 3, to mean the parent company. Defendant's Trial Exhibit 15 at 9 (Determining the Acceptability of Transaction Value for Related Party Transactions (April 2007)).  Courts generally defer "to an agency's interpretations of its own regulations than to its interpretation of statutes, because the agency, as the promulgator of the regulation, is particularly well suited to speak to its original intent in adopting the regulation."  *Gose v. United States*, 451 F.3d 831, 837 (Fed. Cir. 2006) (citing to *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*. 400 F.3d 1352, 1363-64 (Fed. Cir. 2005) and *Am. Express Co. v. United States*, 262 F.3d 1376, 1383-83 (Fed. Cir. 2001)).

Thus, for the "all costs plus a profit" test, financial statements from the parent company are needed to determine the parent's overall profit, which is one of the variables in the formula. Further, to satisfy this test, the sale price between the related producer and middleman must be adequate to ensure recovery of all the seller's costs plus a profit equivalent to the parent company's overall profit.  Defendant's Trial Exhibit 15 at 9.  Finally, "[t]o substantiate an all costs plus profit claim, the importer should be prepared to provide records and documents of comprehensive product related costs and profit, such as financial statements, accounting records including general ledger account activity, bills of materials, inventory records, labor and

overhead records, relevant selling, general and administrative expense records, and other supporting business records." *Id.*

At trial, Meyer failed to substantiate that the first sale price between the China Producer and Meyer Hong Kong or the Thai Producer and Meyer Macau satisfied the "all costs plus a profit" test because:

- Meyer has not provided the financial statements of its parent company, Meyer Holdings, to evaluate whether the profits of the China Producer and the Thai Producer are equivalent to the costs and profit of the Meyer group overall. Attachment B, ¶ 2, page 12.

- Meyer has not provided the financial statements of any of the companies in the Meyer group that manufacture or sell cookware to evaluate whether the profits of the China Producer or the Thai Producer are equivalent to the costs and profit of the Meyer group overall. Attachment B, ¶ 4, page 12.

- the Thai Producer may not constitute "the firm" for the purposes of 19 C.F.R. § 152.103(i)(l)(iii) because it does not sell to unrelated parties and, therefore, all of its sales are potentially affected by a relationship. Attachment B, ¶ 12, page 13.

- the Thai Producer may not constitute "the firm" for the purposes of 19 C.F.R. § 152.103(i)(l)(iii) because the majority of its sales are to the United States and, thus, are potentially affected by the same relationship. Comparing one sale to a set of sales that involve the same relationship provides no way of disaggregating the effect that the relationship may have had on the sales price or determining whether it is "arm's length." Attachment B, ¶¶ 22, 23, 25, page 6.

- the China Producer may not constitute "the firm" for the purposes of 19 C.F.R. § 152.103(i)(l)(iii) because all of its sales are to related parties and, thus, are potentially affected by the relationship.  Comparing one sale to a set of sales that involve the same relationship provides no way of disaggregating the effect that the relationship may have had on the sales price or determining whether it is "arm's length."  Attachment B, ¶ 13, page 13.

- Meyer has not established that the price from the Thai Producer to Meyer Macau was "adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit realized over a representative period of time (*e.g.*, on an annual basis), in sales of merchandise of the same class or kind" because, even if the Court concludes that the Thai Producer may be considered "the firm" for the purposes of this regulation, Meyer has not produced evidence at trial to establish the costs and profit of any of the products manufactured by the Thai Producer to evaluate whether they are equivalent to the Thai Producer's overall profit. Attachment B, ¶¶ 1, 4, 7, 11, 17, pages 12-13.

- Meyer has not established that the price from the Thai Producer to Meyer Macau was "adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit realized over a representative period of time (*e.g.*, on an annual basis), in sales of merchandise of the same class or kind" because, even if the Court concludes that the Thai Producer may be considered "the firm" for the purposes of this regulation, Meyer has not produced evidence during trial to establish the Thai Producer's overall costs and profit during the relevant time period.  Attachment B, ¶¶ 1, 4, 7, 11, 17, pages 12-13.

- Meyer has not established that the price from the China Producer to Meyer Hong Kong was "adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit realized over a representative period of time (*e.g.*, on an annual basis), in sales of merchandise of the same class or kind" because, even if the Court concludes that the China Producer may be considered "the firm" for the purposes of this regulation, Meyer has not produced evidence at trial to establish the costs and profit of 24 of the 26 products manufactured by the China Producer in this case to evaluate whether they are equivalent to the China Producer's overall profit. For the two sample transactions for the years 2010-2012, identified in the PWC study (Trial Exhibit 125 at MUS044890), the profit margins identified are not "equivalent to" the China Producer's stated profit in the benchmarking study (Trial Exhibit 119 at MUS045254). Attachment B, ¶¶ 1, 4, 6, 8, 9, 10, 16, pages 12-13.

- Meyer has not established that the price from the China Producer to Meyer Hong Kong was "adequate to ensure recovery of all costs plus a profit which is equivalent to the firm's overall profit realized over a representative period of time (*e.g.*, on an annual basis), in sales of merchandise of the same class or kind" because, even if the Court concludes that the China Producer may be considered "the firm" for the purposes of this regulation, Meyer has not produced evidence to establish the China Producer's overall costs and profit during the relevant time period. Attachment B, ¶¶ 1, 4, 6, 8, 9, 10, 16, pages 12-13.

## <u>CONCLUSION</u>

As discussed above, based on the applicable law, the application of the Federal Rules of Evidence, and the admissible evidentiary record made at trial, Meyer failed to establish that it is entitled to use the first sale transaction value between the manufacturer/producer and the middleman for the appraisement of its imported cookware.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

PATRICIA M. McCARTHY
Director

/s/Justin R. Miller
By:   JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

*Of Counsel*    /s/ Beverly A. Farrell
PAULA S. SMITH, ESQ.    BEVERLY A. FARRELL
Office of Assistant Chief Counsel    Senior Trial Attorney
International Trade Litigation    Civil Division, Dept. of Justice
U.S. Customs and Border Protection    Commercial Litigation Branch
26 Federal Plaza – Suite 346
New York, NY 10278
Tel. (212) 264-9230 or 0483
Attorneys for Defendant

Dated: June 11, 2025

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. RICHARD K. EATON, JUDGE

------------------------------------------------------------------------- X

MEYER CORPORATION, U.S.,                :

                                       :

                  Plaintiff,         :

                                         :

                v.                   :         Court No. 13-00154

                                         :

UNITED STATES,                             :

                                         :

                  Defendant.      :

------------------------------------------------------------------------- X

## <u>CERTIFICATE OF COMPLIANCE</u>

I, BEVERLY A. FARRELL, a Senior Trial Attorney in the Office of the Assistant

Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field

Office, who is the attorney responsible for Defendant's Supplemental Brief, relying upon the

word count feature of the word processing program used to prepare the response, certify that this

brief complies with the word count limitation under the Court's chambers procedures and

contains 7,976 words.

                                      <u>/s/ Beverly A. Farrell</u>
                                      Beverly A. Farrell

ATTACHMENT A

**PERTINENT FACTS TO WHICH THE PARTIES HAVE PREVIOUSLY AGREED**

1. Meyer Corporation, U.S. (Meyer) is a Delaware corporation with its principal place of business in Vallejo, California and is the importer of record of the merchandise subject to protest and the plaintiff in this case.  Docket No. 148, Schedule C, ¶ 1.

2. Meyer purchases a wide variety of cookware, both in sets and in individual pieces, from overseas affiliates and resells them in the United States for use in the home. It is the exclusive distributor in the United States for all Meyer cookware products.  Docket No. 148, Schedule C, ¶ 1.

3. Meyer Industries, Ltd. (Thai Producer) is located in Laem Chabang, Thailand and is the producer of the Thai origin goods that are the subject of this proceeding.  Docket No. 148, Schedule C, ¶ 2.

4. Meyer Zhaoqing Metal Products Co., Ltd. (China Producer) is located in Zhaoqing, China and is the producer of the Chinese origin goods that are the subject of this proceeding. Docket No. 148, Schedule C, ¶ 3.

5. Meyer Marketing (Macau Commercial Offshore) Co. Ltd. (Meyer Macau or Thai Middleman) is a corporation located in the Chinese Special Administrative Region of Macau and the middleman purchaser of the goods produced by the Thai Producer.  Docket No. 148, Schedule C, ¶ 4.

6. Meyer Manufacturing Company Ltd. (Meyer Hong Kong or China Middleman) is a corporation located in the Chinese Special Administrative Region of Hong Kong and the middleman purchaser of certain goods produced by the China Producer.  Docket No. 148, Schedule C, ¶ 5.

7. Each of the entities identified in paragraphs 3-6 is a related party to Meyer within the meaning of 19 U.S.C. § 1401a(g)1)(F).  Docket No. 148, Schedule C, ¶ 6.

8. Meyer International Holdings Ltd. (Meyer Holdings) is a corporation organized under the laws of the British Virgin Islands and is the parent company of Meyer.  Docket No. 148, Schedule C, ¶ 7.

9. At all times relevant to this proceeding, the Kingdom of Thailand was designated by the President of the United States as a Beneficiary Developing Country (BDC) within the meaning of 19 U.S.C. § 2462(a)(1), also known as a GSP country, *i.e.*, a country designated for preference under the GSP legislation.  Docket No. 148, Schedule C, ¶ 8.

10. At all times relevant to this proceeding, certain of the Thai merchandise under review was an "eligible article," *i.e.*, the merchandise was classified under a provision of the Harmonized Tariff Schedule of the United States (HTSUS), which qualified the article for GSP treatment if it otherwise met the requirements of the GSP statute.  Docket No. 148, Schedule C, ¶

9.

11. The merchandise was classifiable at entry under subheading 7323.93.0045 of the HTSUS, the provision for "table, kitchen or household articles. . . of stainless steel." Docket No. 148, Schedule C, ¶ 10.

12. Each of the cookware items subject to the set issue was imported as a set of cookware, and the common denominator of each of the sets is that the set includes one or more glass lids made in China, a non-BDC country. Docket No. 148, Schedule C, ¶ 11.

13. All of the pots and pans constituting the cookware sets that are the subject of the set issue were manufactured by the Thai Producer. Docket No. 148, Schedule C, ¶ 12.

14. The glass lids in the sets referenced in preceding paragraphs 12 and 13 were produced in China and sold to the Thai Producer, but the glass lids themselves were not substantially transformed in Thailand. Docket No. 148, Schedule C, ¶ 13.

15. The cookware at issue in this case was produced by either the Thai Producer or the China Producer. Docket No. 148, Schedule C, ¶ 14.

16. The PRC is not recognized by the United States as a "market economy" and is, therefore, considered a non-market economy in this proceeding. Docket No. 148, Schedule C, ¶ 16.

17. Meyer Holdings is the only shareholder of Meyer. Docket No. 148, Schedule C, ¶ 17.

18. Meyer, the Thai Producer, the China Producer, Meyer Macau and Meyer Hong Kong are subsidiaries of Meyer Holdings. Docket No. 148, Schedule C, ¶ 18.

19. Other subsidiaries of Meyer Holdings are in the business of cookware, such as Meyer Cookware Australia Pty Ltd. (distributor), Meyer New Zealand (distributor of kitchenware, which includes cookware, *i.e*, pots and pans), Meyer UK Limited (distributor), Meyer Europe SRL (manufacturer), Meyer Japan, Meyer Canada Housewares, Inc. (distributor), Meyer Taiwan Limited (distributor), and Meyer Housewares Singapore (distributor). Docket No. 148, Schedule C, ¶ 19.

20. The subsidiaries listed in paragraph 19 consolidate their financial statements with Meyer Holdings. Docket No. 148, Schedule C, ¶ 20.

21. The Thai Producer, the China Producer, Meyer Macau, and Meyer Hong Kong consolidate their financials with Meyer Holdings. Docket No. 148, Schedule C, ¶ 21.

22. Meyer Macau and Meyer Hong Kong occasionally work together. Docket No. 148, Schedule C, ¶ 1.

23. Meyer Macau sells to Meyer UK Limited, Meyer Cookware Australia Pty Ltd.,

Meyer New Zealand, Meyer Canada Housewares, Inc., QVC, Costco, Walmart, Meyer Japan, Amway, and WMF (a non-Meyer affiliate and competitor cookware company).  Docket No. 148, Schedule C, ¶ 23.

24. Meyer Hong Kong also sells to Meyer UK Limited, Meyer Cookware Australia Pty Ltd., Meyer New Zealand, Meyer Canada Housewares, Inc., QVC, Costco, Walmart, and Meyer Japan.  Docket No. 148, Schedule C, ¶ 24.

25. The Thai Producer and the China Producer both sell to their domestic markets directly.  Docket No. 148, Schedule C, ¶ 25.

26. Meyer Hong Kong owns the Anolon and Circulon brand names.  Docket No. 148, Schedule C, ¶ 26.

27. Meyer Macau owns the exclusive right to the brand name Rachel Ray for cookware, bakeware, tabletops (aka dinnerware, serverware and glassware), gadgets and cutlery for the western hemisphere and some Meyer affiliates have the right to sell with the licensor's consent in UK, South Africa, Ireland and Australia.  Docket No. 148, Schedule C, ¶ 27.

28. Meyer Macau owns the exclusive license for the brand name Paula Deen for cookware, bakeware, tabletops (aka dinnerware, serverware and glassware), gadgets and cutlery for the western hemisphere.  Docket No. 148, Schedule C, ¶ 28.

29. The Rachel Ray and Paula Deen licenses were granted to Meyer Macau plus affiliates, including those like Meyer, that are under the common ownership of Meyer Holdings. Docket No. 148, Schedule C, ¶ 29.

30. Meyer Macau can sell to U.S. Retailers other than Meyer but only in exchange for a commission it pays to Meyer.  Docket No. 148, Schedule C, ¶ 30.

31. The commissions paid by the middlemen for sales to U.S. retailers other than Meyer vary based on lines and customers.  Docket No. 148, Schedule C, ¶ 31.

32. The Thai Producer and the China Producer purchase some components of their cookware from Meyer affiliates that are direct or indirect subsidiaries of Meyer Holdings. Docket No. 148, Schedule C, ¶ 32.

33. The Thai Producer also sold cookware to a customer in Vietnam.  Docket No.  148, Schedule C, ¶ 33.

ATTACHMENT B

## GOVERNMENT'S FINDINGS OF FACT ADOPTED BY THE TRIAL COURT RELATING TO THE ISSUE OF TRANSACTION VALUE

(For the Court's convenience, we are providing the original numbering for those facts adopted by the Court from our Findings of Fact and Conclusions of Law with respect to transaction value, the only issue on remand.  We have deleted the facts relating to GSP and double substantial transformation.)

**FINDINGS OF FACT RELATING TO FRE 1006**:

1.     Plaintiff's Exhibit 119 is a 3-year weighted average benchmarking study prepared by the transfer pricing team at PWC. Vol. 4 at 583:5-16.

2.     In providing his expert opinion, Mr. Pinkerton considered Plaintiff's Exhibit 119.  Vol. 5 at 718:14-18.

3.     In connection with preparing Plaintiff's Exhibit 119, screening criteria is used to select comparable companies, financial statements and other financial reports are reviewed.  Vol. 4 at 599:3-10.

4.     In connection with the preparation of Plaintiff's Exhibit 119, the PWC transfer pricing team extracted data from certain databases and placed it into an Excel file.  Vol. 5 at 715:11-20.

5.     Mr. Pinkerton did not provide a copy of the Excel file, which was used to generate the benchmarking study, to the Government in response to the deposition and document subpoena. Vol. 5 at 715:21-715:2, 718:14-719:4.

6.     Mr. Pinkerton did not provide to the Government any of the financial statements, screening criteria, or work files of PWC used in preparing Plaintiff's Exhibit 119.  Vol. 5at 772:7-773:14.

7.     Meyer did not provide to the Government or the Court a list and copies of the documents used in preparing Plaintiff's Exhibit 119.  See Pl. Exs. moved into evidence.

8.     Plaintiff's Exhibit 125 is a study prepared by PWC on behalf of Meyer assessing transaction value under the first sale method for related parties for which Plaintiff's Exhibit 119 was a part.  Vol. 4 at 603:14-23.

9.     Plaintiff's Exhibit 125 is intended for Meyer's use and benefit and "is not intended for, nor may it be relied upon by, any other party."  Pl. Ex. 125 at MUS044865.

10.     Plaintiff's Exhibit 125 is dated May 13, 2016 and was prepared during the pendency of this litigation.  Pl. Ex. 125 at MUS044863.

11.     In preparing Plaintiff's Exhibit 125, PWC used financial data and sample transactions for the fiscal years 2010, 2011, and 2012.  Pl. Ex. 125 at MUS044866.

12.    In preparing Plaintiff's Exhibit 125, PWC's transfer pricing team:

(i)    prepared its benchmarking study (Plaintiff's Exhibit 119) relying on databases and applying data screens (Pl. Ex. 125 at MUS044882-885);

(ii)    reviewed underlying agreements, payment procedures and other documentation between the China Producer and Meyer Hong Kong (Pl. Ex. 125 at MUS044888);

(iii)    compared profit margins of Meyer Hong Kong and Meyer Trading Company based on financial information (Pl. Ex. 125 at MUS044889);

(iv)    analyzed two sample transactions by using detailed cost breakdown spreadsheets containing costed bills of materials and allocated amounts for labor expense, and manufacturing overhead, and direct expense (Pl. Ex. 125 at MUS044890);

(v)    reviewed purchase orders and commercial invoices through all steps of the two-tiered transaction (Pl. Ex. 125 at MUS044891-92); and

(vi)    reviewed financial statements of the China Producer (Pl. Ex. 125 at MUS044892).

13.    In Plaintiff's Exhibit 125, PWC states: "After agreeing on all contractual terms such as product specifications, prices and quantities with the distribution arms, MHK [Meyer Hong Kong] will place a manufacturing order to MZQ [the China Producer]."  Pl. Ex. 125 at MUS044867.

14.    Meyer negotiated with Ms. Sharon Lau of Meyer Macau for both the Thai Producer and the China Producer when seeking to purchase cookware.  Vol. 1 at 118:25-119:9.

15.    Meyer did not know whether Ms. Lau was negotiating for production by the Thai Producer or the China Producer. Vol. 1 at 122:9-17.

16.    Meyer Macau acts as a middleman for the China Producer.  Vol. 3 at 320:6-14.

17.    When a customer requests a cookware product, Ms. Lau of Meyer Macau determines whether the Thai Producer or the China Producer has the tooling to manufacture the items.  Vol. 3 at 320:15-24.

18.    Meyer did not provide to the Government or the Court a list and copies of the documents and information underlying Plaintiff's Exhibit 125.  *See* Pl.'s Exs. moved into evidence.

**FINDINGS OF FACT RELATING TO DISREGARDING TESTIMONY BASED ON DOCUMENTS NOT PRODUCED IN DISCOVERY AND BIAS**

1.    At the time of his deposition, Mr. Pinkerton, as an expert, was required to provide the Government with all the documents he considered in forming his expert opinion.  Vol. 4 at 489:11-16.

2.      In connection with the deposition of Mr. Pinkerton as an expert, the government served a subpoena with an attached Schedule A, which sought certain documents.  Vol. 5 at 716:3-13, 25.

3.      Among the documents sought of Mr. Pinkerton were documents referenced in his expert report, documents considered in forming the opinions in his expert report, documents relied upon in forming the opinions in his report, databases or other information repositories from which he obtained information for his report.  Vol. 5 at 717:17-718:13.

4.      The benchmarking study that is Plaintiff's Exhibit 119 is one of the documents Mr. Pinkerton relied upon in forming his expert opinions.  Vol. 5 at 718:14-18.

5.      Plaintiff's Exhibit 119 was developed in or about 2016, during the pendency of this litigation.  Vol. 4 at 583:5-16.

6.      In connection with the preparation of the benchmarking study that is Plaintiff's Exhibit 119, the PWC transfer pricing team extracted data from certain databases and placed it into an Excel file.  Vol. 5 at 715:11-20.

7.      In connection with preparing Plaintiff's Exhibit 119, the PWC transfer pricing team used screening criteria and reviewed financial statements to select comparable companies.  Vol. 5 at 737:25-740:6.

8.      In obtaining comparables for the China Producer for the benchmarking study, Mr. Pinkerton relied on information provided by the China Producer to exclude certain manufacturers.  Vol. 4 at 595:12-597:4.

9.      Mr. Pinkerton did not provide a copy of the Excel file prepared by the PWC transfer pricing team, which was used to generate the benchmarking report, to the Government in response to the deposition and document subpoena.  Vol. 5 at 715:21-715:2, 718:14-719:4.

10.      Mr. Pinkerton did not search any of the databases used by the PWC transfer pricing team to gather information for the benchmarking study to determine whether they contained data from any of the Meyer entities involved in the transactions at issue.  Vol. 5 at 719:12-18.

11.      Mr. Pinkerton testified that in many cases when PWC does a court [sic] [port] presentation part of the documentation binder is the financials of the entity, so they can actually do the comps themselves to verify that PWC's calculations match what the financials state.  Vol. 5 at 726:14-727:11.

12.      Mr. Pinkerton's expert opinion on first sale considered the information in the port binder. Vol. 5 at 727:24-728:9.

13.      Mr. Pinkerton did not provide the documents in the port binder, and testified that there's thousands of documents, such as general ledgers, charts of accounts, debit/credit memos that he might have considered in forming his expert opinion that were not produced in response to the Government's subpoena.  Vol. 5 at 728:10-729:9.

17.    Mr. Pinkerton has been representing Meyer since approximately 2006 when he was engaged to assist Meyer in conducting a review as to whether Meyer could use first sale appraisement on its transactions from the Thai Producer through Meyer Macau and unrelated China vendors through Meyer Trading Company.  Vol. 4 at 501:11-15.

18.    Mr. Pinkerton was retained to serve as an expert for Meyer during this litigation.

## FINDINGS OF FACT RELATING TO THE FAILURE TO ESTABLISH ENTITLEMENT TO FIRST SALE TRANSACTION VALUE

### a.    Bona fide sale

1.    Establishing a bona fide sale is done primarily through documentation, i.e., the document flow between the entities in a supply chain.  Vol. 4 at 502:25-503:4.

2.    Mr. Pinkerton testified that to establish a bona fide sale, among other things, he looks to the document flow between the three entities in the supply chain: the purchase order between Meyer and the middleman; the purchase order between the middleman and the producer; the invoice from the producer to the middleman; the invoice from the middleman to Meyer; and proof of payment between these entities.  Vol. 4 at 502:21-503:22.

3.    The first document usually reviewed to determine a bona fide sale is the purchase order between the entities in the supply chain.  Vol. 4 at 503:5-6.

4.    The next document to establish a bona fide sale is proof of payment, typically a wire transfer, between the entities in the supply chain.  Vol. 4 at 503:9-10.

5.    At trial, Meyer did not present any purchases orders between the entities in the Meyer supply chain:  Meyer to Meyer Macau; Meyer Macau to the Thai Producer; Meyer to Meyer Hong Kong; or Meyer Hong Kong to the China Producer.  See Pl. Exs. moved into evidence.

6.    At trial Meyer did not present any proofs of payment between the entities in the supply chain:  Meyer to Meyer Macau; Meyer Macau to the Thai Producer; Meyer to Meyer Hong Kong; or Meyer Hong Kong to the China Producer.  See Pl. Exs. moved into evidence.

### b.    Sale for export to the United States

1.    In establishing sale for export to the United States, "[r]elevant documents include, purchase orders, invoices, proof of payment, contracts and any additional documents (e.g. correspondence) which demonstrate how the parties dealt with one another and which support the claim that the merchandise was clearly destined to the United States."  Def. Ex. 12.

2.    At trial, Meyer did not present any purchase orders between the entities in the Meyer supply chain:  Meyer to Meyer Macau; Meyer Macau to the Thai Producer; Meyer to Meyer Hong Kong; or Meyer Hong Kong to the China Producer.  See Pl. Exs. moved into evidence.

3.      At trial Meyer did not present any proofs of payment between the entities in the supply chain:  Meyer to Meyer Macau; Meyer Macau to the Thai Producer; Meyer to Meyer Hong Kong; or Meyer Hong Kong to the China Producer.  *See* Pl. Exs. moved into evidence.

      **c.**      **Arm's length transaction**

      **i.**      ***Normal pricing practices of the industry in question***

1.      The industry in question is the manufacture and sale of cookware.  Vol. 1 at 18:18-20.

2.      In purchasing cookware, Meyer primarily dealt directly with Meyer Macau as a middleman.  Vol. 1 at 83.

3.      Meyer rarely dealt with Meyer Hong Kong when purchasing cookware.  Vol. 1 at 83.

4.      Meyer entered into a written Master Distribution Agreement with Meyer Macau.  Vol. 1 at 83; Pl. Ex. 124.

5.      Meyer did not enter into a written Master Distribution Agreement with Meyer Hong Kong.  Vol. 1 at 117 -118.

6.      Meyer's Master Distribution Agreement requires Meyer Macau to accept orders from Meyer if Meyer is not in breach of the Master Distribution Agreement at the time the order is placed.  Pl. Ex. 124 at MUS010378 (Section 5.1).

7.      Meyer Macau must charge Meyer the price negotiated and agreed upon by the parties prior to the placement of orders for the products; and Meyer must pay Meyer Macau in cash for the products delivered by Meyer Macau within 21 days of the invoice.  Pl. Ex. 124 at MUS010379 (Section 6).

8.      If the Master Distribution Agreement between Meyer and Meyer Macau is inconsistent with any other document or agreement between them the Master Distribution Agreement prevails to the extent of the inconsistency.  Pl. Ex. 124 at MUS010391 (Section 22.5).

9.      Meyer's primary competitors in the United States are Newell Corporation (Calphalon); Group SEB (T-FAl and All Clad); Tramontina; and the Cookware Company (Green Pan).  Vol. 1 at 90:19-91:15.

10.      Newell Corporation (Calphalon) sourced some of its cookware products from manufacturers in the PRC.  Vol. 1 at 139.

11.      Group SEB owned manufacturing capabilities around the world.  Vol. 1 at 139:16-19.

12.      The Cookware Company sourced the majority of their products from the PRC.  Vol. 1 at 140:13-24.

13.    Meyer negotiated with Ms. Sharon Lau of Meyer Macau for both the Thai Producer and the China Producer when seeking to purchase cookware.  Vol. 1 at 118:25-119:9.

14.    Meyer did not know whether Ms. Lau was negotiating for production by the Thai Producer or the China Producer.  Vol. 1 at 122:9-17.

15.    Meyer only sourced its cookware from Meyer-related entities, and never attempted to source its cookware form anyone else.  Vol. 1 at 116:20-117:2.

16.    Meyer was required to pay the middleman in cash within 21 days according to the master agreement.  Vol. 1 at 127.

17.    The invoice between Meyer and Meyer Macau called for payment in 20 days.  Vol. 1 at 128; Pl. Ex. 190

18.    The purchase order is the contract between the middleman and Meyer.  Vol. 1 at 138:8-19.

19.    Meyer monitored its profit level through its profit and loss statement annually, quarterly and monthly.  Vol. 1 at 145:2-21.

20.    The Thai Producer sells to Meyer Macau, Meyer Hong Kong, and Myrex Thailand Limited, each of which is a subsidiary of Meyer Holdings, and no one else.  Vol. 1 at 159; Vol. 2 at 225, Pl. Ex. 152.

21.    Myrex Thailand Limited is a middleman that sells to local customers in Thailand and nearby "AEC" countries like Vietnam, Cambodia, Laos and Burma.  Vol. 1at 226.

22.    Approximately 96 percent of the Thai Producer's cookware is sold to Meyer Macau, 2 percent to Meyer Hong Kong, and 2 percent to Myrex Thailand Limited.  Vol. 1 at 160.

23.    Of the 96 percent of sales to Meyer Macau, approximately 70 to 80 percent of the goods go to the United States.  Vol. 2 at 229.

24.    Mr. Kwok was responsible for negotiating sales prices on behalf of the Thai Producers with four or five of Meyer Macau's marketing managers. Vol. 1 at 161.

25.    Products sold by the Thai Producer to Meyer Macau are for import into the United States and are shipped by the Thai Producers directly to the United States.  Vol. 1 at 161-62.

26.    The Thai Producer makes stainless steel, aluminum and clad pots and pans and also produces boxes, glass lids, handles and knobs and kitchen tools.  Vol.1 at 166-67

27.    The Thai Producer seeks a profit margin on average of 3 percent and determines its prices to Meyer Macau by using the costs of the cookware plus the 3 percent margin.  Vol. 1 at 176:11-14.

28.    The Thai Producer and Meyer Macau entered into a Master Manufacturing Agreement. Vol. 1 at 178, Pl. Ex. 123

29.    The Master Manufacturing Agreement requires Meyer Macau to purchase $100 million of cookware from the Thai Producer with $20 million allocated to the first and second quarters of the year and $30 million for the third and fourth quarters.  Vol. 2 at 276-77; Pl. Ex. 123

30.    Section 6.2 of the Master Manufacturing Agreement provides that title in the products passes to Meyer Macau upon delivery irrespective of whether the price for such products had been wholly or partially paid or remains completely unpaid at that time.  Vol. 2 at 279-80; Pl. Ex. 123 .

31.    The Thai Producer sets the price for products it sells to Meyer Macau, and, at times, will lower the price but will still make a profit.  Vol. 1 at 179.

32.    With respect to production volume, the Thai Producer is the largest producer of pots and pans in Thailand.  Vol. 1 at 181.

33.    The Thai Producer does not engage in the manufacturing of cookware without first having a purchase order.  Vol. 2 at 230.

34.    Approximately 85 percent of the Thai Producer's cookware is made of aluminum, which it purchased from Meyer Aluminum Thailand Limited in Thailand and Alann in the PRC. Approximately thirty percent of the aluminum purchased from Thailand.  Vol. 2 at 234-35, 281.

35.    With respect to steel cookware, the Thai Producer purchased the steel from non-Meyer-related companies in Thailand and Japan.  Vol. 2 at 281-82

36.    The Thai Producer's factory has produced between 75,000 and 100,000 pots a day, and is the largest cookware manufacturer in Thailand.  Vol. 2 at 234-35.

37.    In addition to cookware, the Thai Producer also produces boxes, knobs, handles, and other non-cookware items, which go with the cookware or are sold to Meyer Thailand Limited. These items are purchased from non-Meyer-related companies in Thailand, the United States, Taiwan, the PRC, and Australia.  Vol. 2 at 243-255.

38.    The general manager of the Thai Producer is Joseph Lau.  Vol. 2 at 267.

39.    Joseph Lau is also the general manager at Meyer Macau and Meyer Hong Kong.  Vol 3 at 384:4-25.

40.     During the years 2010 and 2011, the Thai Producer sold approximately $5,000,000 worth of cookware to Myrex Thailand Limited, which constituted about 2 percent of its sales.  Vol 2 at

41.     Myrex Thailand Limited is a related party to Meyer, the Thai Producer, Meyer Macau, and within the meaning of 19 U.S.C. § 1401a(g)1)(F).  Pl. Ex. 152.

42.     Meyer Macau solicits business as a trading interface between customers and factories with respect to cookware, including pots and pans.  Vol. 3 at 319-20.

43.     Meyer Macau acts as a middleman for the China Producer.  Vol. 3 at 320:6-14.

44.     When a customer requests a cookware product, Ms. Lau of Meyer Macau determines whether the Thai Producer or the China Producer has the tooling to manufacture the items.  Vol. 3 at 320:15-24.

45.     If only the China Producer has the tooling, Ms. Lau assigns the order to Meyer Hong Kong, which has all the order for the China Producer.  Vol. 3 at 320:22-24.

46.     Meyer Macau, not Meyer Hong Kong, negotiates prices with the China Producer.  Vol. 3 at 324:, 342:

47.     Ms. Lau of Meyer Macau negotiates prices with the China Producer and takes customers to it.  Vol. 3 at 323, 324, 342, 351.

48.     Ms. Lau has no employment relationship with Meyer Hong Kong.  Vol. 3 at 357.

49.     Ms. Lau of Meyer Macau negotiates with Meyer for orders placed with the China Producer.  Vol 3 at 341, 352, 391.

50.     Ms. Lau of Meyer Macau decides whether the Thai Producer or the China Producer is more capable of fulfilling a cookware order.  Vol. 3 at 321:6-23.

51.     For business sent to the United States, Ms. Lau testified that Meyer Macau's major competitors are Calphalon, T-Fal, Tramotina, Cuisinart, Pioneer Woman at Wal-Mart and Chrissy Teigen at Target.  Vol. 3 at 342:20-343:4.

52.     Ms. Lau testified that in negotiating prices with the Thai Producer and with Meyer, Meyer Macau must take into consideration what its competitors are doing in the marketplace, i.e., the United States, in order not to lose business.  Vol. 3 at 344:8-17.

53.     Meyer Macau goes to the factories to obtain price quotes. Vol. 3 at 350-351.

54.     The China Producer and Meyer Hong Kong do not reach a price independently for cookware.  Vol. 3 at 390:9-24; 391:17-392:9.

55.     Meyer Hong Kong does not do pricing agreements with Meyer. Vol. 3 at 390:20-22.

56.     Ms. Lau does not know what Meyer Hong Kong's role is in the process but, historically, it has operated as described above.  Vol 3 at 391:12-392:14.

57.     Ms. Lau believes documents reflecting the payment of royalties exist and that the percentage of a price associated with a royalty is disclosed by Meyer Macau if requested.  Vol. 3 at 392:15-393:19.

58.     Ms. Lau is unaware of any agreement between Meyer Macau and Meyer Hong Kong or Meyer Macau and the China Producer.  Vol. 3 at 393:20-394:2.

59.     Meyer Macau committed to contract requiring $100 million of orders to the Thai Producer because Meyer Macau is confident that it can obtain the business and it does not want the Thai Producer selling to everyone.  Vol. 3 at 394:11-23.

60.     Ms. Lau is unaware of a volume arrangement with the China Producer similar to the one in place with the Thai Producer.  Vol. 3 at 394:24-395:2.

61.     The China Producer does not often reject an order from Meyer Macau that the Thai Producer is unable to produce, although a very few times they raise an objection asking why can't the Thai Producer do the job.  Vol 3 at 395:3-12.

62.     Mr. Kam testified that the China Producer sells "work in progress" shells such as that reflected in Pl. Ex. 131F to Meyer Italy and from the Thai Producer.  Vol. 3 at 414:3-415:6.

63.     The China Producer sells to Meyer Hong Kong, Meyer Macau, Meyer Italy and MCN, the sales department of Meyer in China.  Vol. 3 at 415:10-19.

64.     Mr. Kam testified that he provides tours to Meyer Macau customers but recalls only Christina who handles Meyer Japan and Matthew from Meyer UK.  Vol. 3 at 418:4-21; 433:16-21.

65.     Mr. Kam did not know who did the marketing for the China Producer.  Vol. 3 at 454: 11-18.

66.     Mr. Kam testified that in his job responsibilities or at attendance in management meetings he gained knowledge of assistance from the Chinese government to the China Producer.  Vol. 3 at 461:4-13.

67.     The databases used by PWC to obtain information in order to select comparable companies for its benchmarking study are limited to information from publically-traded companies.  Vol. 4 at 682:10-18.

68.     Meyer, Meyer Macau, Meyer Hong Kong, the Thai Producer and the China Producer are not publically-traded companies.  Vol. 4 at 683:5-10.

69.    The entries at issue in this action, submitted by Meyer at trial, contain some or all of: entry summary (CBP Form 7501); entry/immediate delivery (CBP Form 3461); shipping documentation (arrival notice/invoice); tooling invoice; merchandise invoices between the middleman and Meyer, and the Thai or China producer and the middleman; packing lists from the middleman to Meyer, and the Thai or China producers to the middlemen; and bill of lading. Pl. Exs. 157-196, 377, 378.

70.    Plaintiff's Exhibit 157 contains a revised invoice from the Thai Producer to Meyer Macau reducing the unit price for sku no. 10417-T.  Pl. Ex. 157.

71.    Meyer Macau had 60 days to make payment to the Thai Producer.  See, e.g., Pl. Ex. 157 at MUS000953.

72.    Meyer had 20 days to make payment to Meyer Macau.  See, e.g., Pl. Ex. 157 at MUS000948.

73.    At trial, Meyer did not provide the Court with any purchase orders or any proofs of payment for any of the entries at issue.  See, e.g., Pl. Exs. 157-196, 377, 378 (entries at issue in this action).

74.    None of the documents submitted by Meyer at trial contain any purchase orders between the Thai Producer or the China Producer and Meyer Macau or Meyer Hong Kong.  See Pl. Exs. moved into evidence.

75.    None of the documents submitted by Meyer at trial contain any purchase orders between Meyer and Meyer Macau or Meyer Hong Kong.  See Pl. Exs. moved into evidence.

76.    None of the documents submitted by Meyer at trial contain proof of payment by Meyer of any invoices from Meyer Macau or Meyer Hong Kong.  See Pl. Exs. moved into evidence.

77.    None of the documents submitted by Meyer at trial contain proof of payment by Meyer Macau or Meyer Hong Kong of any invoices from the Thai Producer or the China Producer.  See Pl. Exs. moved into evidence.

78.    Mr. Pinkerton "believe[d]" that the screening criteria for comparables to the Thai Producer provided in the benchmarking study (Pl. Ex. 119) was over 100 million baht. Vol. 5 at 741:18-21.

79.     In the fourth quarter of 2011, the exchange rate between U.S. dollars and Thai baht was $1 equals 30 Thai baht.  See https://www.poundsterlinglive.com/bank-of-england-spot/historical-spot-exchange-rates/usd/USD-to-THB-2011.

80.    Converting 100 million Thai baht to U.S. dollars results in an amount of approximately $3,333,333.  See https://www.poundsterlinglive.com/bank-of-england-spot/historical-spot-exchange-rates/usd/USD-to-THB-2011.

81.    The Thai Producer had a contract in place with Meyer Macau that guaranteed a minimum of $10,000,000 worth of business each year.  Pl. Ex. 123 at MUS010361-362.

82.    Whether a company sold pots and pans to the United States was not a part of the screening criteria for benchmarking comparables.  Vol. 5 at 742:9-13.

83.    Mr. Pinkerton did not know whether one of the screening criteria for benchmarking comparables was whether a company sold pots and pans globally, but he did not think so.  Vol. 5 at 742:14-20.

84.    Mr. Pinkerton did not believe that the volume of production was considered in the quantitative screening for benchmarking study.  Vol. 5 at 740:7-9.

85.    In selecting comparable companies, PWC does not consider the volume of production.  Vol. 5 at 740.

86.    In selecting comparable companies, PWC does not know if the databases it uses contain audited financial information.  Vol. 5 at 733.

87.    In selecting comparable companies, PWC does not consider whether those companies sell to the United States.  Vol. 5 at 742.

88.    In selecting comparable companies, PWC does not consider whether those companies sell globally.  Vol. 5 at 742.

89.    In selecting comparable companies, PWC did not consider whether the companies are transacting in a three-tier structure, nor did PWC do any research to obtain that information.  Vol. 5 at 743.

90.    PWC did not know whether any of the companies it identified as comparable are subject to volume contracts similar to those in place for MIL and MZQ.  Vol. 5 at 745-746.

91.    Mr. Pinkerton testified that for Chinese companies the information in the databases is not detailed or accurate.  Vol.4 at 690.

92.    The databases used by PWC to locate comparable companies contain public companies.  Vol. 4 at 682.

93.    Mr. Pinkerton testified that he did not believe the Meyer companies are publically traded.  Vol. 4 at 683.

94.    When asked to identify the Thai Producer's competitors, Mr. Kwok identified the companies that manufacture Zebra and Seagull brand cookware.  Vol. 1 at 180.

95.    Mr. Kwok testified that he did not believe the Thai Producer's competitors' market share in the United States would be much.  Vol. 2 at 270.

96.    Mr. Kwok testified that he did not know from where these competitors purchased raw materials.  Vol. 2 at 271.

97.    Mr. Kwok testified that he did not know if the Thai Producer's competitors were part of an organizational structure similar to that of Meyer.  Vol. 2 at 271-272.

98.    Zebra does not sell to the U.S.  Vol. 3 at 405.

100.    The PWC studies did not factor in statutory additions.  Vol. 4 at 662-663.

101.    The PWC benchmarking study for manufacturers in Thailand states that the "markup on total services cost (operating income/total cost)" ranged from -9.4 percent to 12.9 percent in 2011 and from -14.7 percent to 14 percent in 2012.  Pl. Ex. 119 at MUS045253.

102.    The PWC benchmarking study for manufacturers in China indicated that the "markup on total services cost (operating income/total cost)" ranged from -10.5% to 10.5% in 2011 and from -17.3% to 3.2% in 2012.  Pl. Ex. 125 at MUS045255.

### ii.    *All costs plus a profit equivalent to the firm's overall profit*

1.    "To substantiate an all costs plus profit claim, the importer should be prepared to provide records and documents of comprehensive product related costs and profit, such as financial statements, accounting records including general ledger account activity, bills of materials, inventory records, labor and overhead records, relevant selling, general and administrative expense records, and other supporting business records."  Def. Ex. 15 at 9.

2.    At trial, Meyer presented no financial statements of Meyer Holdings.  See Pl.'s Exs. moved into evidence.

3.    Over half of the first-line, non-dormant entities for which Meyer Holdings owns all or a large portion of shares are in the cookware industry.  *See* Pl. Ex. 152; Section IV at ¶19.

4.    At trial, Meyer presented no financial statements of any of its related companies (see Pl. Ex. 152) that manufacture or sell cookware, including the Thai Producer, the China Producer, Meyer Macau or Meyer Hong Kong.  *See* Pl.'s Exs. moved into evidence.

5.    At trial, Meyer did not present its financial statements.  *See* Pl.'s Exs. moved into evidence.

6.    Meyer Hong Kong is a parent company of the China Producer.  Pl. Ex. 152.

7.    Mr. Kwok testified that the Thai Producer attempts to achieve a profit of 3 percent.  Vol. 1 at 176:

8.    Mr. Kam testified that the China Producer attempts to achieve a profit of 3 to 5 percent. Vol. 3 at 420.

9.    The benchmarking analysis of comparable manufacturers prepared by PWC (the benchmarking analysis), objected to by the Government (see section V above), states that the China Producer's profit for 2011 was 1.65 percent (OPM or operating profit margin)  or 1.60 percent (FCM or full cost markup).  Pl. Ex. 119 at MUS045255.

10.    Mr. Kam testified that he did not know the China Producer's profit for 2011.  Vol. 3 at 454:

11.    The benchmarking analysis, objected to by the Government (see section V above), states that the Thai Producer's profit for 2011 was 2.95 percent (OPM) or 3.01 percent (FCM).  Pl. Ex. 119 at MUS045253.

12.    The Thai Producer does not sell to unrelated companies.  Vol. 1 at 159, Vol. 2 at 225.

13.    The China Producer does not sell to unrelated companies.  Vol. 2 at 415.

14.    There are over 100 products at issue in this action that are imported from Thailand.  See Pl. Exs. 157-196, 377, 378.

15.    There are over 32 products at issue in this action that are imported from the PRC.  See Pl. Exs. 157-196.

16.    Meyer has not provided any cost or profit information or cost or profit analysis for the products in this case imported from the PRC, other than the two products identified in the PWC report (71892-C and 82365-C).  Pl. Ex. 125 at 26.

17.    Meyer has not provided any profit information or analysis for the products in this case imported from Thailand other than that contained in GSP summaries, see Pl. Exs. 154, 155, 156, 379, and 380, to which the Government has objected.

18.    Both the Thai Producer and the China Producer are "limited risk manufacturers."  Vol. 5 at 753:16-18.

19.    Limited risk means that the Thai Producer and the China Producer "don't have risk, they don't carry capital risk, they don't carry exchange risk, which is why they get compensated on the low profit margin."  Vol. 5 at 753:20-23.

20.    Ms. Brenner testified that Customs has issued an Informed Compliance Publication (Def. Ex. 15) that provides information to importers concerning using transaction value for related party transactions.  Vol. 5 at 873:20-874:16.

21.    Ms. Brenner testified that for the "costs plus" test Customs considers the "firm" to usually be the parent.  Vol. 5 at  875:9-876:3.

22.     If a parent does not satisfy the terms of the "costs plus" test, Customs has on occasion used other information, such as another subsidiary in a company that really dominant and selling a lot that provides a good comparison and could be considered the "firm."  Vol. 5 at 876:10-878:12.